### UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| STANLEY LIGAS, by his sister and next friend, Gina Foster; DAVID CICARELLI, by his guardians James and Julianne Cicarelli; ISAIAH FAIR, by his guardian, Lutricia Fair; JAMIE McELROY, by his guardian, Patricia McElroy; and JENNIFER WILSON, by her guardians, Nancy and Richard Wilson, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 05-4331 |
| vs. | ) ) | CLASS ACTION |
| BARRY S. MARAM, in his official capacity as Director of the Illinois Department of Healthcare and Family Services, and CAROL L. ADAMS, in her official capacity as Secretary of the Illinois Department of Human Services, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## SECOND AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF[1]

## INTRODUCTION

1.     Plaintiffs are individuals with mental retardation and other developmental

disabilities who qualify for services under Defendants' system of long-term care for people with

developmental disabilities, including Medicaid services. They bring this action against state

officials who administer Illinois' program for providing such services for people with

developmental disabilities. Plaintiffs seek redress for Defendants' practice of requiring them to

reside in privately-run congregate care facilities -- known as intermediate care facilities for

people with developmental disabilities or "ICF-DDs" -- as a condition of receiving the long-term

---

[1] On August 28, 2009, Defendants stated in writing that they do not object to the filing of the Second Amended Complaint and, accordingly, Plaintiffs may amend their complaint pursuant to Fed. R. Civ. Proc. Rule 15(a)(2).

care services they need and for which they qualify, contrary to their expressed preferences to reside in more integrated community settings (including their own home, their family home, or a community or other small residential arrangement providing necessary care and services), and in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("Title II"); Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) ("Section 504"); Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Title XIX") and 42 U.S.C. § 1983. Plaintiffs bring this action on their own behalf and on behalf of others similarly situated.

2.      Like all human beings, Plaintiffs need "family relations, social contacts, work options, economic independence, educational advancement and cultural enrichment." *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999). For many individuals with developmental disabilities -- including the named Plaintiffs and Class members -- these needs can best be met in settings that integrate these individuals into the community and enable them to interact with nondisabled persons to the fullest extent possible.

3.      Defendants administer and regulate a system for serving people with developmental disabilities that relies heavily on large public and private institutions, including private ICF-DDs. This system defies the national trend of serving people with developmental disabilities in less restrictive, community settings. Illinois ranks 51st among all states and the District of Columbia in its placement of people with developmental disabilities in small Community Settings.

4.      Further, Defendants do not have a comprehensive, effectively working plan for moving persons into the community who are, or who are at risk of being, unnecessarily institutionalized against their will. Defendants maintain no waiting list for community services; Defendants advise those people who seek community services that they can only obtain them in

an "emergency" situation (which is not defined in any pertinent law or regulation); and Defendants otherwise act arbitrarily in administering developmental disability services.

5.     By effectively requiring the unjustified institutionalization of Plaintiffs as a condition of receiving placement in community settings, Defendants have caused Plaintiffs to experience unnecessary segregation.  This segregation "perpetuates unwarranted assumptions" that Plaintiffs "are incapable or unworthy of participating in community life." *Olmstead*, 527 U.S. at 600.

6.     The "integration mandates" of Title II and Section 504 (implemented by 28 C.F.R. § 35.130(d) and 28 C.F.R. § 41.51(d)) require that state government services, programs and activities be provided in the most integrated setting appropriate to the needs of the person with a disability.  The Supreme Court of the United States affirmed these mandates in *Olmstead*, finding that "unjustified institutional isolation of persons with disabilities is a form of discrimination."  527 U.S. at 600.  Defendants have defied this mandate by failing to develop a comprehensive, effectively working plan to offer developmentally disabled individuals services in the most integrated setting appropriate to their needs.

7.     In addition, Defendants' actions violate Title XIX's requirements that Defendants: (1) offer persons with developmental disabilities who are Medicaid-eligible a choice between institutional and community services, and inform them of "feasible alternatives" under the Home and Community Based Services Waiver, which funds some community services in Illinois, see 42 U.S.C. § 1396n(c)(2)(C); (2) ensure that community services are provided with "reasonable promptness," 42 U.S.C. § 1396a(a)(8); and (3) ensure that ICF-DDs are not unnecessarily utilized, through the use of effective assessments to determine whether persons desirous of

community settings could be served in such settings. *See* 42 U.S.C. §§ 1396a(a)(30)(A) & (B); 42 C.F.R. §§ 456.370-371.

8.    Plaintiffs seek to enforce their legal rights to receive services in community settings.

## JURISDICTION AND VENUE

9.    This is an action for declaratory and injunctive relief to enforce the rights of the Plaintiffs and the class they seek to represent under the Americans with Disabilities Act, 42 U.S.C. § 12132, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, 1396a-1396v, and 42 U.S.C. § 1983.

10.    Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b).

11.    Declaratory relief is authorized by 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by 28 U.S.C. § 2202 and Rule 65 of the Federal Rules of Civil Procedure.

## THE PARTIES

### Defendants

12.    Defendants are sued in their official capacities. They are: the Director of the Illinois Department of Healthcare and Family Services, Barry S. Maram, or his duly appointed successor, and the Secretary of the Illinois Department of Human Services, Carol L. Adams, or her duly appointed successor.

13.    Barry S. Maram is the Director of the Illinois Department of Healthcare and Family Services ("DHFS"), which is the single state Medicaid agency for Illinois, responsible for the oversight and administration of the Medicaid program under Title XIX of the Social Security Act, including programs for persons with developmental disabilities. *See* 42 U.S.C.

§ 1396a(a)(5). In this capacity, Mr. Maram administers and funds services provided under the Medicaid Home and Community-Based Services Waiver Program for Adults with Developmental Disabilities pursuant to 42 C.F.R. § 430.25(c)(2). Mr. Maram is responsible for ensuring that the Waiver Program as administered in the State of Illinois complies with federal law.

14. Carol L. Adams is the Secretary of the Illinois Department of Human Services ("DHS"), which, through its Division of Developmental Disabilities ("DDD"), is responsible for providing comprehensive services to people with developmental disabilities in Illinois, to help them achieve self-sufficiency, independence and health to the maximum extent possible. DHS and DDD oversee Illinois' private ICF-DDs, Community Integrated Living Arrangements ("CILAs"), and in conjunction with DHFS, approve Medicaid payments for individuals with developmental disabilities. Ms. Adams is also responsible for administering the State of Illinois' preadmission screening ("PAS") process, through which the State determines whether a person with developmental disabilities is eligible for institutional or community services. DHS performs these screenings through local PAS agencies. There are 17 such agencies in the State, staffed by qualified mental retardation professionals. Ms. Adams is also responsible for ensuring compliance with state and federal laws that govern the provision of services to people with developmental disabilities, including the ADA and Section 504.

### The Named Plaintiffs

#### Stanley Ligas

15. Stanley Ligas is diagnosed with Down Syndrome, a developmental disability under 42 C.F.R. § 1009 and 405 ILCS § 5/1-106. He is eligible for Medicaid services.

16. Since 1994, Mr. Ligas has been a resident at Sheltered Village, a 96-bed ICF-DD in Woodstock, Illinois.

17.     Mr. Ligas is able to make decisions on his own behalf, with support from his siblings.

18.     Mr. Ligas has repeatedly expressed a strong desire to reside in a community setting located in close proximity to one of his siblings.

19.     Mr. Ligas' Interdisciplinary Team at Sheltered Village identified his readiness to move to a community setting at his annual service plan meeting in 2004.

20.     Sheltered Village informed Mr. Ligas' state-appointed PAS agency that Mr. Ligas could handle and benefit from placement in a community setting.  Despite this recommendation, Mr. Ligas remains at Sheltered Village.

21.     A community setting is the most integrated setting appropriate to Mr. Ligas' needs.

22.     Stanley Ligas is eligible for and would benefit from residing in a community setting.

23.     In 2004, Illinois refused to provide Stanley Ligas with placement in a community setting.

24.     Illinois has not given Stanley Ligas any indication of whether or when he could expect to receive placement in a community setting.

25.     Stanley Ligas continues to be unnecessarily institutionalized at Sheltered Village, a setting that is not the most integrated setting appropriate to his needs.

26.     Illinois has denied Stanley Ligas access to placement in a community setting and requires that he continue to be confined in a segregated institution in order to receive placement and services.

**David Cicarelli**

27.     David Cicarelli is diagnosed with moderate mental retardation, a developmental disability under 42 C.F.R. § 435.1009 and 405 ILCS § 5/1-106.  He is eligible for Medicaid services.

28.     Since 1997, David Cicarelli has been a resident at Riverside Foundation, a 96-bed ICF-DD in Lincolnshire, Illinois.

29.     David Cicarelli wants to live in a community setting.

30.     David Cicarelli's parents, James and Julianne Cicarelli, are his legal guardians, and they want him to live in a community setting.

31.     A community setting is the most integrated setting appropriate to David Cicarelli's needs.

32.     David Cicarelli is eligible for and would benefit from residing in a community setting.

33.     In 2001, Mrs. Cicarelli asked David's PAS agency, Community Alternatives Unlimited, to attempt to obtain placement in a community setting for David Cicarelli.  In 2002, the PAS agency terminated its case management services because of its inability to obtain funding from the State for David to live in a community setting.

34.     Illinois has not offered David Cicarelli placement in a community setting.

35.     Illinois refuses to provide David Cicarelli with placement in a community setting.

36.     Illinois has not given David Cicarelli any indication of whether or when he could expect to receive placement in a community setting.

37.     David Cicarelli continues to be unnecessarily institutionalized at Riverside, a setting that is not the most integrated setting appropriate to his needs.

38.     Illinois has denied David Cicarelli access to placement in a community setting and requires that he continue to be confined in a segregated institution in order to receive placement and services.

**Isaiah Fair**

39.     Isaiah Fair is diagnosed as having moderate mental retardation and epilepsy, which are developmental disabilities under 42 C.F.R § 435.1009 and 405 ILCS § 5/1-106.  Mr. Fair is eligible for Medicaid services.

40.     Isaiah Fair currently resides at home with his mother, Lutricia Fair, who is his legal guardian.

41.     Isaiah Fair would like to live in a community setting.

42.     Lutricia Fair would like for her son, Isaiah Fair, to live in a community setting.

43.     A community setting is the most integrated setting appropriate to Isaiah Fair's needs.

44.     Isaiah Fair is eligible for and would benefit from residing in a community setting.

45.     In May 2000, Isaiah Fair was placed in Matteson Court, a 16-bed ICF-DD in Matteson, Illinois.

46.     In May 2002, Lutricia Fair requested that Isaiah Fair's PAS agent, Suburban Access, seek placement for Isaiah Fair in a community setting.  At that time, no such placement was offered.

47.     In May 2003, Mr. Fair had a severe seizure at Matteson Court.  Staff refused to call 911.  Ms. Fair was present and called 911 from her cellular telephone.  In response to this incident, Ms. Fair filed a complaint with the Illinois Department of Public Health ("IDPH") on her son's behalf.  The IDPH determined that the ICF-DD committed medical neglect.  As a result, Ms. Fair removed her son from Matteson Court.

48.    In June 2003, Lutricia Fair again requested that Suburban Access find a placement for Isaiah Fair in a community setting.

49.    Suburban Access evaluated Isaiah Fair and deemed him qualified and eligible for placement in a community setting.

50.    Suburban Access applied for numerous community setting placements for Isaiah Fair.  Illinois refused to provide community services to Isaiah Fair on the grounds that he no longer was in an "emergency" situation since he was residing at home.  Instead, DHS suggested a large ICF-DD or state-operated developmental center, which Ms. Fair refused.  Suburban Access, as state-assigned PAS agent for Mr. Fair, explained to Ms. Fair that the only way her son could have qualified for a community setting under existing DHS standards would be if she had left him in the life-threatening situation at Matteson Court, thereby creating an "emergency."

51.    Isaiah Fair currently lives at home, without necessary supports and services, to avoid the more restrictive environment of an institution.

52.    Illinois refuses to provide Isaiah Fair with placement in a community setting.

53.    Illinois has not given Isaiah Fair any indication of whether or when he could expect to receive placement in a community setting.

54.    Because Ms. Fair must care for her son, she is unable to work and supports her son with her limited savings.  Mr. Fair will not be able to continue to live with his mother and will need out-of-home care.  Ms. Fair has significant health problems.

55.    Isaiah Fair is at risk of institutionalization within the next year.

56.    Illinois has denied Isaiah Fair placement in a community setting and will only provide placement and services through confinement in an institution.

**Jamie McElroy**

57.     Jamie McElroy is diagnosed with moderate mental retardation, a developmental disability under 42 C.F.R. § 435.1009 and 405 ILCS § 5/1-106.  He is eligible for Medicaid services.

58.     Mr. McElroy currently resides at home with his mother, Patricia McElroy, who is his legal guardian.

59.     Jamie McElroy would like to live in a community setting.

60.     Patricia McElroy would like for her son to live in a community setting.

61.     A community setting is the most integrated setting appropriate to Jamie McElroy's needs.

62.     Jamie McElroy is eligible and would benefit from residing in a community setting.

63.     In 2002, a provider offered Jamie McElroy placement in a community setting.

64.     Jamie McElroy's PAS agency**,** Central Illinois Services Access, evaluated Jamie McElroy and determined that he was qualified and eligible for placement in this community setting.  The PAS agent requested funding from DHS for a community setting.

65.     In 2004, Illinois denied Jamie McElroy funding for the community setting and advised that the only "currently funded options" were in institutions.

66.     Jamie McElroy currently lives at home, without necessary supports and services, to avoid the more restrictive environment of an institution.

67.     Jamie McElroy is at risk of institutionalization within the next year.

68.     Illinois refuses to provide Jamie McElroy with placement in a community setting.

69.     Illinois has not given Jamie McElroy any indication of whether or when he could expect to receive placement in a community setting.

70.    Illinois has denied Jamie McElroy placement in a community setting and will only provide placement and services through confinement in an institution.

**Jennifer Wilson**

71.    Jennifer Wilson has moderate mental retardation, cerebral palsy and epilepsy, which are developmental disabilities under 42 C.F.R. § 435.1009 and 405 ILCS § 5/1-106. Jennifer Wilson is eligible for Medicaid services.

72.    Ms. Wilson currently resides at home with her parents, Nancy and Richard Wilson, who are her legal guardians.

73.    Jennifer Wilson would like to live in a community setting.

74.    Nancy and Richard Wilson would like their daughter to live in a community setting.

75.    A community setting is the most integrated setting appropriate to Jennifer Wilson's needs.

76.    Jennifer Wilson is eligible for and would benefit from residing in a community setting.

77.    Jennifer Wilson's PAS agency, Central Illinois Service Access, evaluated her and determined that she was qualified and eligible for placement in a community setting.

78.    In 2004, Jennifer Wilson's PAS agency requested funding from DHS for placement in a community setting for Ms. Wilson.  Illinois denied Jennifer Wilson funding for the program in a community setting.  Instead, Illinois offered Ms. Wilson placement in an ICF-DD.

79.    A provider offered Jennifer Wilson placement in a community setting.

80. Jennifer Wilson currently lives at home, without necessary supports and services, to avoid the more restrictive environment of an institution. Nancy Wilson, Jennifer's mother, left her employment to care for Jennifer. Mrs. Wilson has significant back problems.

81. Jennifer Wilson is at risk of institutionalization in the next year.

82. Illinois refuses to provide Jennifer Wilson with placement in a community setting.

83. Illinois has not given Jennifer Wilson any indication of whether or when she could expect to receive placement in a community setting.

84. DHS has denied Ms. Wilson placement in a community setting and will only provide placement and services through confinement in an institution.

## CLASS ACTION ALLEGATIONS

85. The named Plaintiffs bring this action as a class action pursuant to Rule 23, sections (a) and (b)(2), of the Federal Rules of Civil Procedure.

86. The named Plaintiffs seek to represent two sub-classes of individuals (collectively, the "Class"): (1) ICF-DD residents who have requested community placements; and (2) individuals who are at risk of institutionalization and who have requested community-based services or placements.

87. The first proposed sub-class of individuals -- "ICF-DD Residents Who Have Requested Community Placements" -- consists of adult individuals in Illinois who:

    (1)    have mental retardation and/or other developmental disabilities within the meaning of the ADA, 42 U.S.C. § 12131(2) and the Rehabilitation Act, 29 U.S.C. § 794(a), and who qualify for Medicaid services;

    (2)    reside in a private ICF-DDs with nine or more residents; and

    (3)    for whom Defendants (including Defendants' agencies, employees, contractors and agents, and those acting in concert with them) have a record reflecting that the individual has affirmatively indicated that he or she seeks to receive services in a community setting.

88.    The second proposed sub-class -- "Individuals At Risk of Institutionalization Who Have Requested Community Placements" -- consists of adult individuals in Illinois who:

    (1)    have mental retardation and/or other developmental disabilities within the meaning of the ADA, 42 U.S.C. § 12131(2) and the Rehabilitation Act, 29 U.S.C. § 794(a), and who qualify for Medicaid services;

    (2)    are living in a home-based setting and are at risk of institutionalization because Defendants have determined that the individual is either (i) at imminent risk of abuse, neglect or homelessness or (ii) likely (without interventions) to be at imminent risk of abuse, neglect or homelessness within a year; and

    (3)    for whom Defendants (including Defendants' agencies, employees, contractors and agents, and those acting in concert with them) have a record reflecting that the individual has affirmatively indicated that he or she seeks to receive services in a community setting.

89.     The Class is so numerous that joinder of all plaintiffs is impracticable.  The exact number of individuals in the Class is not known to the Plaintiffs, but is believed to number in the thousands.  Defendants have previously acknowledged that just through its Prioritization of Urgency of Need for Services (PUNS) database, at least 320 current ICF-DD residents and more than 4,000 individuals with disabilities who live at home have expressed a desire for placement in community settings.

90.     The claims of the named Plaintiffs are common to those of the Class and raise common issues of fact and law, including, among others:  whether Defendants are providing services to individuals with developmental disabilities in the most integrated setting appropriate to their needs and expressed desires; whether Defendants have a comprehensive, effectively working plan for achieving that goal; whether Defendants administer a waiting list for community settings that moves at a reasonable pace; whether Defendants adequately determine whether placements in community settings are appropriate to the needs of individuals with developmental disabilities who seek and desire them; and whether Defendants violate Title XIX of the Social Security Act, the Americans with Disabilities Act and Section 504 of the Rehabilitation Act by failing to provide qualified individuals with services in community settings.

91.     The rights and interests of the named Plaintiffs are common to and typical of those of all Class members.  They share the same rights to integrated and community-based programs and services and nondiscriminatory placement.

92.     The named Plaintiffs will fairly and adequately protect the interests of the Class because they suffer from deprivations identical to those of the Class members and have been denied the same federal rights that they seek to enforce on behalf of the other Class members,

- 14 -

many of whom are unable to pursue claims on their own behalf as a result of their disabilities, their limited financial resources, and/or the actions of the Defendants to deprive them of their rights. Named Plaintiffs' interests in obtaining injunctive relief for the violations of their legal rights and privileges are consistent with and not antagonistic to those of any person within the Class. Furthermore, Plaintiffs' counsel has extensive experience in the areas of class action litigation and civil rights laws concerning people with disabilities.

93. Defendants have acted or refused to act on grounds generally applicable to all members of the Class by unnecessarily segregating Class members. Therefore, declaratory and injunctive relief with respect to the entire Class is appropriate.

## STATEMENT OF THE CASE

### The Integration Mandates of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act

94. In 1990, Congress enacted the Americans with Disabilities Act, 42 U.S.C. §§ 12101 - 12181, to advance the civil rights of people with disabilities.

95. The ADA's purpose and goal is "the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

96. In enacting the ADA, Congress stated that "historically, society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination "continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

97. Congress further determined that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic sufficiency for such individuals." 42 U.S.C. § 12101(a)(8).

98. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, *or be subjected to discrimination* by any such entity." 42 U.S.C. § 12132 (emphasis added).

99. Discrimination under Title II of the ADA includes unnecessary segregation and institutionalization. As the Supreme Court stated in *Olmstead v. L.C.*, 527 U.S. 581 (1999), "unjustified institutional isolation of persons with disabilities is a form of discrimination" because "[i]n order to receive needed medical services, persons with [] disabilities must, because of those disabilities, relinquish participation in community life …" *Id.* at 600-01.

100. The regulations to the ADA codify the prohibition against unnecessary segregation and institutionalization. 28 C.F.R. § 35.130(d) ("A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities"). Section 504 has an identical mandate. 28 C.F.R. § 41.51(d) ("Recipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons").

101. Furthermore, the ADA prohibits public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination, which includes unnecessary institutionalization. 28 C.F.R. § 35.130(b)(3). Section 504 has an identical mandate. 45 C.F.R. § 84.4(b)(4); 28 C.F.R. § 41.51(b)(3).

### The Illinois Medicaid Program for Persons with Developmental Disabilities

#### A. Illinois' Participation in Medicaid

102. Medicaid is a joint federal-state program through which the federal government reimburses a portion of expenses incurred by states to furnish health care services to low-income people, including services to persons with developmental disabilities.

103. States are not required to participate in the Medicaid program, but if they do, they must comply with the requirements of Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 -

1396v. Every state that elects to participate must submit a plan to the United States Department of Health and Human Services that provides "such safeguards as may be necessary to assure that . . . care and services will be provided . . . in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

104.    This plan must contain "reasonable standards" to achieve the objectives and requirements of Title XIX. 42 U.S.C. § 1396a(a)(17).

105.    One of Title XIX's primary objectives is "to help such families and individuals attain or retain capability for independence or self-care …" 42 U.S.C. § 1396.

106.    Certain services under Title XIX are "mandatory" and must be provided to all eligible individuals. 42 U.S.C. § 1396a(a)(10)(A) (incorporating 42 U.S.C. §§ 1396d(a)(1-5), (17), (21)). States may additionally provide "optional" services, including ICF-DD (referred to as "intermediate care facility for the mentally retarded [ICF/MR]" in Title XIX). *Id.* § 1396d(a)(15).

107.    Once a state elects to provide an optional service, that service becomes part of the state's Medicaid plan and is subject to all requirements of Title XIX. *Id.* § 1396a(a)(1).

108.    Illinois participates in Medicaid and its plan, approved by the United States Department of Health and Human Services, includes ICF-DD services.

**B.    Medicaid Home and Community Based Services Waivers**

109.    Title XIX also allows states to "waive" certain Medicaid requirements in order to enable people with disabilities to receive services in integrated community settings as opposed to institutions. 42 U.S.C. § 1396n(c). These are known as "Medicaid Home and Community Based Services waivers" ("HCBS waiver"); 42 C.F.R. § 441.300. States can receive Medicaid reimbursement for waiver services up to the average per capita cost of institutional care, including the cost of care in an ICF-DD. 42 U.S.C. § 1396n(c)(2)(D).

110.    Illinois has an HCBS waiver for people with developmental disabilities.  This waiver allows some people who would otherwise be institutionalized to receive services in integrated community settings, including their own home, their family home, or a community or other small residential arrangement providing necessary care and services.

111.    An ICF-DD with nine or more sleeping beds is not a community setting.  ICF-DDs do not qualify as community settings under the Illinois Community Integrated Living Arrangement Licensure Act ("Act"), 210 ILCS § 135.  The Act defines community-integrated living arrangement ("CILA") as a "living arrangement certified by a community mental health or developmental services agency under this Act where 8 or fewer recipients with [] a developmental disability [] reside under the supervision of the agency."  210 ILCS § 135/3(d). CILAs are "intended to promote independence in daily living and economic self-sufficiency." 210 ILCS § 135/2.  CILAs "shall be located so as to enable residents to participate in and be integrated into their community or neighborhood." 210 ILCS § 135/10.

112.    Although states must apply for a specific number of slots for their HCBS waiver programs, there is no limit on how many slots a state may apply for.  Illinois has only 14,000 waiver slots.  Illinois ranks 47th among the states in waiver use per capita.

113.    Historically, the federal government encourages states to apply for waiver slots. A state is not absolved from complying with the integration mandates under the ADA, Section 504 and Title XIX simply because it failed to apply for more waiver slots.  Since the *Olmstead* decision, the federal government has encouraged and provided financial incentives to states to transfer people from institutions to the community.

### C. Title XIX's Requirements

114.    Title XIX requires that individuals eligible for an ICF-DD level of care be given the opportunity to choose alternatives to institutional care, and that such individuals be afforded their choice of placement options and services.  42 U.S.C. § 1396n(c)(2)(C).

115.    Title XIX additionally requires states to "provide that all individuals wishing to make an application for medical assistance under the plan shall have the opportunity to do so, and that such assistance *shall be furnished with reasonable promptness* to all eligible individuals."  42 U.S.C. § 1396a(a)(8) (emphasis added).

116.    Title XIX requires states to ensure against "unnecessary utilization" of ICF-DD services, 42 U.S.C. § 1396a(a)(30)(A).  Title XIX ensures that residents are screened and assessed prior to admission to determine whether their needs can be met in community settings. 42 U.S.C. § 1396a(a)(30)(B); 42 C.F.R. §§ 456.370-71.

### D. Defendants' Unnecessary Segregation of Certain People with Developmental Disabilities in ICF-DDs

117.    In Illinois, approximately 6,000 people live in 246 private ICF-DDs with nine or more people, with some facilities housing hundreds of people.  As state officials have acknowledged, these ICF-DDs do not qualify as community settings.

118.    Many ICF-DD residents who could handle and benefit from living in community settings with appropriate supports and services have affirmatively indicated to Defendants (including Defendants' agencies, employees, contractors and agents, and those acting in concert with them) that they wish to receive long-term care services in a community setting.  For most, if not all, of these individuals, segregation in ICF-DDs is unnecessary.  Rather, the community is the most integrated setting appropriate to their needs, but Defendants have not provided

sufficient community alternatives or provided any indication of when such alternatives might become available.

119. Many persons with developmental disabilities who are eligible for Medicaid services currently live at home with parents or other family members but are in danger of institutionalization because he or she is at imminent risk of abuse, neglect or homelessness, or has not reached that stage of crisis yet, but, without interventions, is likely to within one year. Many of these individuals have affirmatively indicated to Defendants (including Defendants' agencies, employees, contractors and agents, and those acting in concert with them) that they wish to receive long-term care services in a community setting, but Defendants have not provided sufficient community alternatives or provided any indication of when such alternatives might become available.

120. Defendants do not provide Plaintiffs or Class members the choice between receiving services in an institutional or community setting.

121. Defendants do not systematically evaluate persons already residing in ICF-DDs who have expressed an interest in receiving services in a more integrated or community setting to ascertain if they could handle and benefit from such settings.

122. Defendants also deny community-based services to persons already evaluated and determined able to handle and benefit from living in the community or other integrated setting.

123. Defendants do not maintain a waiting list for community-based services. Defendants allocate community residential services in an arbitrary and capricious fashion, often ignoring the recommendations of the PAS agencies, the requirements of the State's own Medicaid Plan, and federal law.

124.     By arbitrarily denying placement in community settings, Defendants have caused substantial, irreparable harm and prejudice to Plaintiffs, as well as all similarly situated Class members, including the unnecessary institutionalization or risk thereof, segregation, loss of life skills, loss of opportunities to develop to their fullest potential, and aggravation of their physical, mental, and emotional conditions.

## LEGAL CLAIMS

## COUNT I:  VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

125.     Plaintiffs reallege paragraphs 1 through 124 as though fully set forth herein.

126.     Plaintiffs and the members of the Class are qualified individuals with disabilities within the meaning of the ADA, 42 U.S.C. § 12131(2).

127.     Title II of the ADA requires that "a public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d)

128.     Regulations implementing Title II of the ADA provide that "a public entity may not, directly or through contractual or other arrangements, utilize criteria or other methods of administration:  (i) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities …"  28 C.F.R. § 35.130(b)(3).

129.     Defendants have systematically failed, and continue to fail, to evaluate many of the named Plaintiffs and Class members to ascertain whether they could handle and benefit from, and fail to place or provide services to such persons in, community-based or other more integrated settings appropriate to meet their needs.  ICF-DDs do not qualify as community settings.

130.    Defendants have discriminated, and continue to discriminate, against the named Plaintiffs and the Class, and have violated, and continue to violate, the ADA and implementing regulations, by denying Plaintiffs and the Class access to community settings and by requiring them to be unnecessarily segregated in ICF-DDs in order to receive necessary services.

131.    Defendants do not have a comprehensive, effectively working plan to serve the named Plaintiffs and the Class, all of whom are people with developmental disabilities, in the most integrated setting appropriate for their needs.

132.    With reasonable modifications to its system for providing long term care services to people with developmental disabilities, Defendants could provide services to the named Plaintiffs and the Class in community settings.

## COUNT II:  VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT

133.    Plaintiffs reallege paragraphs 1 through 132 as though fully set forth herein.

134.    Section 504 of the Rehabilitation Act provides that:  "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).

135.    Regulations promulgated pursuant to Section 504 of the Rehabilitation Act provide that:  "Recipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons."  28 C.F.R. § 41.51(d).

136.     Named Plaintiffs and the Class are qualified individuals with disabilities within the meaning of the Rehabilitation Act.  29 U.S.C. § 794(a).

137.    The regulations promulgated under Section 504 of the Rehabilitation Act further prohibit recipients of federal financial assistance from "utiliz[ing] criteria or methods of administration . . . (i) that have the effect of subjecting handicapped persons to discrimination on

the basis of handicap; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons." 28 C.F.R. § 41.5(b)(3); 45 C.F.R. §84.4(b).

138.     The programs and activities maintained by Defendants and their agencies, DHFS and DHS, at issue in this case, including institutional and community services for people with developmental disabilities, receive substantial federal financial assistance, and therefore, Defendants are subject to the provisions of Section 504 of the Rehabilitation Act.

139.     Placement in a community setting, rather than an ICF-DD, is the most integrated setting appropriate to meet the needs of the named Plaintiffs and the Class.

140.     Defendants have discriminated, and continue to discriminate, against the named Plaintiffs and the Class, and have violated, and continue to violate, the Rehabilitation Act and its implementing regulations, by denying named Plaintiffs and the Class access to community settings and by effectively requiring them to be confined unnecessarily in ICF-DDs in order to receive necessary services.

141.     Defendants do not have a comprehensive, effectively working plan to serve people with developmental disabilities in the most integrated setting appropriate for their needs.

142.     With reasonable modifications to its system for providing long term care services to people with developmental disabilities, Defendants could provide services to the named Plaintiffs and the Class in community settings.

### COUNT III:  VIOLATIONS OF TITLE XIX OF THE SOCIAL SECURITY ACT

143.     Plaintiffs reallege paragraphs 1 through 142 as though fully set forth herein.

144.     Illinois participates in the federal Medicaid program and has chosen to provide long term care services under its Medicaid plan to eligible people with developmental disabilities in ICF-DDs and through HCBS waivers.

145.    Because Illinois participates in the federal Medicaid program, it must comply with the requirements of Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v.

146.    Named Plaintiffs and the Class are recipients of, or are eligible for, Medicaid.

147.    Defendants have failed, and continue to fail, to comply with Title XIX of the Social Security Act.

### A.    Failure to Provide Choice between ICF-DD and HCBS Waiver Services

148.    Named Plaintiffs and the Class require the *level* of care provided in an ICF-DD. Title XIX requires that when persons with disabilities are determined to be likely to require the level of care provided in an ICF-DD, states must inform them of feasible alternatives under the HCBS waiver and give them a choice of either ICF-DD or waiver services.  42 U.S.C. § 1396n(c)(2)(C), 42 C.F.R § 441.302(d).

149.    Defendants have failed to give Plaintiffs and the Class the choice of community services available under the HCBS waiver.

### B.    Failure to Provide Services with Reasonable Promptness

150.    Title XIX requires states to provide Medicaid benefits to all eligible persons with reasonable promptness.  42 U.S.C. § 1396a(a)(8).  Provision of services must not be delayed by the agencies' administrative procedures.  42 C.F.R § 435.930(a).

151.    Named Plaintiffs and the Class qualify for both ICF-DD services and HCBS waiver services.

152.    Defendants have failed to provide HCBS waiver services with reasonable promptness.

### C.    Unnecessary Utilization of ICF-DD Services

153.    Title XIX requires participating states to implement any "methods and procedures … as may be necessary to safeguard against unnecessary utilization" of institutional care,

- 24 -

including ICF-DDs. 42 U.S.C. § 1396a(a)(30)(A). In accordance with this requirement, states must ensure that "each admission to a[n] … intermediate care facility for the mentally retarded … is reviewed or screened in accordance with criteria established by medical and other professional personnel…." Id. § 1396a(a)(30)(B).

154. Regulations implementing this requirement provide that, prior to admission to an ICF-DD, "an interdisciplinary team of health professionals must make a comprehensive medical and social evaluation and, where appropriate, a psychological evaluation of each applicant's or recipient's need for care in the ICF." 42 C.F.R. § 456.370(a).

155. The regulations further require that if an ICF resident's "needs could be met by alternative services that are currently unavailable, the facility must enter this fact in the recipient's record and begin to look for alternative services." 42 C.F.R. § 456.371.

156. Defendants' methods and procedures cause unnecessary utilization of ICF-DD services for Plaintiffs and Class members. Defendants fail to ensure that named Plaintiffs and the Class are adequately evaluated to determine whether their needs could be met by alternative services. Additionally, Defendants fail to ensure the provision of community services for persons found not to require institutional care and who have affirmatively indicated their desire for community services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court:

A. Enter an order certifying named Plaintiffs David Cicarelli and Stanley Ligas as representatives of a sub-class of ICF-DD Residents Who Have Requested Community Placements, consisting of adult individuals in Illinois who:

(1)     have mental retardation and/or other developmental

disabilities within the meaning of the ADA, 42 U.S.C.

§ 12131(2) and the Rehabilitation Act, 29 U.S.C. § 794(a),

and who qualify for Medicaid services;

(2)     reside in a private ICF-DDs with nine or more residents;

and

(3)     for whom Defendants (including Defendants' agencies,

employees, contractors and agents, and those acting in

concert with them) have a record reflecting that the

individual has affirmatively indicated that he or she seeks

to receive services in a community setting.

B.      Enter an order certifying named Plaintiffs Isaiah Fair, Jamie McElroy and Jennifer

Wilson as representatives of a sub-class of Individuals At Risk of Institutionalization Who Have

Requested Community Placements, consisting of adult individuals in Illinois who:

(1)     have mental retardation and/or other developmental

disabilities within the meaning of the ADA, 42 U.S.C.

§ 12131(2) and the Rehabilitation Act, 29 U.S.C. § 794(a),

and who qualify for Medicaid services;

(2)     are living in a home-based setting and are at risk of

institutionalization because Defendants have determined

that the individual is either (i) at imminent risk of abuse,

neglect or homelessness or (ii) likely (without

interventions) to be at imminent risk of abuse, neglect or

homelessness within a year; and

(3)     for whom Defendants (including Defendants' agencies,

employees, contractors and agents, and those acting in

concert with them) have a record reflecting that the

individual has affirmatively indicated that he or she seeks

to receive services in a community setting.

C.     Declare that Defendants' failure to provide the named Plaintiffs and the Class

with services in the most integrated setting appropriate to their needs violates Title II of the

Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Title XIX of the

Social Security Act.

D.     Declare that Defendants do not have a comprehensive, effectively working plan

for placing the named Plaintiffs and the Class in less restrictive settings as required by Title II of

the Americans with Disabilities Act.

E.     Issue a permanent injunction:

(1)     requiring Defendants to identify those individuals who are members of the

sub-class of ICF-DD Residents Who Have Requested Community

Placements, and those individuals who are members of the sub-class of

Individuals At Risk of Institutionalization Who Have Requested

Community Placements, and to maintain lists of these individuals;

(2)     requiring Defendants promptly to offer to evaluate the named Plaintiffs

and Class members to determine whether, in the view of qualified

treatment professionals, they could handle and benefit from placement in a community setting;

(3)    requiring Defendants promptly to offer those named Plaintiffs and Class members who could handle and benefit from placement in a community setting the option (which they are under no obligation to accept) to receive appropriate supports and services sufficient to allow them to live in the most integrated setting appropriate to their needs.

F.    Grant such other and further relief as this Court deems just and proper, including an award of reasonable attorneys' fees, litigation expenses and costs.

Respectfully submitted:

Dated: August 31, 2009                 By:____/s Kendra K. Hartman
                                       One of the attorneys for Plaintiffs

Barry G. Lowy (ARDC No. 6196719)
Laura J. Miller (ARDC No. 6202721)
Barry C. Taylor (ARDC No. 6199045)
John W. Whitcomb (ARDC No. 6204744)
EQUIP FOR EQUALITY
20 North Michigan Avenue, Suite 300
Chicago, Illinois  60602
Tel:  (312) 341-0022
Fax:  (312) 341-0295

John Grossbart (ARDC No. 3126133 )
Kendra K. Hartman (ARDC No. 6257264)
Wendy Enerson (ARDC No. 6272377 )
Corey Shapiro (ARDC No. 6291974)
SONNENSCHEIN NATH & ROSENTHAL LLP
233 S. Wacker Drive, Suite 7800
Chicago, Illinois  60606
Tel:  (312) 876-8000
Fax:  (312) 876-7934

Edward B. Mullen III (ARDC No. 6286924)
ACCESS LIVING OF METROPOLITAN CHICAGO
115 West Chicago Ave.
Chicago, Illinois 60610
Tel: (312) 640-2131
Fax: (312) 640-2101

Benjamin S. Wolf (ARDC No. 3125607)
AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS
180 North Michigan Avenue, Suite 2300
Chicago, Illinois 60601
Tel: (312) 201-9740
Fax: (312) 201-9760

Judith A. Gran
PUBLIC INTEREST LAW CENTER OF PHILADELPHIA
125 S. Ninth Street, Suite 700
Philadelphia, Pennsylvania 19107
Tel: (215) 627-7100
Fax: (215) 627-3183

12623919

## CERTIFICATE OF SERVICE

The undersigned, an attorney for the plaintiffs, certifies that on August 31, 2009, she electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the counsel of record.

s/ Kendra K. Hartman