# *Ligas* Implementation Plan
# FY2019 Revisions

---

## State of Illinois

**Department of Human Services, Division of Developmental Disabilities**

**5/3/2019**

This Implementation Plan has been developed by the Division of Developmental Disabilities, with input from the Plaintiffs, Intervenors, and Monitor, to accomplish the obligations and objectives set forth in the *Ligas v. Hamos* Consent Decree. (Case: 1:05-cv-04331 Document #: 549)

**LIGAS IMPLEMENTATION PLAN**
**FY 2019 Revisions**
**May 3, 2019**

## Section I.  Executive Summary

Background of Litigation and Overview of Consent Decree

On June 15, 2011, the State entered into a Consent Decree settling the *Ligas v. Hamos* lawsuit, filed on July 28, 2005, on behalf of two groups of class members with developmental disabilities:

- Adult individuals in Illinois with developmental disabilities who qualify for Medicaid Waiver services, who reside in ICFs/DD with nine or more residents, and who affirmatively request to receive Community-Based Services or placement in a Community-Based Setting.

- Adult individuals in Illinois with developmental disabilities who qualify for Medicaid Waiver services, who reside in a Family Home, who are in need of Community-Based Services or placement in a Community-Based Setting, and who affirmatively request Community-Based Services or placement in a Community-Based Setting.

The Decree requires certain targets for transition be met over the course of the Decree but does not force individuals who do not want Community-Based Services or placement to move. Nor does it force providers to close beds or enter into downsizing agreements with the State against their will.

The tenets of the Decree assist the DDD in expanding its community-based system to meet the growing demand for those services, while continuing to honor an individual's choice in deciding on the types of services and settings he or she prefers in order to live a personally fulfilling and productive life. The Decree includes the following provisions:

- Services for Individuals Currently Residing in ICFs/DD

Within six years of approval of the Decree, all individuals living in ICFs/DD as of the effective date of the Decree who have affirmatively requested Community-Based Settings were to move to Community-Based Settings. Placements were to be implemented for one-third of all such individuals every two years of this six-year period.  For those individuals who wish to continue living in an ICF/DD, the Decree requires the State to honor that choice and to continue to provide adequate funding to meet the needs of such individuals.

- Services for Individuals Currently Residing in the Family Home

The DDD will continue to expeditiously serve all people who meet the established crisis criteria. There will be no limit to the number of people served who meet the crisis criteria.

The DDD was to serve 3,000 individuals on the Waiting List for Community-Based Services or placement in a Community-Based Setting, as defined in the Decree, over the first six years of the Decree (1,000 within the first two years and 500 each year the next four years) with home-based support services or in community-based residential settings. After the end of the six-year period, all Class Members on the Waiting List are to move off the Waiting List at a reasonable pace.

- Other General Provisions

    - Evaluations and Transition Service Plans will focus on individual desires and goals and will not be limited by existing services. All services and supports in the Transition Service Plan must be integrated into the community to the maximum extent appropriate and consistent with the choices of the class member and his or her legal guardian. The State, however, is not required to develop or offer services that are not part of the approved Waiver or Medicaid State Plan.

    - The Department of Human Services (DHS) will seek sufficient funds in annual budget requests to develop and maintain the services described in the Decree. Implementation of the Decree is not, however, dependent on legislative appropriation of new funds.

    - A monitor was appointed by the Court to oversee compliance with the Decree and report on progress to the Court on an annual basis. After nine years of the approval of the Decree, the State may petition the Court to terminate the monitoring process.

The Implementation Plan

This document sets forth the State's plans to implement the provisions of the Consent Decree for Fiscal Year 2019. It was developed in accordance with Paragraph 26 of the Consent Decree and has incorporated input received from the Plaintiffs, Intervenors and Monitor. References to paragraph numbers in each of the sections below refer to paragraphs within the Consent Decree from which language is excerpted. For full context, readers should refer to the Consent Decree. Should any language in the Implementation Plan unintentionally conflict with that of the Consent Decree, the Consent Decree governs. Each Section of the decree is discussed separately below:

## Section II.  Development and Maintenance of the Class Member List

> *Paragraph 6.  Within thirty (30) days after Approval of the Decree, Defendants shall compile an initial list of Class Members by taking the list of Individuals to whom notice of Preliminary Approval of this Decree was sent, adding those Individuals from whom any of the Parties received a written, affirmative request to receive Community-Based Services or placement in a Community-Based Setting after notice of Preliminary Approval of this Decree was sent, but*

3

*excluding (i) those individuals who filed objections to the Proposed Consent Decree that was the subject of the July 1, 2009 Fairness Hearing as described in Paragraph 3(i) above, and (ii) those Individuals from whom Defendants receive written requests that the Individuals do not wish to receive Community-Based Services or placement in a Community-Based Setting.*

*Paragraph 8. Defendants shall maintain a statewide database in which all Class Members are enrolled.*

Consistent with Paragraph 6 of the Consent Decree, a Class Member list was created and has been maintained since the initial list was provided to the Monitor and Plaintiffs on July 15, 2011. The list includes:

- Adults (age 18 and above) enrolled in the State's Prioritization of Urgency of Need for Services (PUNS) database as of June 15, 2011, who were not already living in a 24-hour Community-Based Setting or State-Operated Developmental Center (SODC); and

- Individuals who had submitted written requests to be included in the Class to the Attorney General's Office.

The list does not include those excluded from the class in accordance with the provisions of Paragraph 6 of the Decree. As of the date of this Implementation Plan, the ICF/DD Class Member List has been finalized, and per the Decree, no new ICF/DD Class Members will be added. The Class List may continue to be modified under limited and specific circumstances where an individuals' rights under the Ligas Decree were not properly exercised. However, individuals from the PUNS waiting list continue to be added as Class Members (including individuals who may be residing in an ICF/DD and enroll on PUNS).

With respect to the PUNS database, as a result of the PUNS Integrity Project, the database is largely up to date and current within one year (over 98% of records). The PUNS list will continue to be maintained during the upcoming Implementation Period and will be discussed further in the section regarding Reasonable Pace, *See Infra, Section VII.*

## Section III. Outreach

*Paragraph 25. Defendants shall maintain a fair and accessible process by which Individuals with Developmental Disabilities or their legal guardians can affirmatively request in writing to receive Community-Based Services and/or placement in a Community-Based Setting or to receive ICF-MR services in an ICF-DD, and Defendants shall maintain up-to-date records of those requests.*

As of the date of this Implementation Plan, all outreach to potential Class Members in ICF/DD settings has concluded. DDD will continue to identify those Medicaid-eligible

4

individuals in need of services through continuation of the PUNS database and work with the ISC Agencies. DDD will continue to maintain the ISC office locator function and toll-free number in addition to numerous web-based resources to enable families and guardians to learn about and apply for services. For purposes of the Decree, however, the Outreach requirements have been met and no additional outreach activities are planned at this time.

General Information Sharing

DDD continues to maintain and update the *Ligas* page on its website. The page is located at http://www.dhs.state.il.us/page.aspx?item=66987. The DDD will post a schedule on its website of all events in which it will present information about the Consent Decree.

*Ligas* Class Member/Family Advisory Town Hall

The Defendants, in conjunction with the Monitor and with input from the Parties, established a *Ligas* Class Member/Family Advisory Committee (CMAC). However, in light of the fact that the decree is now in Year 8 of Implementation, some modifications are warranted. As such, instead of utilizing only the Committee format, for this Implementation Period, DDD will instead support two (semi-annual) *Ligas* Town Hall meetings in addition to two Committee meetings. To facilitate attendance at these Town Halls and Committee meetings, some may be held via webinar. Much like the CMAC, the Town Hall will be an opportunity for Class Members, families, guardians and other interested parties to hear updates directly from DDD staff and to speak from their perspective. The Town Halls will be open to the public and summaries will be provided to the Parties and Monitor. An initial planning meeting with the ARC is scheduled for May 6, 2019. Meeting dates and summaries will be posted on the DDD's website at http://www.dhs.state.il.us/page.aspx?item=69772.

## Section IV. Development of Community Capacity

> *Paragraph 4. The choices of Individuals with Developmental Disabilities, including Class Members, to receive Community-Based Services or placement in a Community-Based Setting or to receive ICF/MR services in an ICF-DD will be honored; provided, however, that this commitment to honoring choice does not alter Defendants' current obligations under existing law regarding licensed ICF-DD capacity system-wide or at any specific ICF-DD, and provided that, under current applicable law, this commitment does not entitle an Individual with Developmental Disabilities to receive ICF/MR services in a specific ICF-DD. Defendants shall implement sufficient measures to ensure the availability of services, supports and other resources of sufficient quality, scope and variety to meet their obligations to such individuals under the Decree and the Implementation Plan consistent with such choices. While the Decree remains in effect, any amendment to the State Plan submitted by the State pursuant to 42 U.S.C.§ 1396, et seq. will continue to include ICF-DD services as an alternative*

5

> *choice for long-term care services for eligible Individuals with Developmental Disabilities. Nothing in this Decree shall impair Defendants' ability to make changes in their provision of supports and services to Individuals with Developmental Disabilities, including Class Members, regardless of setting, provided that Defendants continue to honor Individuals' choices and fulfill Defendants' obligations under the Decree and Implementation Plan. Resources necessary to meet the needs of Individuals with Developmental Disabilities who choose to receive services in ICFs-DD shall be made available and such resources will not be affected by Defendants' fulfillment of their obligations under the Decree, including the obligations under Paragraphs 17 through 19 and 21 through 23. Funding for services for each Individual with Developmental Disabilities will be based on the Individual's needs using federally approved objective criteria regardless of whether the Individual chooses to receive services in an ICF-DD or in a Community-Based Setting; provided, however, nothing in this Decree shall require Defendants to change their current method for establishing funding or from adopting new methods based upon federally approved objective criteria.*
>
> *Paragraph 5. Annual budgets submitted by Defendants on behalf of their agencies shall request sufficient funds necessary to develop and maintain the services, supports and structures described in the Decree, consistent with the choices of Individuals with Developmental Disabilities, including Class Members. Defendants shall take steps sufficient to implement funding mechanisms that facilitate transition among service settings.*

The Decree required that 3,000 individuals currently living at home be provided services under the Home and Community Based Services Medicaid Waiver within the first six years of the Decree. These services could be either Community Integrated Living Arrangements (CILAs) or Home-Based Support Service (HBS). In addition, Class Members residing in ICF/DDs also moved to CILA or HBS settings. Class Members continue to move into CILA or HBS under the Reasonable Pace provisions of the Decree. Individuals selected to receive services under this Consent Decree may choose from any qualified and willing provider as defined in the Waiver.

Illinois has a substantial base of qualified HBS, CILA, and day program providers. Based on billing information, as of January 3, 2019, there are 222 licensed CILA providers (an increase of 9), 118 Self-Directed Assistance providers,[1] 156 developmental training/community day service providers, and 69 supported employment providers, as well as providers of therapies, assistive technology, and other support services under the Waiver.

DDD continues to review progress toward expansion of services as necessary to implement the provisions of the Decree.

---

[1] Service Facilitation is no longer a requirement under the Home-Based Services Program, but such services, now called "Self-Directed Assistance" are available if desired.

6

**Data Reporting, Focused Selection and the PUNS Selection List**

To avoid any confusion on the status of individuals who have been selected from the PUNS list but have not yet initiated services, a change was made to focus on the whole Ligas Services List, as opposed to a sample.

DDD reports on all active class members seeking and/or in need of services on the Ligas Services List, which has been compiled into a database allowing inquiries and searches of particular groups and individual Class Members.

DDD has continued to participate in monthly calls between Defendants and Parties to discuss specific Ligas class members who have funding sources and who continue to seek community–based services.

DDD includes in the monthly reports a summary of all class members who have either been removed from the Ligas selection list or placed on "hold." In addition, a separate submission is provided only to the Plaintiffs and Monitor, to identify the factual basis for the determination. DDD will also provide to Plaintiffs and the Monitor a list of all individuals who have been selected from PUNS but who have not initiated services within 18 months of their selection for further analysis and discussion.

> HBS Services

While a survey of the March 2014 PUNS selection demonstrated a high level of satisfaction with HBS Services, DDD agreed to certain modifications to ISC procedures to ensure individuals and guardians are provided information on the availability of services which address the individual's identified needs and are offered the opportunity to visit one or more CILA settings prior to making a decision about the type of Waiver setting they wish to pursue. The form 1238 has been modified accordingly and is available on DDD's website:

http://www.dhs.state.il.us/onenetlibrary/12/documents/Forms/IL462-1238.pdf (English Version);

http://www.dhs.state.il.us/onenetlibrary/12/documents/Forms/IL462-1238S.pdf (Spanish Version).

ISCs have been instructed to use this revised document during their review of service options with all Class Members.

> New Providers and Programs

New provider information continues to be available on the DDD website.[i] This web page informs potential providers about the qualification process, regulations, compliance issues, staff training requirements, DDD contact persons, etc. In addition, for potential new providers that require a license or certification such as CILA or developmental

training providers, prior to the acceptance of a license or certification application, the DDD mandates attendance at one of the orientation sessions provided by the DDD approximately twice per year. Information about these sessions is posted on the DDD website. At these sessions, community services, quality assurance, and rates staff give joint presentations about provider regulations and processes and are available to answer questions from potential providers.

The DDD continues to encourage providers of day services to develop options that reflect the value of supporting the Class Member with relationships, productive work, participation in community life, and personal decision-making. This includes DDD's obtaining Federal approval for the adult DD waiver, with a focus on an individual's preferences and desired outcomes, the move to conflict-free case management and continued work towards establishing compliance with the 2014 Settings rule. In addition, DDD continuously reviews and proposes updates to various Rules to conform to person-centered planning principles.

<u>Conversion of ICF/DD Capacity</u>

DDD may enter into voluntary closure agreements with providers of ICFs/DD, during which DDD ensures that ICF/DD residents transitioning to a new residential setting are provided with an assessment and service plan that meets the requirements of the Decree. All such individuals and/or their guardians are informed of their right to explore options among any qualified provider and are given a choice of qualified residential providers if they choose to explore those options. For ICFs/DD with the capacity to serve 16 or more individuals, closure agreements provide for rates during the closure period that recognize the need for coverage of fixed costs while individuals are transitioning to new residential settings of their choice, whether operated by the same or a different provider.

In order to provide more detail about the downsizing/closure process, a sample agreement is available for reference on the DDD's website.[ii]

As of December 31, 2018, for FY19 DDD currently has five ICF/DD facilities have closed and another four have signed downsizing agreements. Details on these downsizing plans will be provided to the Plaintiffs and Monitor. All downsizing activity is also reported in the 6-month Data Report. Since the inception of the Ligas decree, 74 ICF/DD facilities have submitted agreements for a formal downsizing.

The process to ensure choice for those individuals residing in ICF/DDs undergoing a downsizing or operations change is the same as the process for individuals entering waiver services. The ISC meets with all persons impacted by the change and explains all options, including the option to explore transitioning to another ICF/DD or to Community-Based Services. As part of this process, the ISC will if requested, facilitate visits to other provider agencies, both ICF/DD and/or CILA, as the individual/guardian/family investigates their options. Once a decision is made, the ISC documents the choice and provides notice to all required entities, including submission of information to DHS/DDD.

<u>Provider Qualifications and Training</u>

The qualifications for each type of Waiver provider are specified in Appendix C of the Waiver.[iii] Training requirements are listed and described in the DDD's training catalogue available on the DDD's website.[iv]

The quality improvement system for the Waiver is described in Appendix H of the Waiver. Performance measures are outlined throughout the Waiver itself.

**PUNS Class Members-Ligas Services List "Hold" and Removal**

**<u>Removal</u>**

Individuals selected from the PUNS list for services are still subject to removal from the Ligas Services List for a number of reasons. Removal of a Class Member from the Ligas Services List does not necessarily result in removal from the PUNS list, nor does it prevent the individual from seeking other waiver-based services. Removal is warranted under the following circumstances:

- Ineligible for services. Reasons for ineligibility include but are not limited to death, relocation out of state, clinical ineligibility, and inability to financially qualify for Medicaid[2]. Ineligibility will also result in removal from the PUNS list, but removal in certain of these circumstances is subject to the appeal rights of the individual.
- Failure to meet Ligas class member requirements (but may remain on the PUNS waiting list). [3]
- Decline of services, in which the individual/guardian may affirmatively request to be placed in the "Planning" category of need on PUNS.
- Decline of services (although Ligas services may be re-initiated during the 3 months after the date services were declined). Failure to re-initiate services within 3 months of the decline of services will void the PUNS selection and the individual will remain in the "Planning for Services" (formerly "Planning") PUNS category.
- Decline of services and request to be removed from PUNS will result in the removal of the individual from the Ligas Selection List and the PUNS database. This is also subject to the 3-month limit to re-initiate services, after which the

---

[2] Individuals and their guardians will be afforded a full 9-month time period (with extensions as needed for good cause) to become eligible for Medicaid.
[3] Class Members must be 18 years of age or older and residing in either a family home or an ICF/DD of 9 or more individuals. State Operated Developmental Centers, SNF-Peds, Skilled Nursing Facilities, residential schools or correctional facilities are among the settings that are not eligible settings. Class Members retain their Class Member status post-transition to a CILA.

9

PUNS selection will no longer be valid and re-enrollment in PUNS will be required.

- Refusal to complete or failure to cooperate in the assessment process. This includes but is not limited to any of the following:
    - o Failure to either make contact with or respond to inquiries (telephonic, written or other) from the assigned ISC Agency within the initial 6-month period following the mailing of the selection letter;
    - o Failure to engage in and begin the assessment process within the initial 6-month period;
    - o After obtaining an extension on the initial 6-month application deadline, failure to complete the assessment and obtain an eligibility determination within 9 months from the date of mailing of the PUNS selection letter. Extensions will be granted upon a showing of continued engagement with the ISC Agency and for extraordinary circumstances.

### Hold List

DDD continues to monitor Class Members who are on the "Hold" list, in which certain individuals selected from the PUNS list who are not yet ready to initiate services or who are unable to complete the process are given a temporary "Hold" period during which they may still exercise the benefits arising from their selection. A Class Member may remain on "Hold" for a maximum of two years, during which time the ISC Agency will contact the individual once every six months. During the two-year period, the individual/guardian may, at any time, choose to continue with the waiver process to obtain services. However, if the individual fails to take any action in furtherance of service initiation, at the end of the two-year Hold period the individual's PUNS selection will be invalidated.[4] At that point, the individual will be able to enroll on PUNS as a new enrollment. Any future PUNS selection will be based on the new enrollment date.

Individuals may be placed in the "hold" category for the following reasons:
- Seeking services from particular provider(s);
- Awaiting opportunity to move with particular peers;
- Inability to decide on a provider;
- Deciding between home-based and CILA services;
- Determining whether to proceed with waiver services;
- To allow time to address medical or personal matters (including but not limited to rehabilitation, medical procedures, family emergencies or other matters that may delay decisions as to services);

---

[4] Individuals on the Hold list will be notified at the 18-month point that absent further action, they will be removed from Hold in six months (at the two-year mark) and be removed from PUNS. However, if the delay in taking action within the two-year period is through no fault of the individual or his/her guardian, the Hold period may be extended on a case-by-case basis.

10

- Other reasons with approval from DDD.

As of December 21, 2018, there are 94 Class Members on the PUNS Selection Hold list.

**Monitor's Concerns Regarding Capacity Development**

In the Fifth Annual Report, the Monitor reiterated many of the concerns contained in the Fourth Annual Report, and again found the Defendants out of compliance with respect to resources and capacity. (See Fifth Annual Report, available at https://www.dhs.state.il.us/OneNetLibrary/27896/documents/Reta/FiledLigasFifthAnnual ReportoftheMonitor_1_20_2017.pdf). The Report identified issues that directly impact the Consent Decree's implementation, and again largely revolved around the prior lack of a State budget and low wages and concerns regarding the ongoing staffing crisis for providers of all types of services in their efforts to recruit and maintain adequate staffing and appropriate training for staff with existing inadequate funding for staff and high turnover levels.

As with the Fourth Annual Report, the State again issued a response to the Monitor's Report in which it disagreed with certain of the findings. The State response can be found at http://www.dhs.state.il.us/page.aspx?item=64489. Since the filing of the Fifth Annual Report and Response, a Motion to Enforce the Consent Decree was filed by the Plaintiffs and Intervenors. On August 11, 2017, the Court entered an order finding the State out of compliance with respect to the issue of whether resources sufficient to meet the needs of Class Members and those residing in ICF/DDs are being provided and required the State Defendants to draft a plan to achieve compliance. A Compliance Plan has been the subject of numerous discussions between the parties and Monitor, and the State's proposed Plan was filed with the Court. The Court subsequently rejected the Compliance Plan, and on June 6, 2018 issued an order requiring additional actions on the part of Defendants.

The Monitor's Sixth Annual Report reflects similar concerns and findings of noncompliance to those included in the two prior annual reports, but also notes that some steps are being taken toward achieving compliance.

As of the date of this Implementation Plan, a number of actions have been taken in an effort to bring the Defendants into compliance. This includes, but it not limited to the following:

- Rate Increase: A $0.75 per hour increase for Direct Service Providers ("DSPs") was enacted by the Legislature for FY18, totaling $56.4 million. The State agreed to seek an additional $0.38 per hour for both FY19 and FY20. For FY19, an additional $0.50 per hour was approved by the Legislature. Rates for FY20 have not yet been determined.

- Compliance Monitoring: In order to ensure that Ligas Class Members have adequate Personal Plans as well as Implementation Strategies and are

receiving the quality and scope of services and supports as indicated in the Consent Decree and the Implementation Plan section of the Personal Planning documents, the Division has been working with the Parties and Monitor to draft a Compliance Monitoring Tool. This tool, which has been finalized, is now being used to survey a statistically significant sample of the Class Members receiving services in a Community Integrated Living Arrangements (CILAs). The tool is being utilized in an independent review process following training of the reviewers and a pilot test of the tool. Review teams consist of four DHS Bureau of Quality Management staff in conjunction with eight additional independent reviewers. The Monitor, Ligas Data and Program Analyst, and the Council on Quality and Leadership (CQL) are overseeing the project. The State's contract with the CQL has been approved and training of the reviewers/ piloting of the protocol took place in February 2019. The results of the training and pilot test were be utilized to finalize the Monitoring Tool and to inform the development of a scoring process to assess compliance for the full statistically significant sample of Class Members. On-site reviews began on April 8, 2019.

- Development of a Rates Oversight Committee: The Oversight Committee is an advisory committee to the Division of Developmental Disabilities on the issues of analysis and potential reconfiguration of rates for Community Integrated Living Arrangements (CILA) and Intermediate Care Facilities (ICF/DD). The Oversight Committee will receive reports and information from the Sub-Committees on various issues pertaining to the rate methodologies and will provide advice and guidance to those Sub-Committees as needed or requested. The Oversight Committee will review and consider recommendations and proposals from the Sub-Committees, and in conjunction with an analysis of current DDD policies, prepare a set of proposals for consideration in further rate developments and modifications. There is not yet a targeted date for submission of the Oversight Committee's final recommendations, but as work progresses, updates will be provided to the Parties and Monitor, including when and if a deadline is set for the final recommendations.

  o The Oversight Committee is made up of fifteen (15) stakeholders, including representatives from DDD, providers, family members of individuals with Developmental Disabilities, legal representatives of Ligas Plaintiffs, Intervenors and Defendants and the Ligas Court Monitor. The Oversight Committee had its first meeting on August 29, 2018 and has met on a monthly basis beginning in October 2018. Meetings are currently scheduled through July 2019.
  o There are currently seven (7) Sub-Committees that will report to the Oversight Committee on specific issues related to CILA and ICF/DD rates. The Sub-Committees are also made up of various

12

stakeholders, each with knowledge specific to their Sub-Committee's topic. The Sub-Committees are as follows:

- Employment/Training
- Staffing
- Technology
- Behavioral
- Transportation
- Nursing/Medical
- ICF/DD

Updates will be provided to the Parties, Monitor and to the extent requested, the Court on all compliance related activities. While certain compliance related activities are identified in this Implementation Plan, once a final Compliance Document is accepted by the Court, it will be incorporated in full into this Implementation Plan.

Per the request of the Monitor and Parties, the following represents additional activities currently underway within the Division of Developmental Disabilities. These activities, while related to certain of the Monitor's concerns, are not specific to the Ligas Decree. As such, the State does not consider them to be a part of, nor governed by either the Ligas Consent Decree or the Implementation Plan. The State makes no representations as to the end result from these activities but will continue to update the Parties and Monitor on progress and developments in these areas as they occur, especially as they impact Ligas Class Members.

- Enhanced Staffing in CILA and Developmental Training Settings. The State recognizes that some individuals with extraordinary behavior and/or medical needs may require additional staffing supports in CILA and Developmental Training settings. In recent years, such supports have been awarded separately from the base rates, and providers have been required to separately track and bill for these additional supports. (This process has been referred to informally via Computer System Program Codes 53R and 53D.) It is believed the new process will give providers more flexibility in directing available resources to best meet their needs and the needs of the individuals served. Drafts of an Information Bulletin on this topic were prepared and issued for stakeholder comment. A workgroup of selected stakeholders last convened on February 27, 2017 to work with the Division on this issue. The workgroup was unable to reach consensus on the approach the Division should take and progress stalled. However, the recent launch of the Rates Workgroup provides a fresh opportunity to address this issue. The Staffing, Behavioral and Nursing/Medical Subcommittees will all be considering the issue of additional supports and whether those supports should be built into the rates or addressed as add-ons. The Rates Oversight Committee will review the information and analysis from the Subcommittees and make a final recommendation.

- The Division continues to offer Short-term Stabilization Homes (SSH) under the adult Medicaid Waiver. Four SSH homes remain in operation to provide

temporary stabilization services due to extraordinary behavior issues for up to four individuals at a time. Total capacity for the homes is 16 individuals.  The homes are equipped with high staffing and oversight ratios, as well as the necessary staff or consultants to address individual behavior and medication needs.  Transition planning for post-stabilization placement is ongoing throughout an individuals' tenure at an SSH, with the primary goal, if feasible, that the individual return to their own/prior home.  However, these transition plans are fluid and depend on the progress the individual makes toward stabilization.

- In addition to the SSH homes currently available, the Division has recently obtained authorization to develop six, four-bed, Long Term Stabilization Homes, providing a total of 24 available Long-Term Stabilization beds.  Once in place, individuals can enter these homes either after exceeding the 90-day limit on SSH settings or if they are identified as needing longer-term stabilization at the time of presentment.  These Long-Term Stabilization homes will not have a specified duration of stay.  The Division is currently in discussions with the Agency Procurement Office to determine what method of procurement will be required to launch the Long-Term Stabilization Homes.  A Request for Application is currently being prepared for release. The Division will provide updates to the Parties and Monitor as these Long-Term Stabilization homes are developed.

- The Division continues to provide increased Behavior Therapy hours to individuals under the adult Waiver.  Up to 104 annual Behavior Therapy hours are now available. This change from 66 annual hours was effective as of July 1, 2016, and an Informational Bulletin was released to stakeholders to notify them of the change and advise of the process for requesting increased hours.  The Informational Bulletin can be found at http://www.dhs.state.il.us/page.aspx?item=88126.  It should be noted, however, that one of the Rates Sub-Committees is addressing behavioral services and may recommend additional changes.

- Pursuant to Public Act 98-0901, Direct Support Persons in settings of 16 or fewer capacities now have the ability to administer insulin injections when appropriately trained by and under the direction of a registered nurse trainer using a DHS diabetes and insulin approved curriculum.  This should create more opportunities for individuals with diabetes.  59 Ill. Adm. Code 116, Administration of Medication in Community Settings, governs medication administration by staff.  On June 24, 2016, the necessary amendatory language for Rule 116 was published in the Illinois Register for public review and comment.  The Rule amendment was adopted on May 26, 2017.   Training webinars for IDHS Approved Trainers are available as a recorded webinar.

- Waiver Employment and Day Program Services.  The Division has been exploring opportunities to enhance access to employment services.  This work is closely aligned with the Supported Employment efforts, as well as reviews of current day service options.   Amendments to the Waiver, effective July 1, 2017,

14

combined site-based DT and community access into "Community Day Services" to allow flexibility in day programming and further facilitate integrated community employment opportunities. Public comments pertaining to employment and day services were also addressed in the waiver (See Section "Additional Needed Information (Optional)"). DDD continues to evaluate and explore additional day program and employment possibilities and will report to the parties and Monitor on new initiatives as they are developed.

- The Division developed a web-based reporting and search mechanism for identifying and tracking vacancies within residential and day programs, as well as new development plans. Under this new application, providers are able to record vacant residential and day program capacity, indicating whether the vacancies are specific to gender, whether the vacancies are accessible with regard to mobility issues, and in which counties (or community areas in the case of Cook County) the vacancies are located. Providers can also record their willingness to develop new service capacity by county, including employment services and non-site-based day options. Class Members and guardians seeking services, as well as Independent Service Coordination Agency staff, can now search the web application to identify potential providers. The application (the Capacity Management Application ("CMA")) is operational and can be found at https://ilocate.illinois.gov/#/dhs.

- The Division has also instituted and continued a number of measures to ensure quality services are provided to individuals. While not specifically required by, or tied to the Ligas Decree, these measures do affect Ligas Class Members. One such measure is the creation of the CILA Score Card, which is available to the public on DDD's website. The Score Card identifies various information on CILA providers, including any OIG investigations. The CILA Score Card can be found at https://www.dhs.state.il.us/page.aspx?item=104519. In addition, the Bureau of Quality Management regularly completes on-site reviews of service delivery for individuals served in the Adult DD Waiver. While the waiver quality reviews are not specific to *Ligas* class members, many *Ligas* class members go through the review process each year by virtue of being in the waiver program. BQM cites any deficiencies noted, requires corrective action plans to address those deficiencies and follows-up on the plans to ensure they were appropriately implemented.

- Finally, under the Grant Accountability and Transparency Act (30 ILCS 708), the Department was required to competitively bid the Independent Service Coordination agency agreements through a Notice of Funding Opportunity (NOFO) process. The awards were announced in January 2019, and those ISC agencies selected through the NOFO process will begin to provide services effective July 1, 2019. As part of its preparation for the NOFO, the Department issued a Request for Information (RFI) on the possibility of realigning some of the geographic boundaries for the ISC regions. After reviewing responses to the RFI, the Department determined that some boundaries should be modified, which

reduced the number of ISC regions from 17 to 12. This realignment however, does not diminish the availability of ISC services. The Department believes that this realignment will allow for greater efficiency while continuing to provide quality services and supports to individuals and their families.

**Housing Options for Class Members**

The Illinois Department of Human Services believes that persons with disabilities can live fully integrated within their community of choice with appropriate services and supports within affordable supportive housing options, whether scattered site or within small single site supportive housing buildings. This not only complies with federal CMS Home and Community Based Services new regulations defining home and community and the Olmstead mandate but is cost effective and meets the desires of persons with disabilities.

As such, in addition to the typical community settings of HBS and CILA, DDD is also working with the Statewide Housing Coordinator/Illinois Housing Development Authority to make supportive housing options available to eligible Ligas Class Members. Class Members are eligible for Statewide Referral Network (SRN) and Section 811 Project-Based Rental Assistance (PBRA) units (depending on income), which are affordable studio, one and two-bedroom units available across the state. These units are individually controlled, with the tenant or his or her guardian having an individually controlled lease and rights of tenancy. To date, at least 5 Ligas Class Members have been awarded PBRA units and 16 have utilized the SRN.

To provide further access to these and other affordable housing resources (including Public Housing Authorities, Low Income Housing Tax Credits, etc.), DDD has released four pieces of guidance/communication to its providers so services further support living in supportive housing:

- o Clarification of DSP Hours for Family and Intermittent CILAs (15 hours is the minimum not maximum);
- o Community Integrated Living Arrangement (CILA) Clarification of Family or Person's Own Home (excludes Room and Board funding from CILA rate and reimbursement, etc.);
- o Additional Staffing Hours in Community Integrated Living Arrangements (CILA) and Developmental Training (DT) Programs (Long Term additional hours will be added into the rate rather than billed separately); and
- o Increase in Behavior Intervention/Treatment Hours (Increased the cap on these hours from 66 hours to 104 hours).

In addition to the above, a Working Group to Implement Supportive Housing (WISH) for persons with developmental disabilities met on January 18, 2017. The WISH-DD

16

outlined the step by step process for persons with I/DD to access affordable housing and the flexible Intermittent CILA services required to live independently. The WISH-DD will design and deliver outreach and education to Individual Service Coordination (ISC) entities; parents, guardians and Ligas Class Members; and I/DD Service Providers. The anticipated schedule for WISH-DD is as follows:

- o January through February – design of step-by-step process and outreach/education process;
- o March – Kick off outreach/education with ISCs, parents/guardians, Ligas Class Members, etc.

The goal is that through this process during Calendar Year 2018, there will be a 50% increase in the number of Ligas Class Members added to the SRN and Section 811 Waiting List, and a 50% increase in the number of Class Members housed in Supporting Housing.

As of January 8, 2019, 30 Ligas Class Members have applied for an SRN unit (compared to 126 for the years 2012-2017) with three individuals housed since January 1, 2018.  In prior years, from 2012-2017, 126 Class Members applied for SRN and nine were housed.  With respect to Section 811 Units, as of January 8, 2019, 28 Class Members have applied for a Section 811 Unit and none have yet received housing.  In prior years, from 2012-2017, 132 Class Members applied for a Section 811 Unit, and five were housed.

## Section V.  Community-Based Services/Placement for Individuals Residing in ICFs/DD

> *Paragraph 17.  …within six (6) years after Approval of the Decree, all Class Members residing in ICFs-DD as of the date of Approval of the Decree (regardless of when in this timeframe the Class Member affirmatively requested placement in a Community-Based Setting) will transition to Community-Based Settings consistent with their Transition Service Plan, if, at the time of transition, the Class Member requests placement in a Community-Based Setting…*

Per the Consent Decree, at 2 ½, 4 ½, and 6 years respectively, the DDD will have implemented services to one-third of the individuals who were residing in ICFs/DD as of June 15, 2011 who inform the DDD they choose to move to Community-Based Placements.  As of June 30, 2017, all known ICF/DD Class Members who indicated a desire to move, were to have been moved to a Community-Based Setting.  As of January 1, 2019, there were 1718 Class Members residing in ICF/DDs on or prior to June 15, 2011.  Of these, 1449 Class Members residing in ICF/DDs have received award letters for Waiver services, and 1446 have moved to their community-based Wavier setting. As of January 1, 2019, there were 269 Class Members in ICF/DDs who have not yet received award letters, including 155 on Hold.  Of those remaining 269 Class Members,

17

219 are individuals under the guardianship of the Office of State Guardian, 119 of whom are on Hold. DDD will review the data on the OSG wards who have yet to receive award letters and who are not on Hold to identify any patterns regarding transition activities and will report to the Plaintiffs and Monitor on their findings. The Monitor will review the data on the OSG wards who are on hold.

The DDD continues to monitor the transitions of individuals from ICFs/DD to Community-Based Settings or Services. Staff within the Division are assigned to each individual, maintaining monthly contact with the applicable ISC agencies during the transition process. Monitoring activities are tracked through an internal database.

In addition to the activities by State staff, the PAS/ISSA monitor the individual's successful adjustment to the new services by completing four weekly visits with the Class Member during the first month and quarterly visits thereafter. In the event the ISSA identifies problems, it shall take steps to resolve issues locally and refer matters as needed to the DDD per the Problem Resolution Protocol within the ISSA Guidelines.[v] It may also request more hours for additional visits per the Guidelines.

**ICF/DD Class Members - "Hold" and Removal from Active Class Member Status**

Class Members residing in ICF/DDs may also be removed from Class Member status or be put in the "Hold" category if not actively seeking transition services.

    **Removal**

Class Members who have previously expressed an interest in seeking community-based services may be removed under the following circumstances:

- Individuals who are ineligible for services will be removed from the Active/Confirmed list. Reasons for ineligibility include death, relocation out of state, clinical ineligibility, and inability to financially qualify for Medicaid[5].
- Individuals who do not meet Ligas class member requirements will be removed from the Ligas Services List but will remain on the PUNS waiting list. [6]
- Declined Community –Based services, demonstrated by completion of a written document stating their or their guardian's preference to remain in the ICF/DD.

---

[5] Individuals and their guardians will be afforded a full 9-month time period (which includes extensions as needed for good cause) to become eligible for Medicaid.

[6] This includes situations where a Class Member has moved from an eligible setting to a non-eligible setting and is no longer seeking community-based services. In those circumstances, while the individual may no longer be a Ligas Class Member, they will still be able to request and apply for Waiver services. A Class Member's eligibility is not lost by a move from an ICF/DD to a nursing facility or State-Operated Developmental Center for short-term stabilization stays of 120 days or less.

### ICF/DD "Hold" Category

As with individuals selected from the PUNS list, Ligas Class Members may be placed into the "hold" category under the following circumstances:

- Seeking services from particular provider(s), including waiting for a particular provider to downsize their ICF/DD operations;
- Awaiting opportunity to move with particular peers;
- Inability to decide on a provider;
- Determining whether to proceed with waiver services;
- To allow time to address medical or personal matters (including but not limited to rehabilitation, medical procedures, family emergencies or other matters that may delay decisions as to services);
- Other reasons with approval from DDD.

DDD continues to monitor ICF/DD Class Members who are on the "Hold" list. A Class Member may remain on "Hold" for a maximum of two years, during which time the ISC Agency will contact the individual once every six months.[7] During the two-year period, the individual/guardian may, at any time, choose to continue with the waiver process to obtain services. If the individual has not taken any action in furtherance of transition, at the end of the two-year period the individual will be removed from the Class List, and the ISC will no longer be responsible for continued contact. If the individual wishes to explore community-based services at a later date, the individual will be able to seek community-based services through the PUNS process. Individuals placed on hold are not included in determining compliance with the ICF/DD benchmarks. As of October 25, there are 146 Class Members on the ICF/DD Hold list (including OSG Class Members added in June 2017).

**Individuals who Decline Community-Based Services to Remain in ICF/DD**

Any individual residing in an ICF/DD as of June 15, 2011 who did not join the class by June 15, 2017 is no longer automatically eligible for Ligas-based services. Should the individual/guardian desire community-based Waiver services in the future, they will be required to register on the PUNS list and placement will be based on PUNS selection criteria.

---

[7] The ISC Agency will notify the individual/guardian at the 18-month mark that absent further action in furtherance of transition, they will be removed from Hold as of the 24-month date and be removed from the Class List. Should the individual wish to transition out of the ICF/DD at a future date, they will be provided with information on PUNS enrollment. However, if the delay in taking action within the two-year Hold period is through no fault of the individual or his/her guardian, the Hold period may be extended on a case-by-case basis.

## Section VI.  Transition Planning

*Paragraph 11.  The Transition Service Plan shall describe the services the Class Member requires in a Community-Based Setting or through Community-Based Services; where and how such services can be developed and obtained; the supports and services the Class Member will need during his or her transition to a Community-Based Setting; and a timetable for completing that transition.*

*Paragraph 12.  The Transition Service Plan shall be developed by a Qualified Professional in conjunction with the Class Member and, where one has been appointed, the Class Member's legal guardian, and, where appropriate, the Class Member's family members, friends and support staff who are familiar with the Class Member.*

*Paragraph 13.  The process for developing a Transition Service Plan shall focus on the Class member's personal vision, preferences, strengths and needs in home, community and work environments and shall reflect the value of supporting the Class Member with relationships, productive work, participation in community life, and personal decision-making.*

*Paragraph 14.  All services and supports in the Transition Service Plan must be integrated into the community to the maximum extent possible, consistent with the choices of the Class Member and the Class Member's legal guardian.*

*Paragraph 15.  The Transition Service Plan shall not be limited by the current availability of services, provided, however, that nothing in this paragraph obligates Defendants to provide the types of services beyond those included in the Waiver and/or the State Plan.*

A detailed Transition Service Plan was created for Ligas Class Members, which has proven successful.  However, considering the Federal CMS guidelines and requirements for Person-Centered Planning, DDD has developed standardized assessment tools (the "Discovery Tool" and the "Personal Plan Tool") to be used in assessing needs and preferences and developing plans for all individuals in the Waiver.

The Ligas Transition Service Plan was replaced by the Discovery Tool and Personal Plan Tool as of January 1, 2018.  Both of these plans are part of the Life Choices Initiative and meet the requirements of the Federal Medicaid requirements for person-centered planning.  The tools and guidelines/procedures can be found at http://www.dhs.state.il.us/page.aspx?item=96986 and a summary of the process is as follows:

- The process begins with the Discovery Process, which is designed to gather information about a person's preferences, interests, abilities, preferred environments, activities, and supports needed. The ISC agencies are responsible

- for facilitating and documenting information resulting from the Discovery process.
- Once the Discovery process is completed, a Personal Plan is created. The Personal Plan is the single, comprehensive personal vision for a person's life. This document focuses on the individual's strengths, preferences, needs and desires. The ISC agencies are responsible for developing the Personal Plan in conjunction with the individual, guardian, family, and providers
- The final step is creation of the Implementation Strategy, in which information identified in the Personal Plan is addressed. An Implementation Strategy details the supports and services that will be provided on a day-to-day basis. Implementation Strategies are developed by provider agencies that have agreed to provide services.

DDD is working collaboratively with the Division of Rehabilitation Services to develop a smoother process regarding access to Vocational Rehabilitation services. Both Divisions recognize the need to put policies in place to ensure there are no roadblocks to individuals with intellectual/developmental disabilities as they seek to enter the job market. To that end, the Divisions have been working on a grid that clearly lays out each Division's roles and responsibilities which will eventually be used to develop a Memorandum of Understanding between the Divisions to guide the work done on behalf of the individuals served. It is anticipated that the Memorandum of Understanding will be completed in the Spring of 2019. The Division will also continue to emphasize the necessity of addressing employment issues and opportunities during the assessment and planning process with Independent Service Coordination Agencies through Information Bulletins as necessary.

## Section VII.  Waiting List for Community Services and Placement

> *Paragraph 22(d).  Within two (2) years after Approval of the Decree, Defendants shall provide, in accordance with the Class Members' Transition Service Plans, appropriate Community-Based Services and/or placement in Community-Based Settings for at least 1,000 Waiting List Class Members who are selected from the Waiting List…with these Class Members served in order of priority.  In each of the third, fourth, fifth and sixth years following Approval of the Decree, Defendants shall serve at least 500 additional Waiting List Class Members who are selected from the Waiting List, again in order of priority.*
>
> *Paragraph 23.  All Class Members who are on the Waiting List after the end of the sixth year following Approval of the Decree shall receive appropriate Community-Based Services and/or placement in a Community-Based Setting, such that they move off the Waiting List at a reasonable pace…*

Over the first six years of the Decree, the DDD was to serve 3,000 individuals under the Medicaid Waiver from the waiting list.  DDD met and exceeded the requirement to serve 3,000 waiting list Class Members within this first six years.

21

Beginning in FY18, the specific numerical benchmarks to serving individuals on the PUNS list were no longer applicable, but rather the State Defendants are to continue to move individuals from the PUNS list into Waiver services at a "reasonable pace." While the Ligas PUNS selections typically involved selections from the Emergency and Critical categories of PUNS, certain modifications to the selection process have been made. For the PUNS selection in June 2018, all individuals who were listed as "Emergency" were selected. The remaining selections were made from the Critical category, with those individuals 18 years or older being selected based on their time in that category. Effective August 2017, PUNS categories were revised to "Seeking Services" and "Planning for Services." Future PUNS selections will be based on the length of time an individual has spent in the Seeking Services category since the age of 18. In addition, to assist families in planning, advance notice of selection from the PUNS list was provided in mid to late 2018 for the Spring 2019 PUNS selection. The Parties and Monitor have agreed upon the process for determining and implementing a "Reasonable Pace," for moving class members, and agreed to negotiate a process for moving people from Home-Based to CILA with reasonable promptness, a description of which is attached as Exhibit A to this Implementation Plan.

As of June 30, 2018, 5,924 Class Members have been selected from the PUNS waiting list. Of those individuals, 3,622 received Waiver service award letters and 3,590 were receiving Waiver services. More specific information regarding Class Member selection and service initiation can be found in the most recent Six-Month Data Report. http://www.dhs.state.il.us/page.aspx?item=110750.

## Section VIII. Community Crises

> *Paragraph 21(c). Defendants shall ensure that all Class Members who are determined to be in a situation of Crisis, and who request to receive Community-Based Services and/or placement in a Community-Based Setting, receive such services and/or placement in such setting expeditiously.*

The ISC agencies continue to submit requests for services from individuals in crisis situations, and the DDD will continue to process these requests, using existing criteria available on the DDD website.[vi] These requests are not part of the 3,000 capacities to be provided under Section VII, Waiting List for Community Services and Placement. The DDD continues to work to ensure individuals are served expeditiously, although as noted in the Monitor's Fourth and Fifth Annual Reports, there remain some concerns on this issue. Through agreement between the DDD and the Monitor, "served expeditiously" is viewed as receiving some supports or services within a 24 to 72-hour period after an individual's crisis status is confirmed to ensure the individual's safety.

DDD will continue to fund crisis requests for services within the agreed upon time frames. It was anticipated that the number of crisis requests would decrease as the Ligas PUNS selections occurred. While numbers of crisis requests increased for a number of years, crisis requests have fallen in recent years. In FY17 there were 467 crisis requests

received, with 447 approved, and in FY18 there were 373 requests with 339 approved. The Division continues to work to ensure the ISC Agencies evaluate the imminent risk to individuals seeking crisis services and is more closely reviewing crisis applications so that those that meet the current crisis criteria are approved for crisis services.

With respect to the Monitor's concerns reflected in the Fourth, Fifth and Sixth Annual Reports regarding safety plans for those individuals in Crisis, efforts have been, and continue to be made to ensure adequate safety plans are in place for all individuals determined to be in Crisis. DDD continues to report on the safety plan as well as the concern raised by the Monitor on the length of time certain individuals determined to be in Crisis have been waiting on the PUNS list. The PUNS issue coincides with the Reasonable Pace discussion, and DDD is hopeful that potential modifications to PUNS may benefit those who end up in Crisis as well.

## Section IX.  Appeal Process

> *Paragraph 24.  Any Class Member who disputes a decision by Defendants or a Community Service Provider regarding eligibility for, or delivery of, Community-Based Services or placement in a Community-Based Setting shall, pursuant to governing law, have the right to appeal or seek administrative or judicial review of such decisions through Defendants' existing Fair Hearings process (as set forth in 89 Ill.Adm.Code Part 120) or as otherwise provided by law.  Class Members also may avail themselves of any informal appeal process that currently exists.*

Individuals may appeal any denial, suspension, termination, or reduction of Home and Community-Based Waiver Services. The appeal process, including time frames, is described in Title 59, Chapter 1, Part 120.[vii] Individuals are informed of this right to appeal through the use of Form IL462-1202, Notice of Individual's Right to Appeal, available on the DDD website.[viii] Individuals are also informed of their right to appeal a determination of ineligibility via the DDPAS-10 Form, available on the DDD website.[ix]

DDD remains in compliance with the appeal requirements of the Decree.

## Section X.  Resources Necessary for Implementation

> *Paragraph 5.  Annual budgets submitted by Defendants on behalf of their agencies shall request sufficient funds necessary to develop and maintain the services, supports and structures described in the Decree, consistent with the choices of Individuals with Developmental Disabilities, including Class Members.*

Each year of the Consent Decree, the DDD and the DHS Budget Office will prepare annual proposals for inclusion in the Governor's Introduced Budget for the funds necessary to carry out the provisions of the Decree. These proposals will include items that are currently funded and must be maintained as well as items that require new

funding.  Further information can be found in the Ligas 6 Month Data Report dated 6/30/18 (http://www.dhs.state.il.us/page.aspx?item=110750).

<u>Appropriations</u>

The DDD's budgets since Fiscal Year 12 combined the major appropriation line for community-based services and ICF/DD services into one line.  This enables the DDD to redirect resources, if appropriate, as individuals and providers make future choices regarding service provision. However, DDD maintains sufficient records to enable the Monitor to determine whether the State is fulfilling its obligations under Paragraph 4 of the Decree, including its obligation to provide funding sufficient to meet the needs of those who choose to live in ICFs/DD and to ensure that such resources are not affected by the State's fulfillment of its obligation to provide Community-Based Services or Settings to those who choose those service options.

Annually, per the deadline established by the Governor's Office of Management and Budget, the DDD will calculate and submit details of needed resources for consideration for inclusion in the Governor's Introduced Budget for the following fiscal year.  Each year the needed resources for implementation of the Consent Decree, separate and apart from the maintenance items specified above, will include, at a minimum, funding for:

- Community-Based Services and Community-Based Settings, both new funds for those beginning services and annualized funds for those who began services in the prior year;
- Assessments;
- Special rates for ICFs/DD voluntary closure agreements; and
- Contractual consultants and staff.

The proposed budget for *Ligas* implementation will be annually presented to the Parties and Intervenors.  Budget information is included in the data reports.

The Ligas budget for FY19 was $235.6 M which includes PUNS placements and ICF/DD transitions (both current and prior year placements) and Ligas staffing/administration/contract costs.  These anticipated costs assume that 85% of new PUNS placements will choose HBS and 15% will chose CILA.  The anticipated FY19 costs also represent a significant increase from FY18, where estimated Ligas costs were $207.2M.  The FY18 budget included a $0.75/hour increase for DSP staff (effective 8/1/2017).  The FY19 budget includes a $.50/hour increase (effective 7/1/2018).

Additionally, the FY19 Ligas budget of $235.6 M can be offset by a corresponding reduction in the ICFDD system's liability, due to facility downsizing and closures, related to Ligas activities.  In FY19 the ICFDD system's liability has decreased by $64.5 M, related to these bed reductions. As a result, the "net" FY19 budget for Ligas activities can be reported as $171.1 M ($235.6 M minus $64.5M).

24

Federal Approval of Waiver Capacity

Each year, as new enrollment opportunities are made available for individuals, the DDD works with HFS to submit an amendment increasing the capacity of the adult Waiver[x], as needed.

The current adult Waiver capacity is 23,049.


## Section XI.  Interagency Agreements

Interagency agreements, necessary to carry out the provisions of the Decree, are in place among the Departments.  Specifically, there is an interagency agreement among the Departments of Children and Family Services, Healthcare and Family Services, Human Services, and Public Health that addresses the interactions involving developmental disabilities Medicaid programs.  This agreement is available upon request from the DDD. DDD continues to work toward a Memorandum of Understanding with the Division of Rehabilitation Services as required by the Workforce Innovation and Opportunity Act (WIOA) and discussed in Section VI above.  The current collaborative effort on the grid mentioned previously will be used to develop this Memorandum of Understanding ("MOU").  Work is nearing completion on the grid, and it is anticipated that the MOU could be in place by Spring, 2019.  At this point, the DDD does not anticipate the need for any other new interagency agreements to implement the Decree.


## Section XII.  Process for Plan Reporting and Modification

> *Paragraph 28.  The Implementation Plan shall be updated and amended annually, or at such earlier intervals as Defendants deem necessary or appropriate…*
>
> *Paragraph 33.  …Not less than every six (6) months, Defendants shall provide to the Monitor, Plaintiffs, Class Counsel, Intervenors and Intervenors' Counsel and make publicly available, a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and Defendants' progress toward achieving compliance.  Prior to the first report, the Parties and the Monitor will agree on the data and information that must be included in such reports…*

Pursuant to Paragraph 28 of the Decree, the DDD will review the Implementation Plan on an annual basis.  It was agreed that the State would provide its next proposed Implementation Plan in January 2020. Changes will be made, as needed, with the assistance of the Monitor.  The proposed modifications will be submitted to the Monitor. The Plaintiffs and, if applicable, the Intervenors, will be given the opportunity for input.

Per Paragraph 33 of the Decree, the DDD will report data and information regarding its progress toward compliance with the provisions of the Decree. The Parties, Intervenors, and Monitor agreed to a standard format for these data reports, which are now being produced twice per year by February 15th and August 15th. Defendants agreed to modify future reports to reflect data related to moving people off of PUNS at a reasonable pace and moving people from Home-Based to CILA with reasonable promptness. [By mutual agreement, the deadline for the first report was extended so the DDD could incorporate information regarding the Governor's proposed budget for FY13.] These reports are being posted on the DDD's website as they are available.

## Section XIII. Acronyms

The following, for reference, is a list of acronyms used throughout this document:

CILA – Community Integrated Living Arrangement
DDD – Division of Developmental Disabilities
DHS – Illinois Department of Human Services
HBS – Home-Based Support Services
HFS – Illinois Department of Healthcare and Family Services
ICF/DD – Intermediate Care Facility for Persons with Developmental Disabilities
ISC – Independent Service Coordination
ISSA – Individual Service and Support Advocacy
JCAR – Joint Committee on Administrative Rules
PUNS – Prioritization of Urgency of Need for Services
RFP – Request for Proposals

---

[i] The link to the new provider page is http://www.dhs.state.il.us/page.aspx?item=47336.

[ii] The link to the sample downsizing agreements are: http://www.dhs.state.il.us/page.aspx?item=85069 and http://www.dhs.state.il.us/page.aspx?item=85081.

[iii] The link to the adult DD Waiver is http://www.dhs.state.il.us/OneNetLibrary/27896/documents/Reta/AdultDDRenewalApproved7117.pdf

[iv] The link to the DDD's training information is http://www.dhs.state.il.us/page.aspx?item=45209.

[vi] The link to the crisis criteria is http://www.dhs.state.il.us/OneNetLibrary/27897/documents/DD%20Reports/Community%20Emergency%20Criteria%20-%20Adults.pdf.

[vii] The link to Rule 120 is http://www.ilga.gov/commission/jcar/admincode/059/05900120sections.html.

viii The link to Form IL462-1202, Notice of Individual's Right to Appeal is
http://www.dhs.state.il.us/OneNetLibrary/27897/documents/Forms/IL462-1202.pdf.

ix The link to the DDPAS-10 Form is
http://www.dhs.state.il.us/OneNetLibrary/4/documents/PAS/DDPAS100111.pdf.

x The link to the adult DD Waiver is
http://www.dhs.state.il.us/OneNetLibrary/27896/documents/Reta/AdultDDRenewalApproved7117.pdf

# Exhibit

**Reasonable Pace Proposal**

**May 3, 2019**

Pursuant to Paragraph 23 of the *Ligas* Consent Decree, Reasonable Pace will be measured based on the number of individuals in the "Seeking Services" category of the PUNS list who Enter Service under the Waiver during a 12-month period (which will be measured by Fiscal Year, July 1-June 30). "Enter Service" means those who have begun receiving services under the Waiver (Home-Based or CILA), as reported by the ISCs. This figure (600 and 630 per year as set forth below) is not dependent on the date on which the individual was selected from PUNS but may include individuals from any previous PUNS selection who enter service during the reporting period. This figure also does not include individuals who enter services through a Crisis determination, consistent with Paragraph 21 of the *Ligas* Consent Decree.

PUNS selections will be conducted annually. Approximately six months prior to the beginning of each fiscal year, individuals and/or guardians who are anticipated to be in the selected group will be provided notification of their likely upcoming selection to encourage early planning. In addition to the annual PUNS selection, if, six-months post selection, the responses to the selection letters are below the anticipated targets, the Division will conduct a second PUNS selection to fill the unused targeted capacity.

PUNS selections will be tailored such that by the FY2025 selection, no individual will wait on PUNS for over 60 months. For individuals who are added to the PUNS list before their 18th birthday, the 60-month period will begin when the individual turns 18.

For Fiscal Year 20 the Division agrees to serve a minimum of 600 individuals selected from the PUNS list. For FY20 only, this figure will include individuals selected from PUNS who are currently receiving Home Based services, but who are seeking CILA placement. In Fiscal Years 21 through 25, the Division agrees to serve a minimum of 630 individuals from the PUNS list each year. However, for this period, individuals selected from the PUNS list who were receiving Home-Based services at the time of selection and who move to CILA services will not be counted toward the 630 minimum. By December 31, 2019, the State and Class Counsel will determine the process for individuals seeking to move from Home-Based services to CILA services with reasonable promptness In addition, the Division agrees to serve an average minimum of 630 individuals from the PUNS list for the years FY20-FY22, such that no fewer than 1,890 individuals will be served for that time period.

The actual number of individuals served will increase during this period as the targeted maximum wait time is reduced as noted below. However, these maximum wait targets are based on current PUNS data, and may fluctuate to some extent over the next few years, with the exception of FY25, in which the maximum will be 60 months.

FY20: Initial Yearly Selection will be based on a maximum wait of 76 months;
FY21: Initial Yearly Selection will be based on a maximum wait of 70 months;
FY22: Initial Yearly Selection will be based on a maximum wait of 64 months;
FY23: Initial Yearly Selection will be based on a maximum wait of 63 months;
FY24: Initial Yearly Selection will be based on a maximum wait of 61 months;

EXHIBIT A

FY25   Initial Yearly Selection will be based on a maximum wait of 60 months.

The Division will include Reasonable Pace data and data related to people seeking to move from Home-Based to CILA in the semi-annual *Ligas* Reports.

EXHIBIT A