# Stanley Ligas, et al.

# v.

# Theresa Eagleson, et al.

## Seventh Annual Report of the Monitor

March 3, 2020

Respectfully Submitted:
Ronnie Cohn
Monitor
ligas.monitor@gmail.com

# Stanley Ligas, et al. v. Theresa Eagleson, et al.

## Seventh Annual Report of the Monitor

March 2, 2020

## Table of Contents

| | | | |
|---|---|---|---|
| I. | Introduction | | 1 |
| II. | Review of Compliance Findings to Date | | 6 |
| | A. | Summary of Fourth, Fifth and Sixth Annual Reports | 6 |
| | B. | Findings for 1/1/2019 through 2/29/2020 | 11 |
| | | 1. Resources and Capacity | 11 |
| | | 2. Ligas Compliance Measures | 14 |
| | | 3. Implementation Plan | 43 |
| | | 4. Person Centered Planning (formerly referenced as Transition Service Plans) | 43 |
| | | 5. Crisis Services | 45 |
| | | 6. Transition for Class Members in ICFs/DD | 54 |
| | | 7. Transitions for Class Members on Waiting List/Class Member Lists | 55 |
| | | 8. Outreach | 57 |
| | | 9. Data Reports | 58 |
| III. | Actions Toward Compliance | | 59 |
| | A. | Parties' Meetings | 59 |
| | B. | Status Conferences in Court | 59 |
| | C. | Oversight Committee Meetings | 60 |
| IV. | Closing Remarks | | 62 |
| V. | Attachments | | |
| | A. | 2019 Implementation Plan | |
| | B. | Ligas Compliance Measures Data Scoring Summary | |

# I.   INTRODUCTION

This Seventh Annual Report of the Monitor is respectfully submitted to the Court, Parties, and Intervenors in accordance with Paragraph 34 of the Ligas Consent Decree (Decree), which was approved and filed by the Court on June 15, 2011.  The Decree requires that:

> *"The Monitor shall file annual reports to the Court, which shall be made publicly available.  Such reports shall include the information necessary, in the Monitor's professional judgment, for the Court, Plaintiffs and Intervenors to evaluate Defendants' compliance or non-compliance with the terms of the Decree*

The first three Annual Reports of the Monitor were submitted by the first Ligas Monitor, Tony Records, who was appointed by the Court on July 19, 2011.  Upon his retirement, the current Monitor's appointment became effective on July 1, 2015 and all subsequent reports were submitted by the current Monitor.  All of these reports are available on the website of the Department of Human Services (DHS):  http://www.dhs.state.il.us/page.aspx?item=64489

As described in the Plaintiffs' current Fact Sheet

> "Ligas v. Eagleson (originally Ligas v. Maram) is a lawsuit filed in 2005 by nine people with developmental disabilities (Plaintiffs) who resided in large private State-funded facilities (ICFs-DD) or who were likely to be placed in such facilities if they did not get community services.  Plaintiffs wanted to receive community services, but their requests had been denied by the State of Illinois.  In 2006, a Judge certified the case as a class action.  (Note that people living in State-operated Developmental Centers are not part of the class action.)  Prior to trial, the parties reached an

agreement, but at a Fairness Hearing in July of 2009, the Judge found that the class definition was too broad as it included people who did not desire to live in the community. Accordingly, the Judge did not approve the agreement and de-certified the class. In January of 2011, the Plaintiffs, the state and the Intervenors (representing those who wished to remain in ICFs-DD) reached a new agreement that all could support. The Judge held a Fairness Hearing on June 15, 2011 and approved the proposed Consent Decree. This historic agreement reflects momentous change in state policy for serving people with developmental disabilities. Over 8,500 class members have received community services under the Consent Decree through November, 2019."

The Monitor appreciates collaborative efforts with the Defendants; Plaintiffs' counsel and representatives; Counsel for the Intervenors; family and advocacy associations; service providers and provider organizations; the Illinois Council on Developmental Disabilities; service coordinators and many others. Ongoing communication with beneficiaries of the Decree and their families continues to be of great value to the Monitor in evaluating the Decree's effectiveness at each stage of its implementation.

Once again, it is recognized that although the Defendants remain out of compliance as described herein, there have been significant efforts toward progress, most notably following United States District Court Judge Sharon Johnson Coleman's Order entered on June 6, 2018:

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| STANLEY LIGAS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 05 cv 4331 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| FELICIA NORWOOD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER

Coming before the Court on the proposed plan for compliance with the Consent Decree submitted by the defendants, officials of Illinois Department of Healthcare and Family Services and the Illinois Department of Human Services. This Court entered an Order on August 18, 2017, finding that defendants were not in substantial compliance with the Consent Decree entered on June 15, 2011. This Court directed defendants to establish a plan for compliance. This Court finds that the proposed plan does not adequately address the shortcomings that the Court identified in its previous Order.

### Statement

In its August 18, 2017, Order this Court found that defendants were not in compliance with the Consent Decree by failing to provide the resources of sufficient quality, scope, and variety. This Court acknowledged the State of Illinois' significant budgetary issues in its Order. Although the Illinois legislature passed a budget today, the Court is under no illusion that Illinois' financial difficulties persist.

Defendants' proposed compliance plan contains four major strategies: (1) defendants have started a pilot program to expand the pool of candidates for service providers to seeking to fill open direct support professional ("DSP") positions; (2) defendants have significantly increased funding for DSP wages, amounting to a 14% increase from FY2017 through FY2020; (3) defendants are enhancing and adding to their monitoring of service delivery; (4) working on several additional programmatic changes and enhancements. The Court finds that this is a good faith effort and a

reasonable start, but doubts that the proposal is adequate to address the issue of wages, staffing, and retention.

At the April 4, 2018, hearing on this matter the Court expressed uncertainty over the defendants' pilot project to expand the pool of potential candidates by coordinating with the Division of Family and Community Services to recruit able-bodied adults with no dependents who receive public assistance benefits from the Temporary Assistance for Needy Families ("TANF") and Supplemental Nutrition Assistance Program ("SNAP"). It is unclear that this pilot program will expand the candidate pool at all. It is also unclear to this Court whether it will address the corollary problem of retention of well-qualified employees when the wages continue to remain low.

Defendants' plan for wages falls woefully short, amounting only to a $0.38 per hour per year increase for between FY2017 and FY2020. Defendants acknowledged that their proposal is particularly inadequate for DSPs working in Chicago, who will need a greater increase to keep pace with the minimum wage increases passed by the Chicago City Council. As both the Court Monitor and the plaintiffs point out, defendants have not always viewed DSP as a minimum wage job. Historically, DSPs were paid twice the minimum wage. It may not be feasible for the State to raise wage rates to that level, but this Court hesitates to affirm the devaluing of the role of caregivers for some of the more vulnerable members of our society. At the same time, this Court is not in the position to act as super-legislator by dictating how the State should allocate funds and administer its budget.

One of the criticisms of the defendants' proposal levied by the Court Monitor is that the proposal is too short-sighted and does not have a long-term plan. This Court agrees. However, it has been nearly seven years since the entry of the Consent Decree and this Court sees no end to the Court's oversight. For the defendants to truly comply and provide adequate services, the parties and stakeholders will have to come together to formulate a long-term plan to address these issues.

This Court believes that convening a work group that includes the Monitor and other independent stakeholders to study the wage rates for DSPs, the funding methodology for CILAs and ICFs for individuals with Intellectual and Developmental Disabilities, and develop a monitoring tool to assess adequacy of services, funding, and administration. Ideally the monitoring tool would include an independent review component. The Court also takes the Court Monitor's recommendation that the parties pursue expeditiously their discussion for developing the criteria for moving individuals from the Prioritization for Urgency of Need for Services ("PUNS") waiting list at a reasonable pace.

      This Court concludes that ultimately it must be the parties that develop adequate solutions to the problems at issue. This Court lacks the expertise and the budgetary authority to impose measures to resolve the issues here. The Court directs the parties to continue to develop a plan to address the issues causing the reduction in services and to bring the State into substantial compliance.

IT IS SO ORDERED.

      ENTERED:

Dated: 6/6/18

                                      _____

                                        SHARON JOHNSON COLEMAN
                                        United States District Judge

## II.  REVIEW OF COMPLIANCE FINDINGS TO DATE

### A.  Summary of the Monitor's Fourth, Fifth and Sixth Annual Reports

The Monitor's Fourth and Fifth Annual Reports cite the lack of a State Budget for Fiscal Years (FY) 2016 and 2017 in Illinois and describe the uncertainties this created for beneficiaries of the Consent Decree and their families as well as for advocates, staff and providers of all types of services received by the Decree's beneficiaries. The joint efforts of the Plaintiffs, Defendants, Intervenors and Monitor in 2015 and 2016 resulted in Court Orders approved by United States District Court Judge Sharon Johnson Coleman which required, in part:

> "The Comptroller shall continue to timely approve and make payments for services, programs and personnel, at a level and within the time period that such payments were made in Fiscal Year 2016, that are necessary to comply with the Consent Decree and Implementation Plans.  The Courts previous orders of June 30, 2015 (Dkt. #597), August 18, 2015 (Dkt. #610) and September 1, 2015 (Dkt. #624) are incorporated herein and shall continue in effect.  This Order shall remain in effect until the earlier of the effective date of the Fiscal Year 2017 budget or July 1, 2017, or until further order of this Court."

This Order also required monthly reports to the Monitor "to enable her to evaluate and to advise the Court and the Parties regarding the State's compliance with the Consent Decree and Orders entered by this Court" and that "if at any time the State believes that it may not be able to comply with any provision of the Consent Decree or this Order, the State must immediately bring the State's potential non-compliance to the

attention of the Court, the Monitor, the Plaintiffs and the Intervenors before such non-compliance occurs."

At the time that the Fifth Annual Report of the Monitor was issued, the Defendants had continued to maintain funding at the same level paid in FY 2015 which, though in compliance with the Court Orders and clearly necessary to continue services, remained inadequate as reported in both the Fourth and Fifth Annual Reports.

Both the Fourth and Fifth Annual Reports of the Monitor emphasize the fact that low wages, particularly those paid to Direct Support Professionals (DSPs) but including those paid to others providing services to beneficiaries of the Consent Decree, resulted in a staffing crisis for providers of services in their efforts to recruit, train and maintain adequate staff. At the time of the writing of the Fifth Annual Report in January, 2017 there had been no relief in terms of salary increases, DSP vacancy rates or increases in rates paid to providers since 2008 while operating costs continued to increase.

Other issues, which were first noted in the Fourth Annual Report and continued into the following two years include, but were not limited to:

1. Delays in initiation of services for Class Members once they have been selected from the Prioritization of Urgency of Need for Services (PUNS) list;

2. Limited availability of small Community Integrated Living Arrangements (CILAs) in some geographic areas as well as for individuals with more intense medical, behavioral or physical needs;

3. Inadequate availability of flexible, person-centered, integrated day activities or employment for individuals seeking such opportunities;

4. Inadequate monitoring of the quality of services provided to beneficiaries of the Consent Decree.

The negative impact upon beneficiaries of the Consent Decree of the inadequacy of both funding of services and of the limited processes put in place by the Defendants to monitor the quality of services is described in detail in the Fifth Annual Report, as is the Monitor's concern regarding the inability of the parties to reach consensus on an Implementation Plan.

The Sixth Annual Report again includes a focus on Paragraphs 4 and 5 of the Consent Decree related to Resources and Capacity and includes: details of the Defendants' responses to the Fifth Annual Report; the Plaintiffs' and Intervenors' 4/7/2017 Joint Motion to Enforce the Consent Decree; the Defendants' response to the Joint Motion as well as several

replies from the Plaintiffs, Intervenor and the Monitor. All of these communications as well as several Court appearances resulted in Judge Sharon Johnson Coleman's Order of 8/11/17 which concluded with:

> "Accordingly, this Court finds that defendants are not in compliance with the Consent Decree by failing to provide the resources of sufficient quality, scope, and variety based on the ample evidence presented to the Court that individuals protected by the Decree have experienced a reduction of services and have suffered substantially as a result. The dire financial situation of the State of Illinois and the attendant competing demands for resources are not lost on the Court. The Court directs the State to devise a plan to address the issues causing the reductions in services and to bring the State into substantial compliance."

In response to the Court's direction to the State to devise a plan to "bring the State into substantial compliance", the Defendants filed a Status Report on 3/30/2018 which included plans to increase hiring and funding of Direct Support Professionals (DSPs), enhance monitoring of service delivery and increase available services. However, the response from the Plaintiffs and Intervenors characterized the proposals as "woefully inadequate" and requested that the Court order the Defendants to both submit a new compliance plan and form a workgroup of stakeholders to recommend revisions to the rate methodologies for CILAs and ICFs/DD. The Monitor responded that the State's plan would not resolve the pervasive staffing issues for staff whose wages had not been increased for almost a decade; that the Court ordered workgroup should be convened; and that an effort should be initiated promptly to develop a quality monitoring tool which would include an independent aspect of the review process.

The Ligas Consent Decree, as well as the Monitor's Fourth, Fifth and Sixth Annual Reports and the Defendants' responses to these reports are available on the website of the Department of Human Services (DHS). http://www.dhs.state.il.us/page.aspx?item=66987 The Equip For Equality website (https://www.equipforequality.org/) also includes information related to the Ligas litigation and the Monitor's reports.

12

## B. <u>Findings for January, 2019 through February, 2020</u>

### 1. Resources and Capacity

Paragraph 4 of the Consent Decree requires in part:

> "Defendants shall implement sufficient measures to ensure the availability of services, supports and other resources of sufficient quality, scope and variety to meet their obligations to such Individuals under the Decree and the Implementation Plan consistent with such choices."

> "Funding for services for each Individual with Developmental Disabilities will be based on the Individual's needs ... regardless of whether the Individual chooses to receive services in an ICF-DD or in a Community-Based setting."

> "Resources necessary to meet the needs of Individuals with Developmental Disabilities who choose to receive services in ICFs-DD shall be made available and such resources will not be affected by Defendants' fulfillment of their obligations under the Decree. ..."

Paragraph 5 of the Consent Decree requires, in part:

> "Annual budgets submitted by Defendants on behalf of their agencies shall request sufficient funds necessary to develop and maintain the services, supports and structures described in the Decree, consistent with the choices of Individuals with Developmental Disabilities, including Class Members. Defendants shall take steps sufficient to implement funding mechanisms that facilitate transition among service settings."

As noted above, although much remains to be accomplished to bring the Defendants into compliance with the Consent Decree, there has been progress over the past year.

*Rates and Wages*

It has continually been noted in national studies, as well as discussed in Court, that DSPs "are central to the quality of life of people with IDD" (The Council on Quality and Leadership) and that "their role is invaluable to the individuals they support, their families, and the long-term care system … and yet direct care workers are often overlooked, their contributions unrecognized and their efforts undercompensated." (Public Health Institute) Illinois is not alone in trying to address this problem, but still remains at the bottom of the nationwide lists for Direct Support Turnover Rates (45th), longest waiting lists (46th), lowest by far among neighboring Great Lake states for I/DD Community Fiscal Effort and Spending per Capita.

Modest wage increases in Illinois over the past three years included $0.75 for DSPs for Fiscal Year (FY) 18 and $0.50 for FY 19 and it appears to be too early to determine whether or not there has been a positive impact on either DSP turnover or vacancy rates. For example, while staff turnover in Community Integrated Living Arrangements (CILAs) may be down slightly, that rate reportedly is in part due to having fewer positions filled. Similarly, vacancies appear to continue to be due to low starting pay as well as insufficient applicants who meet the basic requirements of the job.

In a Joint Status Report to the Court on May 3, 2019, Plaintiffs, Intervenors and the Monitor noted that they had informed the Defendants of significant concerns about the absence of any increase in funding for CILAs and ICFs/DD as "beyond small increases in wages for direct care staff in the last couple of years, there has been no increase in reimbursement rates to cover increases in operating costs since March of 2008." Shortly thereafter, a 3.5% rate increase was announced for both community-based services and ICFs/DD to address providers' staffing and fiscal crises while the Oversight Committee (which is described in Section III below) was conducting its work. However, the 3.5% increase amounted to only approximately 40-50 cents per hour and would not enable providers to meet the $13.00 per hour minimum wage in both CILAs and ICFs in many areas of Illinois. The 3.5% increase required separate approvals, one from the federal Centers for Medicare and Medicaid Services (CMS) for community-based waiver services and the other in the form of a State Plan Amendment, following adoption in Statute, for ICFs/DD. There were delays in the State's submission of documents related to the ICFs/DD and in the implementation of the 3.5% increase. It is anticipated that approval of the differential between the 3.5% increase and $13.00 will be obtained during the first quarter of 2020 for community providers and as close to that as possible for ICFs/DD as there is the more complicated process of adopting the increase in statute and then filing a new State Plan Amendment.

## 2. **Ligas Compliance Measures**

Paragraph 4 of the Consent Decree specifically states that "Defendants shall implement sufficient measures to ensure the availability of services, supports and other resources of sufficient quality, scope and variety to meet their obligations to such individuals under the Decree and the Implementation Plan consistent with such choices". In addition, the Court's order of June 6, 2018 recommends the development of a monitoring tool, "with an independent review component" to assess adequacy of services. With this justification, the Monitor initiated multiple meetings with the Division of Developmental Disabilities, Bureau of Quality Management (BQM), Ligas Parties and others with whom the Monitor had previously engaged in such efforts. Once the IDHS (Illinois Department of Human Services) selected the Council on Quality and Leadership to manage the contract for this project and the Monitor's Data and Program Analyst agreed to be involved as well, the work began to develop the tool and identify as well as train the reviewers. Development of the Ligas Compliance Measures for People Living in CILAs continued through the end of January, 2019 and a final draft tool was issued to the Parties and the reviewers on February 8, 2019 in preparation for training reviewers and pilot testing the tool.

Following completion of all reviews, including data analysis and scoring, it was determined that all 225 class members reviewed would receive an individual "scorecard" to facilitate the process of correcting the identified

deficiencies. The Monitor has initiated conversations with the Parties' to discuss how best to address the review's findings.

# 2019 LIGAS COMPLIANCE MEASURES

## Class Members Living in
## Community Integrated Living Arrangements (CILA)

Development of the Ligas Compliance Measures tool and process began in January, 2019 and a final draft tool was issued in early February in preparation for training reviewers and pilot-testing the tool.

Three teams of 4 reviewers each were brought together for training in February, 2019. One group was from CQL (the Council on Quality and Leadership), one from BQM (Bureau of Quality Management) and one recommended by the Monitor. The training included classroom work, document reviews and on-site visits to Class Members. Each team was comprised of reviewers from mixed groups in an effort to ensure interrater reliability as well as consistency of interpretation and rating of findings. For the pilot, each team was assigned only one class member to review per day and all reviewers then conciliated their findings related to that one person. Each of the two days of review activities ended with an evening of conversation and feedback, followed by the final day of bringing all teams together to discuss any revisions recommended to either the tool or the process. There were several group conference calls prior to beginning the

actual review process, for which each reviewer was assigned one Class Member per review day. Additional individual and group conference calls were convened as necessary. All reviews were completed and submitted to the project manager by the end of December, 2019.

The tool is comprised of 17 sections and each section includes measures by which compliance is to be rated Met, Not Met, N/A (Not Applicable to the individual) or CND (Could Not be Determined). Within each section are measures either identified as "red flags" (indicated in red font on the scoring sheet) or noted to be a requirement of the HCBS (Home and Community Based Settings) Rule (indicated with an asterisk).

The scoring reflects the number of class members who received a "Met" rating out of the possible number of "Met" ratings. Therefore, the N for each Measure could be different than 225 as the N/A and CND ratings were not included in the total number. N/A and CND ratings were assigned for a variety of reasons including, but not limited to: documents were not provided either prior to or available at the time of the review; the individual/guardian/staff or others involved were not responsive. The process of data analysis and conciliation of data for accuracy was completed with assistance from the University of Illinois at Chicago.

In order to be determined in compliance, within a given section each measure must be rated 85% or above, inclusive of red flag measures. Scoring within the Observation Table in Section 3 (Safety) is factored into that section's overall rating. However, the Observation Tables in Sections 4 (Staffing) and 5 (Day/Employment) were added to the tool three months into the review process, based upon reviewers' input. Therefore, those ratings are provided for informational purposes only and are not factored into the overall score for each of those sections.

A general demographics analysis of the Ligas Compliance Measures review process finds that of the 225 class members reviewed, 133 are male and 92 are female with ages ranging from 22-89 (see chart below for more detail).

| Age Range | # Represented in Compliance Reviews |
|-----------|-------------------------------------|
| 22-29 | 31 |
| 30-39 | 48 |
| 40-49 | 39 |
| 50-59 | 54 |
| 60-69 | 31 |
| 70-79 | 16 |
| 80-89 | 6 |

The team reviewed class members residing with 132 residential agencies across 63 counties in Illinois. 93% (209) of the individuals reviewed were receiving 24-hour Community Integrated Living Arrangements (CILA) services. Of these, approximately 83% were residing in larger group homes licensed for 5-8 individuals while only 11% were living in smaller homes licensed for 2-4 individuals. The remaining 16 individuals reviewed were receiving either Intermittent or Host-Family CILA services.

In addition to residential agencies, the sampling process for the Compliance Review ensured that all Independent Service Coordination (ISC) agencies were included. At the time the samples were selected, seventeen ISC agencies were providing case management services in Illinois. However, the number of agencies decreased on July 1, 2019 and now eight agencies provide services in Illinois. The following table reflects ratings for each measure and overall ratings (inclusive of red flag measures) along with Key Findings for each domain. Ratings for measures consistent with HCBS Settings Rule have also been provided for informational purposes.

## SUMMARY of RATINGS by DOMAIN and KEY FINDINGS

| DOMAINs<br>Ratings of "Met" from each individual review completed<br>Total N=225<br>*(CND and N/A ratings have been omitted, therefore each measure may have a different N)* | | |
|---|---|---|
| **1. PERSON-CENTERED PLANNING/MEASURING OUTCOMES** | | **Overall Rating: 46%**<br>**41% (Red Flag)** |
| • *31 measures*<br>• *1/31 measures rated 85% or above (R)*<br>• *16 red flag measures*<br>• *0/16 red flag measures rated 85% or above* | | |
| A | The individual's personal outcomes and preferences are fully captured within the most recent Discovery Tool document. | 68%<br>(N=224) |
| B | The ISC has documented identified risks in the Discovery Tool and developed a plan to mitigate those risks. | 70%<br>(N=224) |
| C | Risks to the individual and the strategies, supports, and safeguards to minimize risk are identified in the Personal Plan. | 45%<br>(N=225) |
| D | The individual's strengths and preferences are documented in the Personal Plan. | 62%<br>(N=225) |
| E | The individual's desired outcomes are documented in the Personal Plan. | 45%<br>(N=225) |

| F | Each specific service and support addresses the persons needs in order to achieve desired outcomes identified in the Personal Plan. | 59% (N=225) |
|---|---|---|
| G | The individual's preferences for leisure and recreational activities are identified in the Personal Plan. | 62% (N=225) |
| H | The individual's valued social roles are identified in the Personal Plan. | 40% (N=225) |
| I | The extent to which the person is capable of and willing to participate in decisions regarding his/her personal funds management as well as the extent to which the agency is entrusted with assisting in the management of personal funds are identified in the Personal Plan. | 48% (N=225) |
| J | The individual's preferences for transportation are identified in the Personal Plan. | 41% (N=225) |
| K | Assessments needed by the individual or required by program regulation were completed in a timely manner to inform the individual's Personal Plan development. | 65% (N=224) |
| L | The individual's identified needs for clinical and/or functional support are documented in the Personal Plan. | 52% (N=216) |
| M | The individual's priorities/interests regarding meaningful community-based activities, including the desired frequency and the supports needed are identified in the Personal Plan. | 38% (N=225) |
| N | The individual's desired outcomes, priorities, and interests regarding meaningful work, volunteer and recreational activities are identified in the Personal Plan. | 41% (N=225) |
| O | The individual's desired outcomes and priorities regarding meaningful relationships are identified in the Personal Plan. | 52% (N=225) |
| P | The individual's desired outcomes and priorities related to health concerns and medical needs are identified in the Personal Plan. | 58% (N=221) |
| Q | Provider agencies that agree to support service(s) or outcomes listed in the Personal Plan will document the service(s) and outcomes on the Provider Signature Page. | 78% (N=225) |
| R | The Personal Plan is completed in a timely manner. | 87% (N=202) |
| S | Implementation Strategies are received and approved from all involved provider agencies within 20 days of signing the Personal Plan. | 59% (N=222) |
| T | The Implementation Strategies address all identified risks in the areas for which the provider is responsible. | 48% (N=224) |
| U | The Implementation Strategies address desired outcomes for which are identified in the Personal Plan and for which the provider is responsible. | 57% (N=225) |
| V | The Implementation Strategies give direction to provider staff how to support the individual and ensure consistent implementation of his/her desired outcomes. | 33% (N=225) |
| W | The Implementation Strategies include justification for all restrictions and setting modifications that impact the person receiving services. | 21% (N=180) |
| X | The Implementation Strategies include criteria by which the team can determine when the outcome has been achieved. | 29% (N=224) |
| Y | Measurable data is kept which verifies the consistent implementation of each of the strategies so a determination regarding progress/lack of progress can be made. | 29% (N=224) |
| Z | Strategies are implemented at a frequency that enables the individual to learn new skills. | 25% (N=224) |
| AA | Monthly/Quarterly reviews track progress toward achievement of Personal Plan outcomes | 25% |

| | | | (N=225) |
|---|---|---|---|
| BB | The person has made measurable progress toward achieving outcomes in the past year. | | 21% (N=219) |
| CC | The person's service(s) in total, contribute to advancing toward or achieving his/her desired outcomes. | | 36% (N=223) |
| DD | If the person is not successful in achieving outcomes, the team has determined why and what changes are needed. | | 6% (N=163) |
| EE | The provider and ISC recognize when the individual is not making progress toward outcomes and take appropriate actions to address the problem(s) in a timely manner. | | 4% (N=168) |

**Key Findings:**

- For 70% of the individuals reviewed did the ISC identify risks in the Discovery Tool. Additionally, strategies, supports, and safeguards to address the identified risks were included in the Personal Plan in only 45% of the individuals reviewed. When strategies were identified, they often relied solely on staffing and supervision (i.e., the individual is receiving 24-hour residential supports) and rarely included development of individual skills that would reduce risks and resulting supervision needs.

- The Discovery Tool was almost always just copied and pasted to the Personal Plan.

- The Personal Plan development often did not include input from supporting provider agencies or persons who know the individual best. Many providers indicated that they were not aware of the plan outcomes until the plan was provided.

- Personal Plan outcomes often reflected activities in which the person already engages, and has been engaged in for a number of years, or were most often deficiency driven, rather than reflecting growth and development of new skills, interest or activities.

- There was a disconnect between the Personal Plan outcomes and the agency Implementation Strategies.

- Provider agency Implementation Strategies often were appended to a document that contained all the elements of a Personal Plan, or were developed through a planning meeting process, but which differed significantly from the Personal Plan authored by the ISC.

- Often, the agency wrote a preface to the Implementation Strategies which was more easily understood than the Personal Plan itself. Some agencies called this an ISP and attached it to the Implementation Strategies.

- Frequently there were outcomes in the Personal Plan that were not reflected in agency Implementation Strategies and there were Implementation Strategies in the agency plans/strategies that addressed outcomes that were not included in the Personal Plan.

- Implementation Strategies often did not include criteria by which the team could determine whether strategies had accomplished the desired outcome.

- Implementation Strategies often did not include sufficient instruction to staff to ensure consistent implementation of outcomes.

- Measurable data was often not available or not provided in monthly or quarterly reviews in order to make an assessment of progress toward outcomes.

- Daily documentation was scant or even nonexistent. A calendar would be provided as documentation to reflect an individual's participation in community activities, and the staff would then explain that the individual went on some, none or all of them. For example, bowling one night a month, trips to the Dollar store, or eating out as a group had no personal, individual information to assess the individual's level of participation. In another example the person's outcome was to call family 1x a week. The staff explained that the person is completing this, but there was no record to support implementation, or describe whether the person was learning to dial a number, or complete other steps to call their family.

- Staff would tell an anecdotal story, such as the individual actually rolled the bowling ball, or picked from a menu, but this was not documented, and progress was not recorded.

- There was often no evidence that provider or ISC recognized or took action to address lack of implementation or lack of progress toward outcomes.

| 2. INDEPENDENT SERVICE COORDINATION | | Overall Rating: 47% 44% (Red Flag) |
|---|---|---|
| • 11 measures • 1/11 measure rated 85% or above (B) • 7 red flag measures • 0/7 red flag measures rated 85% or above | | |
| A | There is evidence the individual/guardian was provided a choice of Independent Service Coordinator. | 15% (N=206) |
| B | Pre-Admission Screening is completed in a timely manner, if applicable. | 92% (N=168) |
| C | There is evidence the ISC has demonstrated competency in assisting the individual in development of a Personal Plan that describes the services and supports necessary to implement the individual's desired outcomes. | 53% (N=224) |
| D | Crisis Transition Plan and Funding Request document (IL462-0140) is completed in a timely manner. | 67% (N=6) |
| E | In person visits with the individual served completed at least 2x/year: once for the development of the personal plan and once at least 4-6 months later (unless greater frequency is requested by the individual and/or guardian). | 80% (N=224) |
| F | Personal Plan is updated when significant changes occur. | 27% (N=111) |

| G | The ISC monitors that the individual is linked to and receiving the services he/she wants and that the services are helping the individual to attain her/her valued outcomes as well as to observe for evidence that the person is safe and well. | 49% (N=223) |
|---|---|---|
| H | There is evidence the ISC reviewed data during their contacts with the individual to determine progress and identify the need for changes in supports. | 30% (N=221) |
| I | The ISC notes reflect monitoring and tracking of the delivery of services as outlined in the Personal Plan. | 40% (N=221) |
| J | The ISC has contact with the individual's guardian, family, advocate, and/or other significant people to assess satisfaction and improve coordination of services. | 40% (N=222) |
| K | The ISC provides case management services at the level needed by this individual, including any necessary follow-up to CIRAS reports or OIG investigations. | 44% (N=216) |
| L | The ISC has assisted the individual and/or guardian in understanding his/her right to appeal adverse actions and facilitated the appeal process upon request. | 44% (N=218) |

### Key Findings:

- The Discovery, Personal Plan and Implementation Strategies for the most part were completed timely.
- As of July 1, 2019, when the number of ISC agencies was decreased, there was no evidence of choice for affected individuals

- The roles of the ISC and the ISC agency were not always identifiable by either the person, the guardian, or even the agency staff, including the name of the actual ISC.

- The ISC was not regularly notified when changes are needed that would have an effect on the person and the personal plan.

- The ISC is making the two required in person visits with the individual but rarely was ISC presence noted at both day and residential settings. ISC visits were found to be at one place or the other.

- Case Management supports and monitoring are core individual and systems safeguards. Yet, documentation that the case manager is monitoring and tracking the delivery of services as outlined in the Personal Plan was present in only 49% of the individuals reviewed.

- The Monitor's Fifth Annual Report describes a project completed by the Monitor and Data and Program Analyst to assess the adequacy of Ligas Transition Service Plans. At that time, ISCs were expected to conduct four visits per year. Based upon a review of 53 class members' visit notes, only 40% identified appropriate outcomes for the person, determined whether or not services were being provided in accord with the ISP or measured progress toward outcomes. The Monitor's recommendation from this project, which took place in 2016, was that "emphasis be placed on addressing these issues as part of ongoing initiatives to enhance quality monitoring."

| 3. SAFETY (INCLUDING RISK MITIGATION, ENVIRONMENTAL MAINTENANCE) | Overall Rating: 83% 74% (Red Flag) 64%* |
|---|---|

- *21 measures*
- *4/8 measures rated 85% or above (A, B, C, E)*
- *8 red flag measures*
- *2/4 red flag measures rated 85% or above (A, B, FF, KK)*
- *2 measures consistent with HCBS Settings Rule*
- *0/2 measures consistent with HCBS Settings Rule rated 85% or above*

| | | |
|---|---|---|
| A | Home is adequate to meet the needs of the individual (e.g., doorways widened, appropriate ramps, stairs inside and out have appropriate railings, bathroom grab rails, walk-in/roll-in showers, etc.), reflects the individual's preferences/culture, is safe, and well maintained. | 87% (N=222) |
| B | Individualized adaptations specified in the individual's Personal Plan are present and in working order. | 86% (N=72) |
| C | Regular drills for fire and weather emergencies (e.g., tornado, earthquake) are conducted and documented as required. | 86% (N=219) |
| D | Fire and EMS personnel have been notified of any significant medical or evacuation issues with individuals in the home. | 76% (N=182) |
| E | The house and vehicles do not stand out apart from other homes in the neighborhood except for accommodations required to meet the needs and preferences of the individuals residing in the home. | 85% (N=220) |
| F | If the individual, family, and/or guardian reported any concerns about the person's health, safety, or environment, appropriate action has been taken to address. | 84% (N=107) |
| G | Based on review of the ISC monitoring reports for the past year, any problems or concerns noted about person's health, safety or environment were promptly and appropriately addressed. | 37% (N=225) |
| H | Based on record review, observations, and interviews does the reviewer note any concerns about the person's health, safety, or environment? | No=32% Yes=68% (N=225) |
| ENVIRONMENTAL OBSERVATION TABLE | | |
| AA | The home is clean, odor free, and well maintained (floors, carpets, walls, furniture, kitchens, baths, etc.). | 83% (N=223) |
| BB | Kitchen and laundry appliances are in working order. | 95% (N=222) |
| CC* | Home furnishings reflect the desires of the individuals residing in the home. | 63% (N=217) |
| DD* | The individual has personal possessions and decorations of his/her choice, not just in bedrooms, but the home reflects the individuals who live there. Are there photos/mementos of friends and family observable? The home should reflect the preferences, age, culture of the individuals, in both the individual bedrooms and throughout the home. In shared spaces, compromise should be reached among the varied preferences of all living in the home. | 64% (N=220) |
| EE | The individual can move freely throughout the home (with the exception of housemates' personal rooms). There are no designated staff areas (except in the case of live-in staff or agency leased office area, if applicable) where individuals are not allowed. | 71% (N=221) |
| FF | The individual has basic necessities such as food, shelter, clothing, utilities, furnishings, grooming supplies. | 98% (N=220) |
| GG | The home has an adequate supply of food, including basic commodities (e.g., sugar, flour, condiments). Food is appropriately stored. There is an adequate supply of enteral | 96% (N=222) |

| | nutrition formula if the individual receives food enterally. Enteral nutrition formula is not expired. | |
|---|---|---|
| HH | The home has an adequate supply of dishes, utensils, pots, pans, bakeware, etc. | 99% (N=221) |
| II | No safety hazards (e.g., dangling wires, broken/exposed electrical outlets, broken windows) are noted in the home. | 95% (N=222) |
| JJ | A fire extinguisher is located in the kitchen. A functional smoke detector is located outside bedrooms (or rooms used for sleeping) and on each level of the home. Carbon monoxide detectors are installed in homes with gas furnaces and appliances. | 96% (N=220) |
| KK | Supplies and information are in place to allow the individual and staff to identify and respond to emergency situations in a quick and efficient manner. Emergency contact phone numbers are readily available in easily accessible locations, including the OIG Hotline number. Contact names and numbers for investigators are posted or available to individuals, families, and staff. Basic first aid supplies are available in the home and in all vehicles. | 88% (N=214) |
| LL | Outside areas of the home, and the yard, is safe and accessible to the individual from the home. | 95% (N=222) |
| MM | Garbage is disposed of properly and is contained. | 99% (N=221) |

**Key Findings:**

- For the most part, individuals' homes were adequate, clean, well-stocked with food, dinnerware and cookware, and were well maintained. However, the home furnishings did not reflect the individuals' preferences and interests and very few individuals had personal possessions or decorations (e.g., family photos, mementos, culturally significant items) in their bedrooms or other areas of the home.

- Many homes had staff offices or other areas not accessible by the individuals living in the homes.

- Fire and emergency drills were conducted as required.

- Often there was no clear understanding from either documentation or interviews with staff as to whether Fire and EMS personnel had been notified or were aware of medical or evacuation needs of individuals living in the home.

- ISCs were not promptly and appropriately addressing noted issues regarding the person's health, safety, or environment. Most often, ISC monitoring reports did not reflect concerns or issues. For over half of the individuals reviewed, team members indicated they had concerns about the person's health, safety, or environment following the on-site visit.

- The guardian was not always notified of any reported concerns about health, safety or environment.

| | |
|---|---|
| **4. STAFF PRESENCE, CONDUCT, COMPETENCE (INCLUDING SUFFICEINT NUMBERS, STAFF TRAINING, STAFF KNOWLEDGE** | **Overall Rating: 77% 85% (Red Flag)** |

| OF PLAN/PREFERENCES, PROVISION OF SERVICES AS DOCUMENTED IN PLAN) | | 94%* |
|---|---|---|
| • 8 Measures<br>• 4/8 measures rated 85% or above (A, B, C, F)<br>• 6 red flag measures<br>• 4/6 red flag measures rated 85% or above (A, B, C, F)<br>• 3 measures consistent with HCBS Settings Rule<br>• 3/3 measures consistent with HCBS Settings Rule rated 85% or above (A, B, C)<br>NOTE: Staffing Observations are rated for informational purposes only, and not included in the overall rating. | | |
| A* | The staff meet the qualifications and have completed the Direct Support Professional training curriculum to be a DSP.<br>(training should also be monitored by another department) | 96%<br>(N=221) |
| B* | The staff is qualified and trained to administer medications. | 92%<br>(N=210) |
| C* | The staff have completed Rule 50 OIG training. | 94%<br>(N=219) |
| D | Adequate staff are present during the week and on weekends to provide the services and supports in the individual's Personal Plan. | 72%<br>(N=223) |
| E | Staffing is adequate to facilitate the individual's desired community life outcomes. | 58%<br>(N=219) |
| F | If the individual has been approved for 1:1 support, he/she is receiving that support. | 88%<br>(N=17) |
| G | Review of documentation and direct observation reflects staff are providing services (type, frequency and duration) as documented in the Personal Plan/Implementation Strategies designed to achieve the individual's desired outcomes. | 51%<br>(N=216) |
| H | The individual's services are delivered by competent staff/supports that understand their role and the person's needs, preferences, and desired outcomes related to his/her Personal Plan. | 72%<br>(N=220) |

| STAFFING OBSERVATION TABLE | | DAY<br>85%<br>83% (Red Flag) | HOME<br>83%<br>82% (Red Flag) |
|---|---|---|---|
| AA | Staff treat the individual, co-workers, visitors, persons calling on the telephone, etc. with dignity and respect. | 88%<br>(N=75) | 83%<br>(N=211) |
| BB | Staff serve as positive role models related to appearance, interactions, and demeanor. | 88%<br>(N=74) | 91%<br>(N=215) |
| CC | Staff do not engage in personal business while working with the individual. Staff do not air complaints and grievances with others while in the presence of persons receiving services. | 95%<br>(N=75) | 94%<br>(N=215) |
| DD | Staff demonstrate competency in person-specific training needed to support the individual (e.g., sign language, behavior management, dining support, etc.)<br>Staff demonstrate competency in communicating in the individual's preferred language (including alternative communication systems such as sign language). | 86%<br>(N=70) | 83%<br>(N=198) |
| EE | Individuals are noted to be neat, clean, dressed for the weather/conditions while reviewers are in the home. When needs | 84%<br>(N=74) | 93%<br>(N=215) |

| | arise, they are addressed promptly in a private and respectful manner that avoids calling undue attention to the individual. | | |
|---|---|---|---|
| FF | Staff interactions foster the individual's ability to make personal choices. | 81% (N=74) | 82% (N=211) |
| GG | Staff interactions promote learning of functional skills and overall independence such as personal care, dressing, eating, household chores, cooking, etc. | 79% (N=74) | 73% (N=202) |
| HH | Staff encourage individual participation in daily activities rather than performing tasks for the person. | 84% (N=74) | 78% (N=203) |
| II | Staff conduct promotes the premise that the home is the individual's home and not an institution, a business, or an office. | 82% (N=28) | 68% (N=214) |

**Key Findings:**

- There is evidence that the provider agencies consistently trained staff to be DSPs and to administer medications and maintain adequate staff training records.

- Staff were not always knowledgeable of the Personal plan or the strategies that they were required to implement.

- Staff indicated that if an individual does not want to work on an outcome, then they will just let it go. In some cases, staff had revised the strategies and the outcome without any authorization to do so.

- Staff working with individuals were caring and knowledgeable, respectful to the individuals and others, and responsive to their needs.

- Many observations revealed a propensity for staff to "do for" individuals rather than teach them the needed skills for greater self-sufficiency.

- Staff were familiar with class members' personal preferences and had received training specific to the needs of the individuals, but staff did not always demonstrate competency in person-specific supports and services.

| **5. EMPLOYMENT/DAY ACTIVITEIS, COMMUNITY INTEGRATION** | **Overall Rating: 31% 26% (Red Flag) 19%\*** |
|---|---|

- *14 measures*
- *0/14 measures rated 85% or above*
- *7 red flag measures*
- *0/7 red flag measures rated 85% or above*
- *3 measures consistent with HCBS Settings Rule*
- *0/3 measures consistent with HCBS Settings Rule rated 85% or above*

*NOTE: Environmental Observations are rated for informational purposes only, and not included in the overall rating.*

| A* | The individual has been offered opportunities to participate in work or job exploration including volunteer work and or trial work options. | 9% (N=191) |
|---|---|---|
| B | If there are barriers to employment, the team has assessed the need for clinical (behavior, health), assistive technology, and therapy supports as necessary for the person to become successful in employment if desired by the person. | 22% (N=143) |
| C | If necessary, the individual is provided with ongoing support as needed through a job coach or more informal supports. | 42% (N=36) |
| D* | The individual is engaged in supported or competitive employment as desired. | 10% (N=182) |
| E | For an individual who receives day services in the community, activities offered that are meaningful to the person. | 68% (N=47) |
| F | For an individual who receives day services in the community, regular opportunities are provided for community inclusion. | 57% (N=49) |
| G | For an individual who receives attends a facility-based day habilitation program or workshop, there is justification in his/her Personal Plan and activities offered are meaningful to the person. | 41% (N=179) |
| H | For an individual who attends a facility-based day habilitation program or workshop, regular opportunities are also provided for community inclusion. | 27% (N=178) |
| I | If the individual is retired, he/she has opportunities to engage in activities of interest during the day. | 39% (N=28) |
| J | The individual has adequate access to and use of generic services and natural supports as desired. | 58% (N=219) |
| K* | The individual is encouraged and supported to have access to the community based on his/her interests/preferences/priorities for meaningful activities. | 36% (N=223) |
| L | If there are barriers to the individual having access and inclusion in the community, the team has assessed the need for clinical supports (behavior, health), assistive technology, and therapy services as necessary. | 42% (N=147) |
| M | The individual has been offered opportunities for considering adult education programs if so desired. | 10% (N=122) |
| N | The individual has been offered opportunities for choosing and attending community-based senior citizen programs if so desired. | 6% (N=48) |
| *DAY/EMPLOYMENT ENVIRONMENTAL OBSERVATION TABLE* | | *67%* |
| 5aa | The facility/building is clean, odor free, and well maintained. | 78% (N=143) |
| 5bb | As you arrive, take note of the surroundings. Is the landscaping well kept? Does it appear safe? | 86% (N=140) |
| 5cc | Is the facility located to promote community integration? | 44% (N=140) |
| 5dd | Is there room for small groups and individual activities? | 75% (N=138) |
| 5ee | Are there signs of restrictions or restraints? | 15% (N=140) |
| 5ff | Did the direct support staff treat (name) in a respectful manner during the observation? | 87% (N=138) |
| 5gg | Were the person's rights respected? | 86% (N=138) |

| **Key Findings:** |
|---|

- 189 (84%) of the individuals in the review sample were of working age.

- Only 17 (9%) of the individuals of working age were engaged in supported or competitive employment.

- Individuals with identified interests were not provided with opportunities for work or job exploration.

- Individuals who were employed were often not working at the frequency they desired.

- Barriers to employment had not been identified with assessment of supports necessary for the person to become successfully employed.

- Most individuals reviewed spend their days in segregated facility-based programs.

- Activities provided at facility-based day programs were not always meaningful to the person nor consistent with their preferences and desires indicated in their Personal Plan.

- Many of the day facilities are located in large warehouse type buildings. Most have a history of production in contractual type work, although this work has declined and, in some cases, stopped altogether. These individuals continue to go to "work" but in reality, days are spent indoors, in large, crowded rooms with little to do, just waiting for snack and lunch times.

- In some cases where the facility had some in-house contracts, there was evidence the agency conducted informal vocational assessments to determine if or where the individual should work within the program. If it was deemed that the individual was either not eligible to work, he or she was given tasks such as sorting, cleaning, shredding, etc. Some were paid minimum wages for hours worked, but most received sub-minimum wage or piece work pay.

- A few facility program directors admitted to struggling with what to do with space and provision of activities, and a few have converted to resale shop type activities, taking in donations, cleaning and labeling products, then reselling in storefronts to the public. Even this work engages only a few individuals for a few hours, while the rest sit in large rooms with minimal instructors.

- Examples of facility-based programs reviewed:
    - In one large program, as many as 25 individuals were found to be sitting or walking around a sizeable room with 4 or 5 "instructors." When lunch time started, they all were taken to the cafeteria where they sat for up to an hour, waiting for lunch, eating and then waiting for everyone to finish. They were then returned to the room for personal care and to wait to go home. Although there were tabletop activities such as toys, puzzles, arts and crafts and books, very few individuals were engaged in these activities.

- In another day program, a single staff sat in a small, crowded classroom with 7 individuals with severe disabilities. Staff reported being unable to do more than talk to each person for a few minutes at a time and had no available time to provide any focused, individualized interaction. At lunch time, the individuals were led to a cafeteria and seated around a table together. When everyone was finished, they were led back to the same room to sit until it was time to go home. The program reported it has had a difficult time recruiting and retaining staff.

- For individuals whose day programs were community-based, only 57% were provided regular opportunities for community inclusion. These activities were often not meaningful to the person or based on their desires or interests and were most often provided in groups rather than individualized.

- Even for individuals with a stated desire for adult education or community-based senior citizen programs, there was little evidence to support they had been provided these opportunities.

- The review team found little evidence that individuals were aware they had options to choose their day services.

| 6.  LEISURE, RECREATION, SOCIAL RELATIONSHIPS (INCLUDING CONNECTION TO FAMILY AND FRIENDS) | | Overall Rating: 55% 48% (Red Flag) |
|---|---|---|
| - *8 measures*<br>- *0/8 measures rated 85% or above*<br>- *5 red flag measures*<br>- *0/5 red flag measures rated 85% or above* | | |
| A | The individual's desired outcomes and priorities regarding meaningful relationships and personal connections are implemented and respected. | 61% (N=222) |
| B | The individual is encouraged and supported to foster and/or maintain relationships that are important and meaningful to him/her. | 57% (N=223) |
| C | People of significance with respect to social relationships to the individual are identified. | 71% (N=222) |
| D | The person is maintaining his/her desired role in the community. | 37% (N=223) |
| E | The individual has leisure activities (e.g., magazines, hobby materials, videos, etc.) available in the home aside from television, consistent with his/her preferences and interests.  If the person has not identified specific interests, does he/she have needed supports to explore possible options? | 79% (N=225) |
| F | The individual participates in a variety of desired experiences and in preferred activities during evenings and weekends. | 48% (N=219) |
| G | The individual has opportunities to attend religious services as often as desired and at the house of worship of his/her choosing (and not of staff or housemates' preference). | 63% (N=169) |
| H | The individual has information about membership to self-advocacy or other community organizations and is supported to become a member and attend if so desired. | 16% (N=187) |
| *Key Findings:* | | |

- Desired outcomes regarding meaningful relationships and personal connections were being implemented and respected for only 61% of the individuals reviewed.

- Leisure materials and activities aside from television (e.g., magazines, games, hobby materials, books, etc.) were available in 79% of the homes visited.

- Documentation indicated that less than half of the individuals reviewed were participating in a variety of experiences and preferred activities during evenings and weekends. This was also reflected in the section above where adequate staff were available to provide the services and supports in the individuals' Personal Plans (72%) and to facilitate individuals desired community life outcomes (58%).

- Individuals were not maintaining desired roles in the community as evidenced by lack of participation in community events and organizations, lack of involvement in social and recreational activities, and lack of being recognized or known by name by others in the community.

- Individuals were not knowledgeable about community organizations that promote self-advocacy, nor were they being supported to attend and to join such organizations.

| 7. PERSONAL FUNDS MANAGEMENT | | Overall Rating: 78% 70% (Red Flag) 57%* |
|---|---|---|
| <ul><li>10 measures</li><li>3/10 measures rated 85% or above (H, I, J)</li><li>4 red flag measures</li><li>0/4 red flag measures rated 85% or above</li><li>1 measure consistent with HCBS Settings Rule</li><li>0/1 measure consistent with HCBS Settings Rule rated 85% or above</li></ul> | | |
| A | If the person so desires, training has been designed and implemented to support the individual in gaining necessary skills for more independent management of his/her personal funds. | 53% (N=197) |
| B | The individual has access to his/her personal spending money as indicated. | 64% (N=216) |
| C* | The agency does not restrict the individual's access to or choice in spending his/her personal money without required approval of a Human Rights Committee. | 57% (N=190) |
| D | When assistance is needed, personal funds are securely stored and each person's funds are separately stored and accurately accounted. Individuals who are able to independently access funds are not prevented from doing so based on agency policy and/or practice. | 83% (N=202) |
| E | The individual's personal needs allowance is rightfully distributed each month and records are maintained regarding utilization of these funds. | 76% (N=205) |
| F | For individuals earning money through employment, he/she determines how this income is used. | 79% (N=96) |

| G | The cost of household supplies, groceries, utilities, furnishing, rent, etc. which are not funded by the provider are fairly shared with housemates, etc. | 81% (N=175) |
|---|---|---|
| H | The individual is able to participate in preferred activities with respect to financial feasibility. | 92% (N=213) |
| I | The individual's personal funds are not loaned to other individuals, staff, etc. | 93% (N=206) |
| J | The person has the resources to obtain possessions and supplies necessary for comfortable daily living. | 97% (N=217) |

### Key Findings:

- Review of documentation and interviews with staff and individuals showed that, for the most part, individuals had enough money to participate in preferred activities and to make purchases of personal items.

- Approximately half of the individuals reviewed had their personal funds restricted without required approval of a Human Rights Committee.

- Although Discovery Tools and Personal Plans specified the extent to which the individual was capable of participating in personal funds management, consideration of training was not maximized in the area of supporting them in gaining necessary skills for more independent management of their personal funds.

| 8.   TRANSPORTATION | Overall Rating: 32% 29% (Red Flag) |
|---|---|

- *4 measures*
- *0/4 measures rated 85% or above*
- *2 red flag measures*
- *0/2 red flag measures rated 85% or above*

| A | The individual is supported to have access to the community with the freedom to come and go as desired using varying modes of transportation as people without disabilities. | 41% (N=213) |
|---|---|---|
| B | If there are barriers to the individual having his/her preferred access and inclusion with regards to transportation, the team has assessed the need for adaptation, orientation, assistive technology, or other necessary supports. | 30% (N=155) |
| C | The individual is encouraged and supported to have access to community life using varying modes of transportation, to the same degree as others in the community, and has adequate money to do so. | 28% (N=205) |
| D | The individual regularly participates in unscheduled and scheduled events using varying transportation modes. | 30% (N=212) |

### Key Findings:

- Agencies often consider individuals to be at too high a risk to access the community without a staff. Therefore Individuals were not being supported to access transportation with as much independence as possible.

33

- In rural areas, public transportation was limited and could not support individuals' access to the community for participation in scheduled and unscheduled events. More often, individuals relied on agency vehicles (i.e., vans) for transportation.

- Review team members did encounter individuals who were accessing their communities by taxi, accessible local transportation, Uber, and who lived close enough to town to walk to local resources.

| 9. HEALTH CARE | | Overall Rating: 79% 75% (Red Flag) |
|---|---|---|

- *12 measures*
- *2/12 measures rated 85% or above (I, J)*
- *7 red flag measures*
- *1/7 red flag measures rated 85% or above (J)*

| | | |
|---|---|---|
| A | A health assessment, which identifies the individual's health care needs, has been completed with sufficient substantive commentary. | 79% (N=221) |
| B | The individual receives all medical and nursing/health care services and supports per his/her health care professional's recommendations. | 81% (N=217) |
| C | The individual receives preventative testing and/or care based on recommended professional guidelines for medical conditions, gender, and age (e.g., GYN exams, pap smears, mammograms, prostate exams) consistent with physician's recommendations. | 57% (N=183) |
| D | The individual has at least annual dental exams. These are more frequent if recommended by dentist. | 79% (N=215) |
| E | The individual has a seizure disorder that is unstable or not well-controlled, he or she has been evaluated by a neurologist and the primary care physician has considered and implemented recommendations for treatment. | 80% (N=41) |
| F | Recommendations for health care services and supports are completed in a timely manner and there is no pattern of missed or frequently rescheduled appointments. | 83% (N=217) |
| G | All medical and healthcare supports and services are properly documented by the service provider at the time of service provision in the individual's record. | 83% (N=219) |
| H | There is a written plan/instruction to address routine care/monitoring to be provided related to the individual's specific medical condition(s). | 55% (N=186) |
| I | Medications are securely stored in a locked location (double-locked for controlled substances). | 91% (N=213) |
| J | Medication administration record (MAR) accurately lists all administered physician-prescribed medications, dosages, time(s) if administration, route of administration, etc. | 86% (N=213) |
| K | Medication errors occur infrequently, and when they do occur, are properly documented, reported, reviewed, and addressed. | 83% (N=126) |
| L | The individual has all necessary medical services and supports in place that allow him/her to live as independently as possible in the least restrictive setting. | 82% (N=219) |

**Key Findings:**

- Individuals reviewed were not always receiving medical and nursing/health care services and supports (79%).

- Physician recommended assessments, examinations, and follow-up consultations were not always completed in a timely manner (81%). Additionally, individuals were not receiving preventative testing or screening for medical conditions, gender and age (e.g., GYN exams, mammograms, prostate exams). (57%)

- There was a lack of written care plans for health issues, both long term (e.g. seizures, constipation, GERD) and short term (e.g. sprain, tooth pain).

- Medication appeared to be securely stored in locked locations. Medication Administration Records (MARs) for the most part accurately indicated all prescribed medications and instructions for administration.

- Many agencies did not have a formal process for regularly assessing class members for side effects.

| 10. VISION, HEARING, SENSORY SUPPORTS AND SERVICES | | Overall Rating: 66% 67% (Red Flag) |
|---|---|---|
| - 14 measures | | |
| - 1/14 measures rated 85% or above (C) | | |
| - 10 red flag measures | | |
| - 0/10 red flag measures rated 85% or above | | |
| A | An individual who has a visual impairment has been evaluated for current needs and recommendations from evaluations have been addressed in a timely manner. | 82% (N=135) |
| B | An individual who has prescribed eyeglasses is supported in use and care. | 80% (N=115) |
| C | Surgical or other interventions have been explored for the individual noted to have cataracts or other treatable disease(s) of the eye, as recommended by an ophthalmologist. | 87% (N=30) |
| D | An individual whose visual impairment interferes with his/her orientation or mobility has been evaluated by a qualified specialist for training in orientation or mobility techniques or other training needed to support independent function (e.g., self-feed techniques, dressing, kitchen safety). | 0% (N=4) |
| E | If adaptive devices (e.g., cane for mobility, tactile cues on clothing) have been recommended, they are used consistently across all life environments, and staff demonstrate competency id proper use and techniques employed. | 50% (N=6) |
| F | Consideration has been given to obtaining specialized services that aid in increasing the individual's ability to access his/her environment more independently (e.g., service animals, services for the blind, street crossing safety training. | 25% (N=4) |
| G | An individual who has a hearing loss has been evaluated for current needs and recommendations from evaluations have been addressed in a timely manner. | 47% (N=32) |
| H | An individual who has been prescribed hearing aids is supported in their use and care. | 63% (N=8) |
| I | An individual with hearing loss has adaptive devices to support independent function (e.g., visual alerts, bed-shaker for fire alert), and staff demonstrate competency in proper use and techniques employed. | 29% (N=7) |

| J | Recommended specialized services that aid in increasing the individual's ability to access his/her environment more independently (e.g., sign language, services for the deaf) are being provided. | 11% (N=9) |
|---|---|---|
| K | For an individual who is deaf and uses sign language, he/she has staff who have been trained and can communicate with him/her. | 0% (N=7) |
| L | Environmental modifications (e.g., bed shaker or strobe alarm for fire alert) have been made as needed and/or recommended. | 40% (N=5) |
| M | An individual who demonstrates stereotypic or self-stimulatory behavior (e.g., rocking, hand-waving, hand-mouthing, etc.) has been evaluated regarding sensory deficits, and therapeutic plans or programs regarding his/her sensory deficits are implemented consistently and across all life areas. | 0% (N=18) |
| N | The individual is provided with intervention(s) designed to provide alternative means of sensory stimulation and reduce the stereotypic self-stimulatory behavior; staff demonstrate competency in implementing the intervention(s). | 18% (N=17) |

## Key Findings:

- Individuals with vision impairments had not always been evaluated for current needs and were not always being supported in the use and care of prescription eyeglasses and hearing aids.

- Documentation indicated that for those individuals with cataracts or other treatable diseases of the eye, surgical or other intervention had been explored.

- Individuals who demonstrate stereotypic or self-stimulatory behavior had not received an assessment of their sensory needs nor been provided with therapeutic interventions for alternative means of sensory stimulation.

| 11.  PT/OT/SLP/OTHER COMMUNICATION SUPPORTS AND SERVICES | Overall Rating: 30% 29% (Red Flag) |
|---|---|

- *5 measures*
- *0/5 measures rated 85% or above*
- *4 red flag measures*
- *0/4 red flag measures rated 85% or above*

| A | An individual who receives, or has identifiable needs for, speech, occupational, or physical therapy services, has current evaluations in his/her record for the therapy services. | 21% (N=91) |
|---|---|---|
| B | Evaluations and plans of care include appropriate and measurable therapy goals. | 33% (N=33) |
| C | Written instructions have been developed to provide clear steps and direction to direct support staff for implementing therapy related activities (e.g., range of motion, stretching, bathing, ambulation, use of equipment and devices) including the frequency and setting in which therapy related activities are to be conducted. | 44% (N=36) |
| D | Therapy services plans of care are implemented consistently as recommended. | 29% (N=28) |
| E | Documentation of services reflects measurable progress toward established therapy goals, outcomes, and/or therapy objectives.  If the therapy objective is to prevent | 36% (N=28) |

| | further decline, measurable information is provided to document that functional status has been maintained. | |
|---|---|---|

**Key Findings:**

- The review team met individuals with indicators of need for therapy services, but the individuals' planning teams had not recognized these needs as a barrier or requested evaluations or assessments. For example, review team members observed individuals with unsteady gait, limitations of movement, and communication barriers which were not being addressed.

- The review team found a general lack of physical, occupational, or speech therapy evaluations for individuals who could benefit from these services. For example, although many individuals had indications of speech language pathology or need for swallowing and feeding therapy, such as a history of aspiration pneumonia and/or choking incidents, this service was generally not provided and team members interviewed tended to indicate it was not even available.

- For individuals who were receiving therapy services, evaluations and plans of care rarely included measurable goals and written instructions did not provide clear direction to staff for implementation.

- Therapy services were not consistently implemented and documentation did not reflect measurable progress.

- Availability of physical, occupational, and speech therapy services was limited in some geographic areas of the state.

| 12. ADAPTIVE EQUIPMENT AND ASSISTIVE TECHNOLOGY | Overall Rating: 60% 60% (Red Flag) |
|---|---|

- *5 measures*
- *0/5measures rated 85% or above*
- *5 red flag measures*
- *0/5 red flag measures rated 85% or above*

| | | |
|---|---|---|
| A | The person's need for adaptive equipment and assistive technology has been assessed. | 38% (N=80) |
| B | The person has received all recommended adaptive equipment and assistive technology. | 63% (N=65) |
| C | The person uses adaptive equipment and assistive technology for positioning, ambulation, and/or communication to increase his or her safety, independent participation in daily activities, community participation. | 61% (N=71) |
| D | All prescribed adaptive equipment and assistive technology is available, clean, in good repair (including having charged batteries), and available to the person at all appropriate times and during community activities. | 66% (N=67) |
| E | Staff demonstrate competency in proper use and techniques of all prescribed equipment and devices. | 78% (N=63) |

**Key Findings:**

- The review team met individuals with indicators of need for adaptive equipment and assistive technology, but the individuals' planning teams had not recognized this need as a barrier or requested evaluations or assessments.

- Not all individuals for whom adaptive equipment and assistive technology had been recommended had received their equipment or devices.

- Individuals with adaptive equipment (e.g., wheelchairs, walkers, shower chairs) were not always using the equipment as prescribed to increase their independence.

- Adaptive equipment was not always available for use across all life environments, or was not clean or in good repair.

- Staff were not always aware of nor could they demonstrate proper use of prescribed equipment and devices.

| 13. DINING/DIETARY SUPPORTS AND SERVICES | Overall Rating: 71% 61% (Red Flag) |
|---|---|

- *8 measures*
- *0/8 measures rated 85% or above*
- *5 red flag measures*
- *0/5 red flag measures rated 85% or above*

| | | |
|---|---|---|
| A | The individual has been assessed for safe dining practices including food texture, and liquids consistency and a corresponding plan/strategy has been developed. | 66% (N=82) |
| B | The individual receives consistent support and assistance with regard to safe practices for increased independence in dining. | 72% (N=102) |
| C | All special dining equipment (e.g., non-slip mats, special utensils, cups) listed in his/her dining plan/strategy is present. | 67% (N=36) |
| D | When an individual has a specific, prescribed diet, he/she is achieving or maintaining goals of the diet. | 72% (N=105) |
| E | Special dining plans for the individual are carried out and designed so as to be used in restaurants and other community locations. | 81% (N=69) |
| F | Meals served are per the individual's preference and dietary needs. | 81% (N=207) |
| G | Home staff involve the individual in meal planning to ensure that personal preferences for meals are accommodated. To the extent desired by the person, he/she is involved in food shopping and meal preparation. | 56% (N=210) |
| H | If the individual is. Noted to have unexplained weight loss/gain, GERD, diabetes, or swallowing issues, he/she is promptly taken to an appropriate practitioner for evaluation. | 80% (N=49) |

### Key Findings:

- Homes visited had adequate supplies of food and food was appropriately stored. However, special equipment was not always present and staff could not always describe or demonstrate competency with regard to individuals' prescribed dining plans.

- Individuals with specific prescribed diets were not always achieving or maintaining goals of the diet.

- Individuals noted to have unexplained weight loss/gain, GERD, diabetes, or swallowing issues, were not always promptly evaluated for treatment.

- Individuals are not always encouraged to participate in meal planning, food shopping and meal preparation.

| 14. BEHAVIORAL SUPPORTS AND SERVICES | Overall Rating: 53% 54% (Red Flag) 51%* |
|---|---|

- 15 measures
- 0/15 measures rated 85% or above
- 13 red flag measures
- 0/13 red flag measures rated 85% or above
- 5 measures consistent with HCBS Settings Rule
- 0/5 measures consistent with HCBS Settings Rule rated 85% or above

| | | |
|---|---|---|
| A | A comprehensive Functional Behavioral Assessment has been completed. | 37% (N=150) |
| B | The behavior support plan (BSP) was developed from the Functional Behavioral assessment. | 44% (N=142) |
| C | The Behavior Support Plan, or plan summary, is written in plain easily understandable language and describes how to implement the strategies include in the Behavior Support Plan. | 68% (N=149) |
| D | The Behavior Support Plan includes a personalized plan for teaching and reinforcing alternate behaviors. | 71% (N=148) |
| E* | The Behavior Support Plan includes the least restrictive or least intrusive methods possible in the behavioral approaches, strategies and supports designed to address the challenging behavior. | 71% (N=147) |
| F | Staff responsible for the support and supervision of the individual who has a behavior support plan know how to implement the person's plan and the specific interventions included. | 42% (N=144) |
| G | The individual's Behavior Support Plan provides a method for collection of behavioral data to evaluate treatment progress. | 54% (N=146) |
| H | All behavior supports and services are properly documented at the time of service provision in the agency's record for the individual. | 60% (N=141) |
| I* | The Behavior Support Plan includes a schedule to review the effectiveness of the interventions included in the Behavior Support Plan. | 52% (N=138) |
| J* | The individual's Behavior Support Plan includes a description of the person's behavior that justifies the inclusion of the restrictive/intrusive intervention(s) and/or limitation of rights. | 48% (N=98) |
| K* | The Behavior Support Plan includes a specific plan to minimize, fade, eliminate or transition restrictions and limitations to more positive interventions. | 41% (N=95) |

| L | The Individual's Behavior Support Plan describes how the use of each intervention or limitation is to be documented. | 42% (N=89) |
|---|---|---|
| M* | If the behavior support plan includes rights restrictions or restrictive interventions, BSP has been reviewed by a human rights committee (HRC) prior to implementation and at least annually thereafter. | 62% (N=106) |
| N | Clinical justification for use of restrictive interventions or rights limitations in an emergency is documented in the individual's record. | 40% (N=47) |
| O | If the individual needed crisis respite services during the past 12 months, these services were provided in his/her home whenever possible. If the individual needed out-of-home crisis respite services during the past 12 months, these services were available in an appropriate crisis respite home/facility. | 0% (N=6) |

**Key Findings:**

- Most individuals with noted behavioral challenges had not received a comprehensive Functional Behavioral Assessment.

- Most Behavior Support Plans (BSPs) were not written in easily understandable language to facilitate implementation of strategies.

- For those individuals with restrictive or intrusive interventions in their BSPs, the plan did not include a description of the behavior justifying the interventions or limitation of rights.

- Not all restrictive plans had been reviewed by a human rights committee.

- Most Behavior Support Plans (BSPs) did not include strategies for teaching and reinforcing alternative behaviors.

- BSPs that included restrictive/intrusive methods to address challenging behaviors did not always include a plan to minimize, fade, eliminate, or transition restrictions and limitations to more positive interventions.

- Fewer than half of the direct support staff could articulate implementation of individuals' behavior support services.

- Behavior Support Plans did not include a method of data collection to evaluate progress or a schedule to review the effectiveness of the plan.

| **15. MENTAL HEALTH SUPPORTS AND SERVICES** | **Overall Rating: 63% 64% (Red Flag)** |
|---|---|

- *12 measures*
- *1/12 measures rated 85% or above (H)*
- *8 red flag measures*
- *1/8 red flag measures rated 85% or above (H)*
- *1 measure consistent with HCBS Settings Rule*
- *0/1 measure consistent with HCBS Settings Rule rated 85% or above*

| A | Individuals receiving psychotropic medications have a current comprehensive psychiatric evaluation that documents the operating diagnosis or condition for which medication is prescribed, includes rationales for any prescribed psychotropic medication, and includes an analysis of the risks and benefits or recommended treatment. | 29% (N=138) |
|---|---|---|
| B | Medication to address factors contributing to an individual's challenging behavior or symptom of a diagnosed co-occurring psychiatric disorder is administered only as part of a Behavior Support Plan, Treatment Plan, or Medication Monitoring Plan which includes other supporting interventions. | 60% (N=136) |
| C | Documentation of informed consent for all psychotropic medications is present in the individual's records. | 64% (N=138) |
| D* | The individual's psychotropic medication regimen has been reviewed or at least annually by a Human Rights Committee. | 72% (N=134) |
| E | Staff are able to locate information to explain the reason why the individual is taking psychotropic medication and to explain the potential side effects. | 81% (N=129) |
| F | Agency has a documentation system in place for tracking targeted symptoms/index behaviors and providing this information to the individual's prescribing practitioner in order to evaluate the benefits/risks of continuation. | 42% (N=139) |
| G | Documentation indicates the prescribing physician has re-evaluated the effectiveness of the individual's psychotropic medication regimen. | 54% (N=134) |
| H | As PRN psychotropic medications are not permitted in Illinois, the individual has no prescription for and is not receiving such PRN medication. | 97% (N=143) |
| I | Agency ensures that tardive dyskinesia screenings (e.g., AIMS, DISCUS, MOSES, MEDS), are completed (as appropriate) at least every six months, and that documented comprehensive informant completed side effect screens are completed, minimally, on those individuals who are unable to verbally report medication side effects. | 70% (N=125) |
| J | The individual is offered counseling services if needed and agency ensures these services are being provided as recommended. | 64% (N=61) |
| K | If the individual has a history of admissions to psychiatric facilities, agency has developed a plan or strategy to aid in preventing future psychiatric admissions. | 0% (N=6) |
| L | If the individual needed crisis respite services during the past 12 months, these services were provided in his/her home whenever possible. If the individual needed out-of-home crisis respite services during the past 12 months, these services were available in an appropriate crisis respite home/facility. | 0% (N=2) |

### Key Findings:

- For individuals receiving psychotropic medications, prescribing physicians rarely developed medication plans that: explained the diagnostic rationale; identified the intended purpose of the psychotropic medication being prescribed; described symptoms associated with diagnosed mental health conditions; or defined the expected outcomes. The lack of such a plan makes it difficult, if not impossible, to objectively determine the appropriateness or effectiveness of class members' prescribed medication regimens.

- Agencies were not observed to have appropriate documentation systems in place to track targeted symptoms/index behaviors to provide to the prescribing physician in order for the physician to evaluate the benefits/risks of continuing the medication continuation.

- Medication to address factors contributing to individuals' challenging behavior or symptom of a diagnosed co-occurring psychiatric disorder was administered as part of a formal plan that includes other supporting interventions (e.g., Behavior Support Plan, Treatment Plan) for only 60% of the individuals reviewed.

- Individuals' medication regimens had not always been reviewed by a Human Rights Committee (72%). These reviews were not thorough and included little to no documentation of rationale for approval.

| 16. PROTECTION FROM HARM | | Overall Rating: 71% 71% (Red Flag) |
|---|---|---|
| • 6 measures <br> • 1/6 measures rated 85% or above (C) <br> • 6 red flag measures <br> • 1/6 red flag measures rated 85% or above (C) | | |
| A | The individual has received training/education and information on what is abuse, neglect, exploitation and mistreatment. | 64% (N=219) |
| B | The individual and/or guardian knows who to contact to report abuse, neglect, or mistreatment. | 57% (N=214) |
| C | The individual's home and community staff have been trained on how to report abuse, neglect, exploitation, or mistreatment. | 94% (N=220) |
| D | If the individual was a victim of abuse, neglect, exploitation, or mistreatment, actions were taken to address the person's and/or guardian's complaints, concerns, harm. | 74% (N=27) |
| E | If there is (or was) an investigation, the individual has received appropriate protection while the case is (or was) under review. | 68% (N=22) |
| F | There is evidence that: <br> • Appropriate follow-up on investigations of abuse/neglect/exploitation/mistreatment involving the individual has occurred. <br> • Measures/actions were identified, planned, and implemented to prevent future/similar events involving the individual. <br> • Actions were taken to implement and/or address recommendations resulting from the investigative findings. | 56% (N=25) |

### Key Findings:

- The majority of individuals reviewed had not received training or education and information about how to recognize abuse, neglect, or exploitation, and how and to whom to report such mistreatment.

- In almost all cases (94%), staff had received required training on how to report abuse, neglect, exploitation.

- In those instances when an individual had been a victim of abuse, neglect, exploitation, or mistreatment, documentation did not always reflect whether appropriate actions had been taken to address the individual's (or guardian's) complaints, concerns, or harm.

- Documentation indicated that during an investigation, individuals were not always provided appropriate protection while the case was under review (e.g., staff involved were not removed from working with the individual).

- For those individuals involved in an investigation, there wasn't always evidence of appropriate follow-up or actions taken to address recommendations resulting from the investigation. Additionally, actions had not always been identified, planned, implemented to prevent future or similar events.

| 17. RIGHTS AND AUTONOMY | Overall Rating: 61% 59% (Red Flag) 59%* |
|---|---|

- *18 measures*
- *2/18 measures rated 85% or above (F, G*
- *15 red flag measures*
- *1/15 red flag measures rated 85% or above (F)*
- *10 measures consistent with HCBS Settings Rule*
- *0/10 measures consistent with HCBS Settings Rule rated 85% or above*

| | | |
|---|---|---|
| A* | The individual is provided with information about his/her rights in appropriate language and in a way that is accessible to him/her. | 42% (N=213) |
| B* | The individual is informed of his/her right to object to services/supports and the process to do so. | 59% (N=225) |
| C | The individual knows whom to contact/how to make a complaint, including anonymous complaints if desired. | 38% (N=192) |
| D | In any situation where a complaint has been made, the issue(s) has been resolved in a satisfactory and timely manner. | 54% (N=57) |
| E | The individual is encouraged and supported to advocate for him/herself and to increase self-advocacy skills. | 48% (N=202) |
| F | The individual is not subjected to coercion (including subtle coercion). | 87% (N=201) |
| G | The individual is supported to express him/herself through personal choices/decisions on style of dress and grooming preferences. | 94% (N=213) |
| H | The individual is supported to participate in cultural/religious/associational practices, education, celebrations and experiences per his/her preferences and interests. | 65% (N=209) |
| I* | The individual is supported to have visitors of his/her choosing according to stated/identified preferences. | 69% (N=202) |
| J* | The individual has privacy in his/her home, bedroom, or other environment(s) per identified or stated needs/preferences. | 70% (N=214) |
| K* | The individual is aware that he/she is not required to follow a particular schedule for waking up, going to bed, eating, leisure activities, etc. | 62% (N=195) |
| L* | The individual is encouraged and supported to make his/her own scheduling choices and changes according to preferences and needs. | 59% (N=202) |
| M* | The individual is supported to have access to food at any time, consistent with risk factors identified in the Discovery Tool and Personal Plan. | 72% (N=210) |
| N* | The individual is supported to have independent access to his/her home. | 54% |

| | | (N=214) |
|---|---|---|
| O | The individual has access to typical spaces in his/her day setting and is supported to use them. | 82% (N=215) |
| P* | The individual's rights are respected and staff support and advocate for the individual's rights. | 65% (N=213) |
| Q* | When interventions that restrict or modify the individual's rights are used (not part of a behavior support plan), the individual's Personal Plan includes a description of the need/behavior, and positive and less intrusive approaches that have been tried but have not been successful. | 19% (N=151) |
| R | The individual, or the individual's guardian (if the individual is unable to make this decision), has given informed consent to the rights limitations/restrictions in place. | 40% (N=164) |

### Key Findings:

- Observations and review of documentation did not indicate that individuals were subjected to coercion or subtle coercion.

- Observations indicated individuals were supported to express themselves through personal choices and decisions.

- Individuals reviewed were not being provided with information about their rights in appropriate language or in a manner that is easily understood.

- Individuals were not being given the tools to make objections or complaints and to ensure they are heard.

- Individuals were not being empowered to self-advocate or to increase self-advocacy skills.

- Individuals were not always supported to participate in cultural, religious, or other associations/organizations, celebrations and experiences per their preferences.

- Individuals were not always supported to have visitors of their choosing or privacy in their home/bedroom per their preferences.

- Some agencies had implemented broad restrictions as a general rule. Cameras in homes, alarms on doors and windows, locked chemicals and food, locked thermostats, and house rules were restrictions present in homes visited. Such restrictions had not been discussed with the individual or included in the Personal Plan.

- Individuals interviewed were not always aware they were not required to follow a prescribed schedule for waking up, going to bed, eating, etc. In addition, they were not supported or encouraged to make their own scheduling choices.

### 3. Implementation Plan

The Ligas Implementation Plan, FY 2019 Revisions, dated May 3, 2019, was, for the first time since 2015, filed jointly by the Defendants, Plaintiffs and Intervenors. In accordance with Paragraph 26 of the Consent Decree, and as noted therein, it was developed by the Division on Developmental Disabilities and incorporated input from the Plaintiffs, Intervenors and the Monitor. This Implementation Plan includes several of the Monitor's repeated concerns related to specific paragraphs of the Consent Decree and addresses, in part, inadequate rates for providers and wages for staff; lack of a robust quality monitoring system; limited opportunities for individuals with the most significant medical or behavioral needs; lack of individualized employment and day service options; determining the reasonable pace at which Ligas Class Members can expect to be selected from the PUNS list. All of these areas are discussed in more detail below and a proposal describing reasonable pace is attached to the Implementation Plan. A copy of the Implementation Plan can be found on the DHS/DDD website and is also attached to the current report. A 2020 Revision will be completed and posted as well. http://www.dhs.state.il.us/page.aspx?item=69861

### 4. Person-Centered Planning
### (formerly referenced as Transition Service Plans)

Paragraphs 11 through 15 of the Consent Decree set forth the requirements for developing Ligas Transition Service Plans and for the content of these plans. These plans were designed to "focus on the Class Member's personal

vision, preferences, strengths and needs in home, community and work environments" and to "reflect the value of supporting the Class Member with relationships, productive work, participation in community life and personal decision making". It was required that these plans "not be limited by the current availability of services" and that they must be "consistent with the choices of the Class Member and the Class Member's legal guardian."  In 2017, however, as part of DDD's Life Choices Initiative and being mindful of Federal guidelines for Person-Centered Planning, DDD developed the Discovery Tool and Personal Plan Tool to assess needs and preferences for all individuals included in the Medicaid Waiver.  Collaboration among DDD, the Plaintiffs and Monitor to ensure that Class Members would not be losing any of the benefits of the Ligas Transition Service Plans resulted in the Discovery Tool and Personal Plan together replacing the Ligas Transition Service Plan as of January 1, 2018.

In order to provide information related to the replacement of the Ligas Transition Service Plans, the Division of Developmental Disabilities  posted a document entitled "Person Centered Philosophy Statements" which outlines the Centers for Medicare and Medicaid Services' (CMS) regulations related to conflict free case management and person centered planning, including the process of Discovery and development of personal plans and implementation strategies. This document is available on the DHS website. This year, for the first time, the quality and implementation of Personal Plans were monitored as part of the robust, newly created Compliance Measures protocol described above.

## 5. Crisis Services

As indicated in Paragraph 21(a)-(b) of the Ligas Consent Decree, "an individual is in a situation of "Crisis" if he or she is at imminent risk of abuse, neglect, or homelessness. The provision of interim emergency services (including interim placement in an ICF-DD where no placement in a Community-Based Setting was immediately available) will not necessarily exclude the Individual from being deemed to be in a situation of Crisis. If, following a screening, the Individual who is determined to be in Crisis requests appropriate Community-Based Services to be provided in the Family Home or requests placement in a Community-Based Setting, Defendants will promptly develop, in conjunction with the Class Member, a Transition Service Plan."

State Defendants are required to serve expeditiously class members who meet the above-described criteria and who request community services or placement in a community-based setting. A review of crisis requests from July 1, 2018 through June 30, 2019 indicated that 304 crisis services requests were received and reviewed by DDD with 280 requests approved. Denials of crisis services requests were due to crisis criteria not being met and/or determination of lack of clinical eligibility. Of the approved crisis requests, 55 were classified as abuse, 135 were classified as neglect, and 90 were due to the individual being homeless.













Services provided to class members in crisis included four types of CILA (Community Integrated Living Arrangement) options: 24-Hour CILA, Host Family CILA, Intermittent CILA, and Family CILA, in addition to Home-Based Support Services (HBS). For the period of July 1, 2018 through June 30, 2019, of the 280 approved crisis requests, 169 were funded to receive 24-Hour CILA, 2 were funded to receive Host Family CILA, 10 were funded to receive Intermittent CILA, and 13 were funded to receive Family CILA. 86 class members were authorized to receive Home-Based Support Services.













Combining the reporting years of 7/1/13-6/30/19, a total of 2406 crisis requests received have been approved by DDD and services were authorized to class members in crisis within the four types of CILA options:



During the 2013/2014 reporting period, the Monitor established, with the agreement of the parties, that the timeframe to receive services for class members in crisis will be 24-72 hours, although this timeframe may vary, depending on individual circumstances, or if temporary services are in place to address the immediate crisis. Since this agreement, the Monitor has analyzed class member information and data from all crisis requests received and reviewed by the Defendants and determined to meet the requirements

for crisis services. From the Monitor's analysis, the majority of crisis requests were reviewed by the region within an adequate timeframe. As can be seen in the chart below, for the past 3 years, the timeliness of review occurred, for the most part, within the 24-72 hours as established:

| Timeliness of Review | FY 2016-2017 N=447 | | FY 2017-2018 N=339 | | FY 2018-2019 N=280 | |
|---|---|---|---|---|---|---|
| Within 1 day | 391 | 87% | 301 | 89% | 250 | 89% |
| Within 2-3 days | 42 | 9% | 37 | 11% | 28 | 10% |
| 4-6 days | 10 | 2% | 1 | <1% | 2 | <1% |
| Insufficient Data | 4 | <1% | n/a | n/a | n/a | n/a |

Data from the most recent reporting period (July 1, 2018 to June 30, 2019) shows that 60% of the class members who were found to be in crisis, received some service within a 24-72 hour period after their crisis status was confirmed; for 33%, services were initiated between 4 and 9 days; 5% received services between 10-19 days; services were not initiated for 3 of the individuals for more than a month; and for 4 class members, data was insufficient to include in the analysis. As noted in the chart below, while the past three years show improvement over FY 13/14, only one-half of the individuals who were found to be in crisis received some services within the 24-72 hours agreed upon timeline.

| Timeliness of Authorization of Crisis Services | FY 2013-2014 N=397 | | FY 2014-2015 N=461 | | FY 2015-2016 N=482 | | FY 2016-2017 N=447 | | FY 2017-2018 N=339 | | FY 2018-2019 N=280 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24-72 hours | 107 | 27% | 218 | 47% | 220 | 46% | 229 | 51% | 175 | 52% | 167 | 60% |
| 4-9 days | 122 | 31% | 151 | 33% | 175 | 36% | 164 | 37% | 106 | 31% | 91 | 33% |
| 10-19 days | 74 | 19% | 64 | 14% | 60 | 12% | 43 | 10% | 26 | 8% | 15 | 5% |
| 20-29 days | 36 | 9% | 15 | 3% | 15 | 3% | 8 | 2% | 4 | <1% | 0 | 0 |
| 30-39 days | 15 | 4% | 6 | 1% | 3 | 1% | 2 | <1% | 8 | <2% | 2 | <1% |
| 40+ days | 35 | 8% | 5 | 1% | 6 | 1% | 1 | <1% | 4 | <1% | 1 | <1% |
| Insufficient Data | 8 | 2% | 2 | 1% | 3 | 1% | n/a | n/a | 16 | 5% | 4 | 1% |

| Timeliness of Authorization of Crisis Services | Overall 2013-2018 | |
|---|---|---|
| | N=2406 | |
| 24-72 hours | 1116 | 46% |
| 4-9 days | 809 | 34% |
| 10-19 days | 282 | 18% |
| 20-29 days | 78 | 32% |
| 30-39 days | 36 | 15% |
| 40+ days | 52 | 2% |
| Insufficient Data | 33 | 1% |

Review of the data associated with the crisis requests reviewed and approved revealed that, in nearly all cases, a "safety plan" had been determined to be in place for the class member in order to ensure safety and reduction of risk while awaiting approval of services. In the Fourth, Fifth, and Sixth Annual Reports, the Monitor raised concerns as to the adequacy of safety plans wherein the class member in crisis is not in a permanent or stable situation (e.g., psychiatric hospital, nursing home, lack of consistent caregivers), and with this report continues to raise such concerns.

In addition to raising the question of the adequacy of crisis safety plans in the Fourth, Fifth, and Sixth Annual Reports, the Monitor also expressed concern that nearly half (49%) of the individuals with approved crisis placements were on the PUNS waiting list for three years or more. This report continues to provide an analysis of crisis data to determine the relationship between crisis applicants and the PUNS list and as can be seen in the chart below for the period of 7/1/18-6/30/19, more than half of the individuals with approved crisis placements were on the PUNS waiting list for three years or more. For those individuals in the insufficient data category,

6 sought crisis services but were not already on PUNS, but were given a pre-award letter and services began. The ISC then pulled together the required documentation for a funding request packet and entered the person on PUNS. For 2 individuals, there was no indication they had ever been entered on PUNS. The remaining 3 individuals declined services.

| Approved Crisis Placements and Length of time on PUNS Waiting List July 1, 2018-June 30, 2019 | | |
|---|---|---|
| Time Period | Number of Placements | % of Total |
| One Month or Less | 13 | 5% |
| Over 1 Month to 1 Year | 57 | 20% |
| 1 to 2 Years | 22 | 8% |
| 2 to 3 Years | 17 | 6% |
| 3 to 4 Years | 12 | 4% |
| 4 Years or More | 148 | 53% |
| Insufficient Data* | 11 | 4% |
| | | N=280 |

| Approved Crisis Placements and Length of Time on PUNS Waiting List July 1, 2017-June 30, 2018 | | |
|---|---|---|
| Time Period | Number of Placements | % of Total |
| One Month or Less | 14 | 4% |
| Over 1 Month to 1 Year | 102 | 30% |
| 1 to 2 Years | 45 | 13% |
| 2 to 3 Years | 24 | 7% |
| 3 to 4 Years | 23 | 7% |
| 4 Years or More | 128 | 38% |
| Insufficient Data | 3 | <1% |
| | | N=339 |

| Approved Crisis Placements and Length of Time on PUNS Waiting List July 1, 2016-June 30, 2017 | | |
|---|---|---|
| Time Period | Number of Placements | % of Total |
| One Month or Less | 24 | 5% |
| Over 1 Month to 1 Year | 117 | 26% |
| 1 to 2 Years | 58 | 13% |
| 2 to 3 Years | 26 | 6% |
| 3 to 4 Years | 39 | 9% |
| 4 Years or More | 153 | 34% |
| Insufficient Data | 30 | 7% |
| | | N=447 |

| Approved Crisis Placements and Length of time on PUNS Waiting List July 1, 2016-June 30, 2019 | | |
|---|---|---|
| **Time Period** | **Number of Placements** | **% of Total** |
| One Month or Less | 51 | 5% |
| Over 1 Month to 1 Year | 275 | 26% |
| 1 to 2 Years | 125 | 12% |
| 2 to 3 Years | 67 | 6% |
| 3 to 4 Years | 79 | 7% |
| 4 Years or More | 429 | 40% |
| Insufficient Data | 45 | 4% |
| | | **N=1,066** |

The Monitor greatly appreciates the assistance of Melanie Reeves Miller, the Monitor's Data and Program Analyst, in conducting this review of Crisis Services.

## 6. Transitions for Class Members in ICFs/DD Waiting List

Paragraph 17 of the Consent Decree requires that within six years after the approval of the Decree, all Class Members residing in ICFs/DD as of the date of approval of the Decree will transition to community-based settings consistent with their Transition Service Plans if, at the time of the transition, the Class Member requests placement in a community-based setting as confirmed and documented in accordance with the Decree. As described in the most recent Ligas Data Report, 1459 Class Members have moved to waiver services.

### 7. Transitions for Class Members on the Waiting List/Class Member Lists

Paragraph 22 of the Consent Decree defines the numeric requirements for transitions of Class Members on the Waiting List to the community for the period 6/15/11- 6/15/2017 and paragraph 23 states that after 6/15/2017 Class Members who remain on the Waiting List "shall receive appropriate Community-Based Services and/or placement in a Community-Based Setting such that they move off the Waiting List at a reasonable pace. Since 2016, the Plaintiffs, Defendants and Monitor have been engaged in a process to both define a "reasonable pace" for moving Class Members off the Waiting List following 6/15/2017 and decrease the amount of time that Class Members remain on the Waiting List prior to receiving desired services. Two of the steps taken already to clarify how priorities are established for these transitions are to simplify the categories related to those waiting for services to "Seeking Services" and "Planning for Services" and to consider the amount of time for which an individual has been waiting on the PUNS list since reaching the age of 18. In addition, in order to facilitate the PUNS selection process for individuals and their families, DDD will now be notifying those who are anticipated to be part of a PUNS pull in advance of the actual pull to allow families to have more time to explore service options.

During the process of developing the 2019 Revisions of the Ligas Implementation Plan, the parties convened several times and consensus was reached on a definition of reasonable pace. This document is included here:

**Reasonable Pace Proposal**

**May 3, 2019**

Pursuant to Paragraph 23 of the *Ligas* Consent Decree, Reasonable Pace will be measured based on the number of individuals in the "Seeking Services" category of the PUNS list who Enter Service under the Waiver during a 12-month period (which will be measured by Fiscal Year, July 1-June 30). "Enter Service" means those who have begun receiving services under the Waiver (Home-Based or CILA), as reported by the ISCs. This figure (600 and 630 per year as set forth below) is not dependent on the date on which the individual was selected from PUNS but may include individuals from any previous PUNS selection who enter service during the reporting period. This figure also does not include individuals who enter services through a Crisis determination, consistent with Paragraph 21 of the *Ligas* Consent Decree.

PUNS selections will be conducted annually. Approximately six months prior to the beginning of each fiscal year, individuals and/or guardians who are anticipated to be in the selected group will be provided notification of their likely upcoming selection to encourage early planning. In addition to the annual PUNS selection, if, six-months post selection, the responses to the selection letters are below the anticipated targets, the Division will conduct a second PUNS selection to fill the unused targeted capacity.

PUNS selections will be tailored such that by the FY2025 selection, no individual will wait on PUNS for over 60 months. For individuals who are added to the PUNS list before their 18th birthday, the 60-month period will begin when the individual turns 18.

For Fiscal Year 20 the Division agrees to serve a minimum of 600 individuals selected from the PUNS list. For FY20 only, this figure will include individuals selected from PUNS who are currently receiving Home Based services, but who are seeking CILA placement. In Fiscal Years 21 through 25, the Division agrees to serve a minimum of 630 individuals from the PUNS list each year. However, for this period, individuals selected from the PUNS list who were receiving Home-Based services at the time of selection and who move to CILA services will not be counted toward the 630 minimum. By December 31, 2019, the State and Class Counsel will determine the process for individuals seeking to move from Home-Based services to CILA services with reasonable promptness In addition, the Division agrees to serve an average minimum of 630 individuals from the PUNS list for the years FY20-FY22, such that no fewer than 1,890 individuals will be served for that time period.

The actual number of individuals served will increase during this period as the targeted maximum wait time is reduced as noted below. However, these maximum wait targets are based on current PUNS data, and may fluctuate to some extent over the next few years, with the exception of FY25, in which the maximum will be 60 months.

FY20: Initial Yearly Selection will be based on a maximum wait of 76 months;
FY21: Initial Yearly Selection will be based on a maximum wait of 70 months;
FY22: Initial Yearly Selection will be based on a maximum wait of 64 months;
FY23: Initial Yearly Selection will be based on a maximum wait of 63 months;
FY24: Initial Yearly Selection will be based on a maximum wait of 61 months;

FY25 Initial Yearly Selection will be based on a maximum wait of 60 months.

The Division will include Reasonable Pace data and data related to people seeking to move from Home-Based to CILA in the semi-annual *Ligas* Reports.

Another area that the parties are now addressing relates to Service Transitions. Plaintiffs, Defendants and the Monitor will consider developing a process whereby Individuals who receive waiver services but either want or need to change their existing service categories can apply to do so.

In addition, a report of Individuals Seeking Services or with Services Initiated representing PUNS selections for the years 2012-2019 was provided to the Ligas Monitor on November 22, 2019. This report contains 2,485 Ligas Class Members. Their current status is summarized in the table below:

| PUNS Selection Year | # of Individuals Seeking Services | CURRENT STATUS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Contact Made | No Contact | Level II Eligibility-In Process | Level II Eligibility Confirmed | Award Pending | Award Issued | Agency Preparing Funding Packet | IAA-Services Initiated | Services Initiated | Hold |
| 2012 | 109 | 4 | | 4 | 15 | | | | | 83 | 3 |
| 2013 | 5 | | | | 1 | | | | | 3 | 1 |
| 2014 | 33 | | | 3 | 18 | | | | | 12 | |
| 2016 | 50 | 5 | | 3 | 16 | | 1 | 1 | | 20 | 4 |
| 2017 | 233 | 30 | 1 | 35 | 50 | | 5 | 2 | | 132 | 28 |
| 2018 | 678 | 65 | 1 | 44 | 55 | 2 | 18 | 2 | | 458 | 33 |
| 2019 | 1191 | 472 | 89 | 245 | 215 | 9 | 74 | 5 | | 73 | 9 |

## 8. Outreach

The Monitor has recently learned that there are several Class Members living in State Operated Developmental Centers (SODCs) and the reasons for their admissions are not clear. Additional data has been requested.

### 9. Data Reports

Paragraph 33 of the Consent Decree requires, in part: "Not less than every six months, Defendants shall provide to the Monitor, Plaintiffs, Class Counsel, Intervenors and Intervenors' Counsel and make publicly available, a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and Defendants' progress toward achieving compliance."

The most recent Ligas Data Report is dated February 25, 2020. These reports are provided, in compliance with the Consent Decree, every six months and typically on February 15th and August 15th. The current Report reflects data collected from July 1, 2019 through December 31, 2019.

The Monitor acknowledges that the Ligas Data Reports are typically submitted timely and that Defendants have also created additional reports as requested by the Monitor, such as Transitions to CILA by Size of Home, Reasonable Pace, Adults on PUNS Seeking Services, and Transitions from AHBS to CILA. DDD staff continue to be available to answer the Monitor's questions, clarify data and address concerns related to documents they have prepared.

## III.  ACTIONS TOWARD COMPLIANCE

### A.  <u>Parties' Meetings</u>

Between January 1, 2019 and February 29, 2020, seven Parties' meetings were convened.  Agenda items typically included preparation for Status Conferences with Judge Coleman which are often scheduled for shortly after such meetings.

### B.  <u>Status Conferences and Court Filings</u>

Between January 1, 2019 and February 29, 2020, Plaintiffs' Counsel, Defendants, Counsel for the Intervenors, and the Monitor appeared in Court eight times. Frequently, the Court requested status reports prior to these conferences and these were filed with the Court in advance of next appearances. Some topics of most interest to the Court during this time period included:

- 3.5% rate increase which was inadequate to cover the providers' ability to meet the concomitant raise of minimum wage in Chicago and surrounding areas to $13.00 per hour.

- Implementation of both the 3.5% rate increase and the sorely needed second increase to enable providers to meet minimum wage requirements, which is not yet finalized.

- ▪ ICFs/DD being subject to longer delays in the implementation of increases than waiver services due to Defendants' filings and the more complex requirements for both state and federal approvals.

- ▪ The significant role played by DSPs, which has been recognized by the Court in Orders appended to the current report

- ▪ The work of the Oversight Committee and its relationship with a third-party consulting group which is now developing a rates methodology for Illinois

## C.  Oversight Committee Meetings

The Oversight Committee's initial work and composition is described in the Sixth Annual Report, as it was recommended in the Court's 6/6/2018 Order as part of an effort to achieve compliance with the Ligas Consent Decree. The first meeting was held on 8/29/ 2018 and monthly meetings have continued to date, with most recent reporting including recommendations from all of its seven Subcommittees: Staffing, Nursing/Medical, Assistive Technology, Employment and Training, ICF/IDD, Transportation, Behavioral Supports. Some general recommendations, as interpreted by the Monitor, include:

- ➢ Immediate intervention must be made to stabilize the community system (which includes waiver services and ICFs) while the rates review is being conducted.

➢ Rates must be based upon an individualized assessment and planning process.

➢ Rates must be based upon actual costs of doing business and must be reviewed and updated on a regular basis to reflect the actual cost of providing services.

➢ Rates must address all program supports, not just staffing.

➢ DHS must review regulations, policies and practices to address barriers to people in community services maximizing choice, independence and flexibility

➢ The DSP wage factor in both the CILA and ICFDD rate methodologies must set a factor of 1.5 to whatever the minimum wage is at any particular time.

As reported in a Joint Status Report to the Court in January, 2020, the new rate methodology is currently due by July, 2020.

## IV. Closing Remarks

As stated previously, the Monitor remains indebted to all of those who provide expertise and insights to inform the Annual Reports. Continued shared efforts with the beneficiaries of the Consent Decree and their families; Plaintiffs, Defendants and Intervenors; advocates, providers of services and other colleagues are critical to not only the Monitor's work but also to achieving our common goal of compliance with the Consent Decree.