# Stanley Ligas, et al.

# v.

# Theresa Eagleson, et al.

## Eighth Annual Report of the Monitor

### February 2, 2022

Respectfully Submitted:
Ronnie Cohn
Monitor
ligas.monitor@gmail.com

# Stanley Ligas, et al. v. Theresa Eagleson, et al.

## Eighth Annual Report of the Monitor

February 2, 2022

## Table of Contents

I.   Introduction                                                                      1

II.  Review of Compliance Findings to Date                                             6
     A.  Summary of Fourth, Fifth, Sixth and Seventh Annual Reports                    6
     B.  Findings for 3/1/2020 through 1/31/2021                                       10
         1.  Resources and Capacity                                                    10
         2.  Implementation Plans                                                      12
                 Person-Centered Planning                                              15
                 Short-Term Stabilization Homes                                        16
                 Ligas Compliance Measures                                             17
     C.  Data Reports                                                                  19
                 Seeking Services                                                      19
                 6-Month Reports                                                       19
     D.  Crisis Services                                                               21
     E.  Ligas Family Advisory Council                                                 37

III. Actions Toward Compliance                                                         38
     A.  Status Reports and Remote Conferences                                         38
     B.  Guidehouse Final Report and Timelines                                         47
     C.  Parties' Meetings                                                             48
     D.  Work Groups                                                                   48
     E.  Monthly Meetings                                                              49
     F.  Ligas Compliance Measures                                                     49

IV.  Closing Remarks                                                                   53

# I.     INTRODUCTION

This Eighth Annual Report of the Monitor is respectfully submitted to the Court, Parties and Intervenors in accordance with Paragraph 34 of the Ligas Consent Decree (Decree), which was approved and filed by the Court on June 15, 2011. The Decree requires that:

> *"The Monitor shall file annual reports to the Court, which shall be made publicly available.  Such reports shall include the information necessary, in the Monitor's professional judgement, for the Court, Plaintiffs and Intervenors to evaluate Defendants' compliance or non-compliance with the terms of the Decree."*

The first three Annual Reports of the Monitor were submitted by the first Ligas Monitor, Tony Records, who was appointed by the Court on July 19, 2011.  Upon his retirement, the current Monitor's appointment became effective on July 1, 2015 and all subsequent reports were submitted by the current Monitor.  All Ligas Monitor reports are available on the website of the Department of Human Services (DHS):  https://www.dhs.state.il.us/page.aspx?item=64489

As described in the Plaintiffs' current Fact Sheet…

> "Ligas v. Eagleson (originally Ligas v. Maram) is a lawsuit filed in 2005 by nine people with developmental disabilities (Plaintiffs) who resided in large private State-funded facilities (ICFs-DD) or who were likely to be placed in such facilities if they did not get community services.  Plaintiffs wanted to receive community services, but their requests had been denied by the State of Illinois.  In 2006, a Judge certified the case as a class action.  (Note that people living in State-operated Developmental Centers are not part of the class action.)  Prior to trial,

the parties reached an agreement, but at a Fairness Hearing in July of 2009, the Judge found that the class definition was too broad as it included people who did not desire to live in the community. Accordingly, the Judge did not approve the agreement and de-certified the class. In January of 2011, the Plaintiffs, the state and the Intervenors (representing those who wished to remain in ICFs-DD) reached a new agreement that all could support. The Judge held a Fairness Hearing on June 15, 2011 and approved the proposed Consent Decree. This historic agreement reflects momentous change in state policy for serving people with developmental disabilities. Over 10,500 class members have received community services under the Consent Decree through December 2021."

The Eighth Annual Report of the Monitor is not being filed one year after the Seventh Annual Report, which was filed with the Court on March 3, 2020. In fact, several issues addressed in the current report are not built upon any previous reports because the COVID 19 pandemic, which changed the landscape of services, medical concerns and so much more, broke out shortly after the Monitor's, Parties' and Intervenors' Court appearance on March 12, 2020. Since that time, several Status Reports were filed with the Court by the Monitor, Parties and Intervenors. There has been only one in-person Court appearance between 3/12/2020 and the present time. The current report, in the section titled Actions Toward Compliance, includes information from these Status Reports as well as some Parties' Meetings, all of which have been held remotely since April of 2020.

The monitor greatly appreciated the work of the provider organizations, ISC agencies, ICDD (Illinois Council on Developmental Disabilities), DDD (Division of Developmental Disabilities), IDHS (Illinois Department of Human Services), Arc of Illinois and many others who held regularly scheduled open meetings, remotely, to

share information regarding COVID-19, necessary changes in services, how to obtain personal protective equipment and other significant topics.

The American Network of Community Options and Resources (ANCOR) is a nonprofit trade association which represents more than 1000 private providers of community living as well as employment supports and services for individuals with disabilities. During the summer of 2021, ANCOR conducted a survey to "further quantify the impact of the COVID-19 pandemic on the DSP (Direct Support Professionals) workforce". Some of the findings of this national study are not significantly different from the critical concerns the Monitor has been hearing from service providers in Illinois. For example: 77% of providers in the ANCOR study are turning away new referrals; 58% of providers are discontinuing programs or services due to insufficient staffing; 84% of providers are delaying the launch of new programs or services; 81% of providers are struggling to achieve quality standards; 29% of providers are spending more than $500,000 annually in costs related to high turnover and vacancy rates; providers are continuously competing with entry-level industries offering less demanding work and higher wages. There is no question that these findings constitute a national crisis with regard to the DSP workforce. <u>There is a great deal to be accomplished nationally, including in Illinois, before these and other noteworthy staffing problems are resolved.</u>

A recent Fact Sheet from Plaintiffs' Counsel includes some questions and answers related to the State's compliance with the qualitative aspects of the Consent Decree and when the Consent Decree will end. It is noted therein that in 2017, the

3

Monitor found the State out of compliance and the attorneys for the Plaintiffs and Intervenors filed a Motion for Enforcement asking the Judge to find the State out of compliance because Class Members and people who chose to remain in ICFs-DD (Intermediate Care Facilities for Persons with Developmental Disabilities) were not receiving what they were entitled to under the Consent Decree. The Judge agreed. In 2018, the State submitted a Compliance Plan which the Judge found to be inadequate and ordered the State to review its rates structure. The State convened a Stakeholders Committee, then hired a consultant group which was first called Navigant Consulting and then Guidehouse. On December 8, 2020, IDHS issued the report, Illinois Developmental Disability Services Rates Study regarding Residential Services and Related Supports, with recommendations to revise the state's rate structure. The State has recently begun implementation of some of the recommendations and is responding to some of the Monitor's findings as well. More details are included in the section herein entitled Review of Compliance Findings to Date.

In terms of the questions the Monitor has received regarding the Consent Decree ending, the Fact Sheet states: "The Consent Decree requires an Independent Monitor determine annually whether the State is in Compliance …. Once the State feels it has met all of the requirements of the Decree … the Judge would have to find that the State Defendants have substantially complied with the terms of the Decree and determined that the Defendants have implemented and are maintaining a system that complies with the Decree. Plaintiffs, Intervenors and in 'substantial compliance' and then the Judge would decide." Paragraph 50 of the

Consent Decree states: "Termination of the Court's jurisdiction over the Consent Decree may occur only in the event of a successful request to terminate the monitoring process pursuant to Section XVIII. The Decree shall remain in effect, and the Court shall retain its jurisdiction over the Decree, until a final order is entered granting the Termination Request and all appellate rights and/or appeals have been exhausted." The Monitor's opinion, at the present time, is that, despite the State's recent efforts as discussed herein, there is more work that remains to be done in order for the State to demonstrate such compliance with the Consent Decree.

During these difficult times, the Monitor continues to appreciate collaborative efforts with the Defendants, Plaintiffs' counsel and representatives, Counsel for the Intervenors, family and advocacy associations, service providers and provider organizations, the Arc of Illinois, the Illinois Council on Developmental Disabilities, service coordinators and many others. Ongoing communications with beneficiaries of the Decree and their families continue to be of great value to the Monitor in evaluating the Decree's effectiveness at each stage of its implementation.

## II.    REVIEW OF COMPLIANCE FINDINGS TO DATE

### A. <u>Summary of the Fourth, Fifth, Sixth and Seventh Annual Reports</u>

As the current Monitor's fourth, fifth, sixth and seventh reports are available on the DHS and EFE websites at the following links, this report only includes some highlights of each:

     https://www.dhs.state.il.us/page.aspx?item=64489

     https://www.equipforequality.org

Joint efforts of the Plaintiffs, Defendants, Intervenors and Monitor in 2015 and 2016 resulted in Court Orders approved by United States District Court Judge Sharon Johnson Coleman which required that the Comptroller make timely payments for services, programs and personnel that are necessary to comply with the Consent Decree and Implementation Plans. In addition, that Order was to remain in effect "until the earlier of the effective date of the Fiscal Year 2017 budget or July 1, 2017, or until further order of this Court." The Defendants continued to maintain funding at the same level paid in 2015, as ordered, so that services could continue, but that level remained inadequate as previously reported. At that time, there had been no relief in terms of salary increases, DSP vacancy rates, or increases in rates paid to providers since 2008 while operating costs continued to increase.

Other issues which were first noted in the Fourth Annual Report and continued into the following three Annual Reports included:

- Delays in initiation of services for Class Members once selected from the PUNS list (Prioritization of Urgency of Need for Services list)
- Limited availability of small Community Integrated Living Arrangements (CILAs) in some geographic areas as well as for individuals with more significant medical, behavioral or physical needs
- Inadequate availability of person centered, integrated day activities or employment for those seeking such opportunities
- Inadequate monitoring of the quality of services provided to beneficiaries of the Consent Decree.

The Fifth Annual Report described the negative impact on beneficiaries of the Consent Decree of the inadequacy of both funding of services and of the limited processes put into place by the Defendants to monitor the quality of services. The Monitor also addressed therein her concern regarding the inability of the parties to reach consensus on an Implementation Plan.

The Sixth Annual Report again focused on Paragraphs 4 and 5 of the Consent Decree related to Resources and Capacity and included the Plaintiffs' and Intervenors' 4/7/2017 Joint Motion to Enforce the Consent Decree. Several communications and Court appearances related to the Joint Motion resulted in Judge Sharon Johnson Coleman's Order of 8/11/17 which concluded with:

*"Accordingly, this Court finds that defendants are not in compliance with the Consent Decree by failing to provide the resources of sufficient quality, scope and variety based on the ample evidence presented to the Court that individuals protected by the Decree have experienced a reduction*

> *of services and have suffered substantially as a result. The dire financial situation of the State of Illinois and the attendant competing demands for resources are not lost on the Court.  The Court directs the State to devise a plan to address the issues causing the reductions in services and to bring the State into substantial compliance."*

On 3/30/2018, the defendants filed a status report in response to the Court's direction. The Plaintiffs and Intervenors characterized the State's proposals as "woefully inadequate" and requested that the Court order the Defendants to submit a new compliance plan and to form a work group of stakeholders to recommend revisions to the rate methodologies for CILAs (Community Integrated Living Arrangements) and ICFs/DD (Intermediate Care Facility for Persons with Developmental Disabilities). The Monitor responded that the State's Plan would not resolve the pervasive staffing issues for staff whose wages had not been increased for almost a decade, that the Court ordered workgroup should be convened and that an effort should be initiated promptly to develop a quality monitoring tool which would include an independent aspect of the review process.

The Seventh Annual Report, filed with the Court on 3/3/2020, includes quotes from paragraphs 4 and 5 of the Decree related to resources and capacity, describes modest wage increases in Illinois over the past three years, and indicates that it was too early to determine whether or not these modest increases had a positive impact on either DSP (Direct Support Professional) turnover or vacancy rates.

Much of the Seventh Annual Report describes in detail the Ligas Compliance Measures which had been developed by the end of January, 2019 and then implemented with 225 class members. Reviewers included staff from the state's Bureau of Quality Management (BQM), experienced reviewers from the Council on Quality and Management (CQL), which is independent of the State and experienced independent reviewers selected by the Monitor. The reviewers were trained together in February of 2019 and all reviews were completed by the end of December, 2019. The process of data analysis and conciliation of data for accuracy was completed, with the Monitor's appreciation, through assistance from the University of Illinois at Chicago.

Based upon the findings of this extensive review process, it was clear that most of the areas reviewed required significant improvements in order to approach compliance with the Consent Decree.

At a Parties' meeting on 3/11/20, there was a serious conversation related to the Monitor's 7th Annual Report, during which the Defendants responded to the findings therein and acknowledged that there were several areas cited in the review which were in need of improvement. It was also determined that the results of this review, which was the most comprehensive since the approval of the Decree, would serve as a blueprint for the upcoming Implementation Plan.

## B. Findings for 3/1/2020 through 1/31/2022

**RESOURCES AND CAPACITY**

The Monitor's Seventh Annual Report references the vital roles of Direct Support Professionals (DSPs) in supporting those they serve and noted the modest wage increases they had received over the prior three years. It was also noted therein that a 3.5% rate increase would be provided to both community-based services and ICFs/DD (Intermediate Care Facilities for Persons with Developmental Disabilities). However, the 3.5% increase amounted to only 40-50 cents per hour and wouldn't meet the minimum wage of $13.00 per hour. Much remained to be accomplished in this area.

Just a few months later, the Joint Status report filed with the Court by the Plaintiffs, Defendants, Intervenors and the Monitor on 7/13/2020 addressed both the significant impact COVID-19 was having on the delivery of services to individuals with developmental disabilities and also the financial support that was needed by both day and residential programs due to the pandemic. The following increases were put into place quickly:

➢ Retention payments, calculated using previous months' billings, were provided to day programs, which were closed as of 3/17/20, in an effort to maintain staff, space, utilities, cleaning and other necessities. At the time of the 7/13/20 status report, the expectation was that these payments would continue through August 31st.

➢ Residential programs received a 20% increase to cover the unfunded hours and increase in residential staff due to day program closures.

➢ Other temporary increases included funding for Personal Protective Equipment (PPE) as well as some of the equipment itself.

Other information provided in this status report Included:

➢ Funding increases for Fiscal Years 2018 to 2021
- **2018**: $.75 hour wage increases to both Community Integrated Living Arrangements (CILAs) and Intermediate Care Facilities (ICFs/DD)
- **2019**: $.50 hour wage increase for CILAs with additional $.04 for Chicago and $.50 hour wage increase for ICFs/DD
- **2020**: 3.5% rate increase for both CILAs and ICFs/DD
- **2020**: $.58 and $.62 hour wage increase for CILAs and $.24 hour wage increase for ICFs/DD
- **2021**: $1.50 hour wage increase for both CILAs and ICFs/DD, with required pass throughs to non-executive staff for both CILAs ($.80/hour) and ICFs/DD ($.40/hour)

The Ligas Rates Oversight Committee had begun its work in FY19 and issued its final report and recommendations on November 13, 2019. Per the recommendations of the Committee, the DDD hired an independent rates consulting group, Guidehouse (previously Navigant) to review the recommendations and develop a rates methodology, wages and other concurrent policies. The final rate methodology and policies were to be completed by November 20, 2020 but were slightly delayed due to COVID related issues. The Ligas Implementation Plan, FY 2022 Revisions, briefly describes the Guidehouse Final Report titled Developmental Disability Services Rate Study which was distributed on 12/8/2020 by IDHS (Illinois

Department of Human Services) and can be found on the IDHS website at: https://www.dhs.state.il.us/page.aspx?item=136098    The Recommendations therein include a phased-in timeline to be implemented between Fiscal Years 2022 and 2026.  The State continues to propose a longer timeline while the Monitor, Class Counsel and the Intervenors recommend that the State fully implement the Guidehouse rate study in the time frame put forth in the report, if not sooner.  The Executive Summary with recommendations can be found on pages 1-3 and Implementation Priorities can be found on pages 90-93. Communications continue among all involved.

## IMPLEMENTATION PLANS

 The Implementation Plans herein include several of the Monitor's concerns related to specific paragraphs of the Consent Decree and address, in part: adequate rates for providers and wages for staff, limited opportunities for individuals with the most significant medical or behavioral needs; lack of individualized employment and day services options; implementation of the reasonable pace process; Independent Service Coordination.

During the pandemic, the Parties, Intervenors and Court Monitor continued to work toward completing the Ligas Implementation Plan, Fiscal Year 21 Revisions, which was jointly filed on 9/9/2020.  The Ligas Implementation Plan, Fiscal Year 22 Revisions, was initially filed jointly on 6/30/21, but was revised on 8/4/21 to be consistent with the status report filed on that date.

<u>It was noted in the Implementation Plan, FY2021 Revisions, that the Monitor's
concerns regarding capacity development focused on rates and staffing.</u>  Staff
vacancies and high turnover by staff were prevalent statewide then and have now
become even worse.  The Monitor has heard from dozens of providers and families
who are directly and negatively involved in such situations. For example, families
from one house were, due to short staffing, expected to take home their family
members and medical equipment over weekends. Another agency was operating
with nearly 100 DSP openings, despite paying weekend and holiday differentials as
well as raising entry DSP wages to $15.00 in advance of expected state funding
increases. Still another spoke of 14 CILAs impacted by both the staffing crisis and
COVID. 30%-45% staffing vacancies are not unusual. Other comments from
providers include:

*"What has been a crisis for some time has now become a dire emergency."*

*"Providers are now being forced to consolidate or close homes."*

*"Current staff are leaving at twice the rate of new staff coming in."*

*"Dedicated management staff are filling shifts, working weekends. These are band-aids."*

*"Staff are working to the point of fatigue… These individuals are worn out and leaving our
agency…Having fewer staff working in a home for longer hours leaves individuals receiving
supports (and their caregivers) more vulnerable."*

*"We are trying to keep people out of SODCs (State Operated Developmental Centers)."*

*"The system may not have another year to survive. Guidehouse's last benchmark is too far
away."*

*"People with the highest support needs are suffering the most."*

Also in this Implementation Plan are updates related to the important areas of Reasonable Pace and Movement within Waiver Services.  The parties had already agreed that a schedule was needed for individuals to receive services from the PUNS list at a "reasonable pace" between FY21 and FY25, by which time the maximum waiting time on the PUNS list would be 60 months from the date of enrollment or the individual's 18th birthday if enrolled prior to his or her 18th birthday. It was agreed that a minimum of 630 individuals would be served from the PUNS list each year. Current reports indicate that this annual minimum is being met or even exceeded. However, reports also indicate that there are some significant difficulties in finding services once the individuals are selected from the PUNS list. The Monitor has heard from families, providers, ISCs (Independent Service Coordinators) and others that the reasons are staffing shortages and the lack of capacity for those with medical problems, accessibility needs, and behavioral challenges. This has been an ongoing problem which is not yet resolved.

The topic of movement within waiver services was addressed in this Implementation Plan as well, but not resolved until the FY 2022 Revisions.  As stated in that Implementation Plan, "During FY 21, the DDD (Division of Developmental Disabilities) worked with the Parties and Court Monitor on a draft policy to govern requests for a change in waiver services.  After the policy was finalized, the DDD issued an Information Bulletin to the field."  Individuals no longer need to enroll on PUNS (Prioritization of Urgency of Need for Services) or demonstrate a change in their needs in order to change services within the waiver and those on the PUNS list for just this purpose were notified and removed from

the PUNS list. This does not impact an individual's Class status. The Ligas Six Month Data Reports now include the number of people who request movement within waiver services and the number of people whose requests are granted each month.

Both the FY 2021 and FY 2022 Revisions of the Ligas Implementation Plans addressed the critical areas of <u>Person-Centered Planning, Short-Term Stabilization Homes and Ligas Compliance Measures</u>.

> ***Person-Centered Planning*** – This process, formerly referenced as Transition Service Plans, has gone through several iterations from the 2017 Life Choices Initiative to the need to comply with Federal guidelines. The Parties and Monitor agreed that the new Person-Centered Planning process would not cause Class Members to lose any of the benefits of the Transition Service Plans and as of January 1, 2018 Person Centered Planning replaced the Ligas Transition Plans. The new vocabulary included Discovery Tools, Personal Plans, Implementation Strategies and Conflict Free Case Management, which means the same entity is both assisting an individual to gain access to services and providing services to that individual. The DHS has related documents on its website (https://www.dhs.state.il.us/page.aspx?item=96986). The 2019 Ligas Compliance Measures protocol was the first time that the quality and implementation of Personal Plans were monitored.

> Due to COVID related delays, DHS was not able to complete the Person-Centered Planning process review in FY21 but in FY22 began the process with UIC (University of Illinois-Chicago). In April, 2021, UIC began the work to

focus on areas in the Monitor's reports, including the entire Person Centered Planning process and identifying gaps in community service capacity, especially for people with the most significant behavioral and medical challenges, accessibility requirements, and communication needs. The second year of this project will concentrate on, among other things, the Monitor's concerns regarding underline capacity development underline as well as supporting DDD and provider trainings and implementing the recent recommendations regarding person centered planning. The Monitor and Class Counsel will receive updates on the progress and deliverables of this project, with the final report of the first year's Person-Centered Planning work expected shortly. In addition, the Monitor learned recently, after a great deal of concern about the recent practice of ISCs (Independent Service Coordinators) visiting the individuals they support only twice per year, that the previous practice of visiting those they serve four times per year is being reinstated as of July 1, 2022. This will undoubtedly enhance the relationships between ISCs and those they serve as well as enable the ISCs to monitor, and amend as needed, the Discovery tool, the Personal Plans and the Implementation Strategies. The size of the ISC's caseloads will also be evaluated.

***Short Term Stabilization Homes*** – At the time of the filing of the corrected FY2022 Revisions of the Ligas Implementation Plan on 8/4/2021, there were six Short-term Stabilization Homes (SSH) in operation and two others scheduled to open in FY22. Each home can serve four individuals and provide

temporary stabilization services for those with extraordinary behavioral needs. As stated in this Implementation Plan, "the homes are equipped with high staffing and oversight ratios, as well as the necessary staff and consultants to address individual behavior and medication needs. Transition planning for post-stabilization placement is ongoing throughout an individual's tenure at an SSH, with the primary goal, if feasible, that the individual return to their own/prior home. These transition plans are fluid and depend on the progress the individual makes toward stabilization." These homes clearly meet significant needs, but it is clear that they are subject to the same staffing crisis as other residential settings. In addition, there are often no vacancies for new individuals as it has become difficult to find post-stabilization placements with sufficient staffing. The Monitor will request updates regarding these issues and the status of the additional two homes.

***Ligas Compliance Measures*** – As of this writing, the process of reviewing a sample of Plans of Corrective Action from the 2019 reviews is scheduled to take place before the end of FY2022. As stated in the Ligas Implementation Plan FY 2022 Revisions, "Going forward, the parties and the Monitor will confer on modifications to the 2019 Compliance Measures tool and scorecard. In addition, as the DDD is planning to continue its work on revising the BQM's (Bureau of Quality Management) monitoring tool, the Monitor will participate in that effort as well. The next Ligas compliance reviews will be completed utilizing both BQM and independent groups, such as a team

selected by the Monitor, within FY 22 and FY23. After FY23, the parties and Monitor will discuss the process going forward."   More details are available in Section III, Ligas Compliance Measures, herein, which is specific to this topic.

## C. Data Reports

**SEEKING SERVICES**

A report of Individuals Seeking Services or with Services Initiated representing PUNS selections for the years 2012-2019 was provided to the Ligas Monitor on November 10, 2021. This report contains 2,856 Ligas Class Members. Their current status is summarized in the table below:

| PUNS Selection Year | # of Individuals Seeking Services | CURRENT STATUS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Contact Made | No Contact | Level II Eligibility-In Process | Level II Eligibility Confirmed | Award Pending | Award Issued | Agency Preparing Funding Packet | Services Initiated | Hold |
| 2012 | 109 | 4 | | 4 | 15 | | | | 83 | 3 |
| 2013 | 5 | | | | 1 | | | | 3 | 1 |
| 2014 | 33 | | | 3 | 18 | | | | 12 | |
| 2016 | 50 | 5 | | 3 | 16 | | 1 | 1 | 20 | 4 |
| 2017 | 233 | 30 | 1 | 35 | 50 | | 5 | 2 | 132 | 28 |
| 2018 | 678 | 65 | 1 | 44 | 55 | 2 | 18 | 2 | 458 | 33 |
| 2019 | 1191 | 472 | 89 | 245 | 215 | 9 | 74 | 5 | 73 | 9 |
| 2020 | 747 | 234 | 6 | 110 | 159 | 2 | 37 | 8 | 103 | 88 |
| 2021 | 1534 | 723 | 247 | 279 | 111 | 5 | 56 | 4 | 102 | 7 |

**6-MONTH REPORTS**

The most recent 6-Month Report, also known as the Ligas Data Report, was completed on August 6, 2021 and the next one will be circulated on February 15, 2022 as the seventeenth such report. The information therein refers to the Class Member List, Services for Class Members in ICFs/DD, Services for Class Members from the Waiting List, Transition Service Plans (which are now known as part of the Person Centered Planning process), Transitions to CILA by CILA size of home, Crisis Services, Voluntary ICFs/DD Closure/Downsizing Agreements, Appeals, Reasonable

Pace, Waiver Service Transitions, Adult Waiver Services, DD CILA Waiver Services, and (more recently) information related to the Rates Oversight Committee/Rate Development, Expansion of Short-Term Stabilization Homes, Implementation Plan Updates and Amendments, COVID-19. The Monitor appreciates these comprehensive and timely reports.

## D. Crisis Services

As indicated in Paragraph 21(a)-(b) of the Ligas Consent Decree, "an individual is in a situation of "Crisis" if he or she is at imminent risk of abuse, neglect, or homelessness. The provision of interim emergency services (including interim placement in an ICF-DD where no placement in a Community-Based Setting was immediately available) will not necessarily exclude the Individual from being deemed to be in a situation of Crisis. If, following a screening, the Individual who is determined to be in Crisis requests appropriate Community-Based Services to be provided in the Family Home or requests placement in a Community-Based Setting, Defendants will promptly develop, in conjunction with the Class Member, a Transition Service Plan."

State Defendants are required to serve expeditiously class members who meet the above-described criteria and who request community services or placement in a community-based setting. A review of crisis requests from January 1, 2020 through June 30, 2021 indicated that 376 crisis services requests were received and reviewed by DDD with 369 requests approved. Of the 7 total denials of crisis services requests, six were due to determination of lack of clinical eligibility. The seventh was denied because the request was for Home-Based Services which was not an option based upon the individual's mother's refusal to allow him/her back home. Of the approved crisis requests, 46 were classified as abuse, 201 were classified as neglect, and 122 were due to the individual being homeless.

21



The Monitor has been tracking compliance with Paragraph 21(a)-(b) of the Ligas Consent Decree since 2013. Historical charts are provided below to memorialize the number of class members who have entered services via crisis requests from July 1, 2013 through June 30, 2021.













During the 2013/2014 reporting period, the Monitor established, with the agreement of the parties, that the timeframe to receive services for class members in crisis will be 24-72 hours, although this timeframe may vary, depending on individual circumstances, or if temporary services are in place to address the immediate crisis. Since this agreement, the Monitor has analyzed class member information and data from all crisis requests received and reviewed by the Defendants and has noted continued improvement with timeliness of review as required by the Consent Decree. As can be seen in the chart below for the period

of 1/1/20-6/30/21, the timeliness of review occurred, for the most part, within the 24-72 hours as established:

| Timeliness of Review | 1/1/20-6/30/20 N=120 | | 7/1/20-12/31/20 N=109 | | | 1/1/21-6/30/21 N=140 | |
|---|---|---|---|---|---|---|---|
| Within 1 day | 108 | 90% | 99 | 91% | | 129 | 14% |
| Within 2-3 days | 12 | 10% | 2 | 2% | | 8 | 6% |
| 4-6 days | 0 | n/a | 7 | 6% | | 3 | 2% |
| 7 days or more | 0 | n/a | 1 | <1% | | 0 | n/a |

Data from the most recent reporting period (January 1, 2020 to June 30, 2021) shows that 75% of the class members who were found to be in crisis, received some service within a 24-72 hour period after their crisis status was confirmed. While there has been improvement since FY 13/14 (see historical charts below), delays in authorizing services within the 24-72 hours agreed upon timeline for individuals who were found to be in crisis continues to require attention.

| Timeliness of Authorization of Crisis Services | Overall 1/1/20-6/30/21 N=369 | |
|---|---|---|
| 24-72 hours | 277 | 75% |
| 4-9 days | 53 | 14% |
| 10-19 days | 24 | 7% |
| 20-29 days | 10 | 3% |
| 30-39 days | 0 | n/a |
| 40+ days | 5 | 1% |

| Timeliness of Authorization of Crisis Services | 1/1/20-6/30/20 N=120 | | 7/1/20-12/31/20 N=109 | | | 1/1/21-6/30/21 N=140 | |
|---|---|---|---|---|---|---|---|
| 24-72 hours | 85 | 71% | 82 | 75% | | 110 | 79% |
| 4-9 days | 20 | 17% | 17 | 16% | | 16 | 11% |
| 10-19 days | 9 | 8% | 7 | 6% | | 8 | 6% |
| 20-29 days | 4 | 33% | 2 | 2% | | 4 | 3% |
| 30-39 days | 0 | n/a | 0 | n/a | | 0 | n/a |
| 40+ days | 2 | 2% | 1 | <1% | | 2 | 1% |

25

| Timeliness of Authorization of Crisis Services | FY 2013-2014 N=397 | | FY 2014-2015 N=461 | | FY 2015-2016 N=482 | | FY 2016-2017 N=447 | | FY 2017-2018 N=339 | | FY 2018-2019 N=280 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24-72 hours | 107 | 27% | 218 | 47% | 220 | 46% | 229 | 51% | 175 | 52% | 167 | 60% |
| 4-9 days | 122 | 31% | 151 | 33% | 175 | 36% | 164 | 37% | 106 | 31% | 91 | 33% |
| 10-19 days | 74 | 19% | 64 | 14% | 60 | 12% | 43 | 10% | 26 | 8% | 15 | 5% |
| 20-29 days | 36 | 9% | 15 | 3% | 15 | 3% | 8 | 2% | 4 | <1% | 0 | 0 |
| 30-39 days | 15 | 4% | 6 | 1% | 3 | 1% | 2 | <1% | 8 | <2% | 2 | <1% |
| 40+ days | 35 | 8% | 5 | 1% | 6 | 1% | 1 | <1% | 4 | <1% | 1 | <1% |
| Insufficient Data | 8 | 2% | 2 | 1% | 3 | 1% | n/a | n/a | 16 | 5% | 4 | 1% |

| Timeliness of Authorization of Crisis Services | Overall 2013-2018 N=2406 | |
|---|---|---|
| 24-72 hours | 1116 | 46% |
| 4-9 days | 809 | 34% |
| 10-19 days | 282 | 18% |
| 20-29 days | 78 | 32% |
| 30-39 days | 36 | 15% |
| 40+ days | 52 | 2% |
| Insufficient Data | 33 | 1% |

| Timeliness of Authorization of Crisis Services | Overall 2013-2021 N=2775 | |
|---|---|---|
| 24-72 hours | 1393 | 50% |
| 4-9 days | 862 | 31% |
| 10-19 days | 306 | 11% |
| 20-29 days | 88 | 3% |
| 30-39 days | 36 | 1% |
| 40+ days | 57 | <1% |
| Insufficient Data | 33 | <1% |

Services provided to class members in crisis included four types of CILA (Community Integrated Living Arrangement) options: 24-Hour CILA, Host Family CILA, Intermittent CILA, and Family CILA, in addition to Home-Based Support Services (HBS). For the period of July 1, 2020 through June 30, 2021, of the 369 approved crisis requests, 199 were funded to receive 24-Hour CILA, 4 were funded for Host Family CILA services, 9 were funded to receive Intermittent CILA, and 10 were

funded to receive Family CILA. 147 class members were authorized to receive Home-Based Support Services.



Combining the reporting years of 7/1/13-6/30/2021, a total of 2,775 crisis requests have been approved by DDD and services were authorized to class members within the four types of CILA options (a year-by-year breakdown follows the summary charts below):















In the Fourth, Fifth, Sixth, and Seventh Annual Reports, the Monitor raised concerns as to the adequacy of "safety plans" for class members to ensure safety and reduction of risk while awaiting approval of services. Numerous meetings and discussions have occurred over the years related to these concerns. Two such meetings occurred in 2021. Following a meeting on January 22, 2021 DDD developed training and held three sessions to train ISCs on completing and submitting crisis services request packets, including ensuring adequate safety of the individual until adequacy of safety plans are in place (i.e., safety plans). An Information Bulletin was also issued by the Defendants effective 4/6/21 to clarify the process for individuals who are in crisis and need services in order to relieve their crisis situation (https://www.dhs.state.il.us/page.aspx?item=131772). However, this bulletin stops short of laying out the expectations for adequate safety planning by ISCs. The Monitor requested a sample of 22 Crisis Transition Plan and Funding Request packets received during the period of 7/1/20-6/21/21 representing the three categories for crisis (Abuse, Homeless, Neglect). From the Monitor's review of this sample, the adequacy of crisis safety plans remains significantly deficient. In the Monitor's July 2021 Status Report, it was recommended that intensive and focused training of ISCs be developed and implemented to ensure full understanding of what constitutes adequate safety measures to ensure health, safety, and welfare of individuals in crisis. A follow-up meeting was held on September 28, 2021 to continue discussions and additional trainings with ISCs were held on 1/28/22 with two sessions scheduled for 2/1/22. While the Monitor appreciates the efforts to develop and conduct training, it would be beneficial for the Defendants and Monitor to collaborate on revising the training to focus on providing the ISCs with the skills necessary to facilitate supports and services

designed to ensure health, safety, and welfare of individuals in crisis and how to articulate this as part of the Crisis Transition Plan and Funding Request.

The Monitor has repeatedly expressed concern that individuals with approved crisis placements were on the PUNS waiting list for three years or more as is illustrated in the charts below. This report continues to provide an analysis of crisis data to determine the relationship between crisis applicants and the PUNS list as can be seen in the chart below for the most recent period of 1/1/21-6/30/21.

| Approved Crisis Placements and Length of time on PUNS Waiting List January 1, 2021-June 30, 2021 | | |
|---|---|---|
| Time Period | Number of Placements | % of Total |
| One Month or Less | 11 | 5% |
| Over 1 Month to 1 Year | 19 | 15% |
| 1 to 2 Years | 12 | 10% |
| 2 to 3 Years | 6 | 6% |
| 3 to 4 Years | 7 | 5% |
| 4 Years or More | 55 | 60% |
| | | N=110 |

The charts below reflect a historical summary of July 1, 2016-June 30, 2021 followed with a year-by-year breakdown of the relationship between crisis applicants and the PUNS list:

| Approved Crisis Placements and Length of time on PUNS Waiting List July 1, 2016-June 30, 2021 | | |
|---|---|---|
| Time Period | Number of Placements | % of Total |
| One Month or Less | 72 | 4% |
| Over 1 Month to 1 Year | 325 | 23% |
| 1 to 2 Years | 158 | 11% |
| 2 to 3 Years | 84 | 6% |
| 3 to 4 Years | 91 | 7% |
| 4 Years or More | 516 | 37% |
| Insufficient Data | 50 | 4% |
| | | N=1,385 |

| Approved Crisis Placements and Length of time on PUNS Waiting List July 1, 2020-June 30, 2021 | | |
|---|---|---|
| **Time Period** | **Number of Placements** | **% of Total** |
| One Month or Less | 15 | 5% |
| Over 1 Month to 1 Year | 35 | 12% |
| 1 to 2 Years | 22 | 10% |
| 2 to 3 Years | 13 | 4% |
| 3 to 4 Years | 13 | 4% |
| 4 Years or More | 102 | 65% |
| | | **N=200** |

| Approved Crisis Placements and Length of time on PUNS Waiting List July 1, 2019-June 30, 2020 | | |
|---|---|---|
| **Time Period** | **Number of Placements** | **% of Total** |
| One Month or Less | 6 | 5% |
| Over 1 Month to 1 Year | 14 | 12% |
| 1 to 2 Years | 11 | 10% |
| 2 to 3 Years | 4 | 4% |
| 3 to 4 Years | 4 | 4% |
| 4 Years or More | 74 | 65% |
| Insufficient Data* | 6 | 5% |
| | | **N=113** |

| Approved Crisis Placements and Length of time on PUNS Waiting List July 1, 2018-June 30, 2019 | | |
|---|---|---|
| **Time Period** | **Number of Placements** | **% of Total** |
| One Month or Less | 13 | 5% |
| Over 1 Month to 1 Year | 57 | 20% |
| 1 to 2 Years | 22 | 8% |
| 2 to 3 Years | 17 | 6% |
| 3 to 4 Years | 12 | 4% |
| 4 Years or More | 148 | 53% |
| Insufficient Data* | 11 | 4% |
| | | **N=280** |

| Approved Crisis Placements and Length of Time on PUNS Waiting List July 1, 2017-June 30, 2018 | | |
|---|---|---|
| Time Period | Number of Placements | % of Total |
| One Month or Less | 14 | 4% |
| Over 1 Month to 1 Year | 102 | 30% |
| 1 to 2 Years | 45 | 13% |
| 2 to 3 Years | 24 | 7% |
| 3 to 4 Years | 23 | 7% |
| 4 Years or More | 128 | 38% |
| Insufficient Data | 3 | <1% |
| | | N=339 |

| Approved Crisis Placements and Length of Time on PUNS Waiting List July 1, 2016-June 30, 2017 | | |
|---|---|---|
| Time Period | Number of Placements | % of Total |
| One Month or Less | 24 | 5% |
| Over 1 Month to 1 Year | 117 | 26% |
| 1 to 2 Years | 58 | 13% |
| 2 to 3 Years | 26 | 6% |
| 3 to 4 Years | 39 | 9% |
| 4 Years or More | 153 | 34% |
| Insufficient Data | 30 | 7% |
| | | N=447 |

Finally, data was provided to the Monitor in March 2021 and updated in November 2021 relative to SODC admissions of class members between 2015 and 2021. An analysis of this data shows that 46 class members who entered services via crisis are now currently residing in State Operated Developmental Centers across the state. The redacted table below summarizes these admissions:

33

| SODC | Admission Date to SODC | Admitted Via (if indicated in data) | Date Services Began from Crisis | Approx Length of Time After Crisis Services Began to SODC Admission | CILA Type from Crisis | Status on Ligas Class List |
|---|---|---|---|---|---|---|
| Chaote | 9/20/18 | Jail | 9/25/14 | 47 months | 24hr | Removed |
| Chaote | 6/26/18 | Jail | 4/2/18 | 2 months | 24hr | Removed |
| Choate | 6/23/15 | No data | 12/4/14 | 6 months | 24hr | Removed |
| Choate | 12/19/16 | No data | 11/26/13 | 36 months | Host Family | Removed |
| Choate | 4/1/16 | No data | 1/19/16 | 2 months | 24hr | Removed |
| Choate | 9/26/16 | No data | 12/15/14 | 21 months | Home Based | Removed |
| Choate | 11/28/17 | CILA | 6/1/15 | 29 months | 24hr | Removed |
| Choate | 10/18/18 | Jail | 1/22/18 | 8 months | 24hr | Removed |
| Choate | 8/27/19 | Jail | 1/30/19 | Refused Services | n/a | Removed |
| Choate | 5/16/19 | Jail | 9/18/18 | 7 months | 24hr | Removed |
| Choate | 2/21/19 | Jail | 8/11/17 | 18 months | 24hr | Removed |
| Choate | 12/4/20 | Jail | 3/23/16 | 56 months | 24hr | Removed |
| Choate | 12/2/20 | Home | 7/1/20 | 5 months | Home Based | Removed |
| Kiley | 12/13/17 | MH | 4/21/15 | 31 months | 24hr | Removed |
| Kiley | 7/19/18 | CILA | 12/14/14 | 43 months | 24hr | Removed |
| Kiley | 6/20/18 | CILA | 1/24/17 | 16 months | 24hr | Removed |
| Kiley | 10/31/18 | Psych Hospital | 5/14/14 | 53 months | 24hr | Removed |
| Kiley | 7/10/18 | Homeless | 4/9/18 | 3 months | Family Based | Removed |
| Kiley | 9/10/19 | SODC | 6/27/19 | 2 months | 24hr | Removed |
| Kiley | 12/10/19 | Home | 7/10/18 | 8 months | 24hr | Removed |
| Ludeman | 5/12/17 | No data | 6/22/15 | 22 months | 24hr | Removed |
| Ludeman | 12/13/17 | CILA | 4/16/16 | 19 months | 24hr | Removed |
| Mabley | 12/1/15 | No data | 10/23/15 | 1 month | 24hr | Removed |
| Mabley | 8/22/17 | Home | 4/8/17 | 4 months | Home Based | Removed |
| Mabley | 10/9/18 | CILA | 8/30/18 | 1 month | 24hr | Removed |
| Murray | 10/31/18 | Hospital | 9/24/18 | 1 month | 24hr | Removed |
| Murray | 3/20/18 | Home | 8/31/16 | 18 months | Home Based | Active |
| Murray | 9/10/18 | CILA | 6/10/15 | 39 months | 24hr | Removed |
| Shapiro | 12/7/15 | No data | 6/6/14 | 18 months | 24hr | Removed |
| Shapiro | 8/24/15 | No data | 10/20/14 | 10 months | HBS | Removed |
| Shapiro | 7/22/15 | No data | 10/11/13 | 21 months | 24hr | Removed |
| Shapiro | 12/8/15 | No data | 7/23/14 | 16 months | 24hr | Removed |
| Shapiro | 4/27/16 | No data | 12/4/14 | 16 months | 24hr | Removed |
| Shapiro | 6/15/16 | No data | 11/25/15 | 6 months | Host Family | Removed |
| Shapiro | 9/13/17 | CILA | 9/4/13 | 47 months | Family Based | Removed |
| Shapiro | 8/29/17 | MH | 2/6/15 | 30 months | 24hr | Removed |
| Shapiro | 7/17/17 | Home | 9/12/14 | 34 months | 24hr | Removed |
| Shapiro | 9/4/18 | CILA | 9/22/17 | 11 months | 24hr | Removed |
| Shapiro | 3/25/18 | CILA | 3/8/18 | 17 days | 24hr | Removed |
| Shapiro | 8/21/18 | CILA | 8/9/14 | 48 months | Family Based | Removed |
| Shapiro | 11/8/18 | CILA | 12/1/17 | 11 months | 24hr | Removed |
| Shapiro | 11/13/19 | CILA | 10/1/15 | 49 months | 24hr | Removed |
| Shapiro | 10/31/19 | Home | 8/12/14 | 62 months | 24hr | Removed |
| Shapiro | 3/14/19 | CILA | 9/26/18 | 5 months | 24hr | Removed |
| Shapiro | 3/10/20 | CILA | 11/2/16 | 40 months | 24hr | Removed |
| Shapiro | 8/31/18 | CILA | 10/22/14 | 46 months | 24hr | Removed |

As can be seen from the table above, the length of time class members had been receiving CILA services after approval through the crisis process ranged from one month to 62 months prior to admission to a SODC. 24-hour CILA services were in place for thirty-four of the class members (74%); 3 class members were receiving Family CILA services; 6 were receiving Home Based CILA; and 2 were receiving Host Family CILA. (Note: one class member was authorized to receive CILA services through the crisis process but refused and was therefore never served). Given that the majority were receiving 24-hour CILA services and supports, it is questionable whether all resources for supporting these individuals failed resulting in developmental center placement. All but 1 class member are noted as no longer active (or removed) from the Ligas Class List. According to information provided to the Monitor, the removal reason was noted as:

- fully served-meaning they have entered services and are no longer in need of anything more
- withdrawn-meaning that for any number of reasons they have withdrawn their desire to seek services through Ligas
- unable to locate-the ISC could not get in contact with the individual and eventually closed them from active status
- or "other"

Along with the 46 class members residing in SODCs referenced in the table above, there are an additional 139 class members currently residing in SODCs. After the Monitor requested more detailed information related to the class members in SODCs, specifically circumstances leading to the admission, such detail was provided for the 23 class members admitted in 2021. Of these it is critical to note that circumstances included no interest from providers after numerous referrals;

wait list at Short-Term Stabilization Homes; provider closed (at least 5 instances); court ordered placement; denied appeals from provider notice of discharge. <u>Given the current stressors on the provider system and the risk of class members being institutionalized, it is imperative that the Defendants provide the Monitor with immediate notification of SODC admission of a class member, ongoing updates of the database, including information collected by DDD with regard to ensuring class members in SODCs understand all options relative to non-SODC residential options (including Waiver services)</u>.  Additionally, the Defendants should ensure prompt planning for class members in SODC's to return to the community.

### E.  Ligas Family Advisory Council

The Ligas Family Advisory Council meets four times per year, twice as a committee and twice as Town Halls. Attendees vary and include family members of Class Members, Class Members themselves, providers, other members of organizations who serve class members and other individuals who have disabilities, staff of DDD, Plaintiffs' Counsel, the Monitor, and others. Detailed agendas are prepared by the group's chairperson with input from others. Due to COVID-19 concerns, the meetings have been virtual for almost two years but some of the members appreciate the convenience and it is hoped that going forward there can be options of both in-person and virtual meetings. The most recent meeting was on 1/11/2022 and DDD as well as the Arc send out notices prior to these meetings.

# III.   ACTIONS TOWARD COMPLIANCE

## A. Status Reports and Remote Conferences

The 3/12/20 Court appearance was based upon the then recently filed Monitor's 7th Annual Report and focused on modest wage increases, progress of the Oversight Committee in working toward a new rates methodology, delays in initiating services after individuals receive award letters, limited availability of CILAs in some geographic areas and for individuals with the most significant needs, lack of availability of person centered and integrated day activities and employment, inadequate monitoring by the State of quality of services provided to beneficiaries of the Consent Decree.   Findings of the then recently completed Compliance Measures were discussed as was the need for addressing individuals' needs as well as systemic issues. The Monitor reported on a meeting with providers the day before and emphasized that the negative findings of the Compliance Measures were rarely caused by negative provider performance but due to the system's noncompliance.   The Monitor appreciated some of the comments from the Defendants at a Parties' meeting the day before as to the 7th Annual Report as "eye opening" and addressing systemic issues which require systemic strategies. There was also recognition that addressing the discussed problems might also facilitate the State's need to comply with the requirements of the Federal waiver scheduled to go into effect in 2023. Federal Court Judge Sharon Johnson Coleman suggested that, with regard to wages, people coming into this field need incentives. Plaintiffs' Counsel indicated that we have to build on the comprehensive findings of the 7th Annual Report as this systemic review and related monitoring could lead to

compliance. Following the 3/12/2020 hearing, correspondence with the Court was in the form of status reports and conference calls.

Status reports were typically filed jointly by the Defendants, Plaintiffs' Counsel, Intervenors and the Monitor on the dates below and were often followed by conference calls with the Court a week later:

➢ 7/13/20: The major topic was COVID's significant impact on the delivery of services, with day programs closed as of 3/17/20 and DDD providing additional funding to residential programs to compensate for their unfunded hours; further modest wage increases with rules that 80%
goes to wages for non-executive staff; Parties, Intervenors and the Monitor worked toward filing a revised Implementation Plan to address the Compliance Measures and the State's strategies to address these findings.

➢ 9/8/20: In response to the Court, a Joint Status Report was filed to address the following areas:
   ▪ COVID-19: On September 1, 2020, the DHS Division of Developmental Disabilities' Community Day Services (CDS) programs reopened at reduced capacity and the State is monitoring how the low capacity/reenrollment may impact CDS provider organizations. On September 2, there had been 500 positive cases of COVID-19 and 28 confirmed fatalities in CILAs.  As of September 8, there had been 470 positive cases (with 438 of those residents having recovered) and 10 confirmed fatalities in SODCs.  The data on ICFs is collected by the

Illinois Department of Public Health for all long-term care facilities and is not broken down between ICFs/DD and other long term care facilities.

- Rate Increase Update: $1.00 per hour (as of 7/1/20) and $.50 per hour (as of 1/1/2021) approved for CILA direct care staff; the State Plan Amendment needed to provide the same increases for ICFs/DD and MC/DD services has not yet been approved. By the time of the filing of the next Status Report, on 3/31/21, the necessary approvals were in place for the ICFs/DD and MC/DD services as well.

- Rate Study Update: The Ligas Rates Oversite Committee continued its work with the rates consultant, Guidehouse, to finalize the rate methodology recommendations. The Oversite Committee's final report was expected to be completed in 11/2020. IDHS began early discussions with the Department of Healthcare and Family Services, the Governor's Office of Management and Budget, and the Governor's Office regarding the 102nd General Assembly session, and those discussions will include the Oversight Committee's recommendations.

- Implementation Plan Update: The FY21 Implementation Plan was circulated for final approval and was filed with the Court on 9/9/2020.

➢ 3/31/21 Status Report: Topics included:
  - HFS, along with DDD, submitted a Waiver Amendment to the Federal CMS (The Centers for Medicare and Medicaid Services) requesting

changes that would add the following to the Adults with Developmental Disabilities Medicaid Waiver: Include Remote Supports as a service for individuals in residential services/Community Integrated Living Arrangements (CILAs); Allow Personal Support Workers (PSWs)to be paid while providing support in a hospital.

- The Guidehouse final report, Developmental Disabilities Services Rate Study, was released on December 8, 2020 and included recommended actions to update or create new rates and rate methodologies for the I/DD system as well as a list of recommendations (p.2-3) and priorities for implementation (p. 90-93).

- The DDD had provided the Guidehouse Report to the Parties, Court Monitor, the Oversight Committee, and the broader I/DD stakeholder community. The DDD Director presented this information to stakeholders via several webinars and other presentations. The following quote from the State illustrates the Defendants' initial response to the Guidehouse report:

    *"While the State supports and agrees with the Guidehouse substantive recommendations and is committed to implementation of those recommendations, due to the State's current fiscal challenges, the recommended changes will need to be phased in over a number of fiscal years beyond the five years recommended in the Guidehouse Report, as it is unlikely the state will have the revenues to implement the recommendations in the proposed time period."*

The State committed to developing a "longer range plan", "partial implementation of the recommendations", implementing regional service rates but not in FY22- "in the future". The Parties, Intervenors and Monitor continue to communicate on these differences related to the report's implementation.

- Federal funding sources are discussed in this report as is the Governor's proposed budget.

- The <u>COVID-19 updates</u> include restrictions for certain services, allowing at-home day programming without prior approval, virtual day services, and ICF/DD day programming.

- Despite the pandemic, the Parties and Monitor continued to make progress on the <u>Reasonable Pace</u> requirements and Waiver- related policies. In addition, in FY 21, the DDD provided support to 109 individuals through crisis services.

- DDD established a <u>DDD Advisory Committee</u> in which the Monitor is included.

- DDD and BQM worked with the Monitor and program manager regarding the <u>Plans of Corrective Actions</u> required from providers and ISCs in response to the Compliance Measures.

42

- DDD released several <u>Information Bulletins</u> to clarify processes and procedures. These are available on the DHS website: https://www.dhs.state.il.us/page.aspx?item=51195

- Specific to employment, the category with the highest noncompliance findings, DDD has joined the State Employment Leadership Network and completed a Memorandum of Understanding with the State's Vocational Rehabilitation program. In addition, in August 2021 the DDD hired a full-time staff person to focus on employment expansion, data collection, information bulletins, and training and technical assistance support for ISCs and provider organizations.

- <u>4/20/21</u>:  <u>Virtual Status Conference Call with the Court</u>- Documents were provided to the Court in advance<u>: 3/31/21 Status Report; Rates Oversight Committee Final Report; Guidehouse Report; Monitor's Compliance Measures Ratings.</u>

- <u>7/30/21</u>:  <u>Joint Status Report, followed by Monitor's revision dated 8/4/21 which covered the period of April 1 through July 30, 2021 – Capacity Building/DSP Crisis – Defendants remain out of compliance with regard to resources and capacity.</u>  CILA services are not always adequate for people with the most significant needs and even the six operating short term stabilization homes rarely have vacancies or sufficient staffing. The only available options at times may be State Operated Developmental Centers, even for individuals who are eligible for and prefer waiver services.

Insufficient community resources result in individuals spending entire weekends at home due to the staffing crisis and inability of providers to facilitate the activities required in personal plans. The current DSP crisis is reminiscent of similar problems cited by the Monitor in 2016 but maybe even worse.

The Monitor's focus in this Status Report is on the following areas:
Capacity Building/ DSP Crisis; Compliance Measures; Crisis Services/Safety Plans; Employment; Home Based Services; Independent Service Coordination and Person-Centered Planning.

The State is developing several trainings and other initiatives to begin to address the noncompliance described in the 7th Annual Report and FY 2021 and 2022 Implementation Plans. It will take a significant amount of time to deliver trainings, secure appropriate staffing, initiate programs, and then maintain the efforts over time.

There were no plans to require ISCs to visit individuals they support four times per year instead of twice.

➢ 8/12/21:  The First In-Person Court Appearance since 3/12/2020
  ▪ As part of the recent filings, the State provided a very helpful document of FY21 Activities Completed and tied each item to the Implementation Plan sections.  The Monitor appreciates the information about trainings, Information Bulletins, Pilot Projects and

44

new processes and looks forward to the outcomes of these efforts and their impact upon beneficiaries of the Consent Decree.

- The State reported that the rate study was completed and that it was being implemented. However, it was also indicated in a Status Report that the implementation was going to take longer than was recommended by the study. Agreement has not been reached among the parties, intervenors and Monitor.

- The State disagreed with the Monitor's reference to the staffing crisis and its impact upon individuals getting the services they need or obtaining placements in the community.

- All agreed that the State had made progress and met quantitative requirements of the Consent Decree.

- Plaintiffs' Counsel discussed the qualitative requirements of the Consent Decrees that had not yet been met.

- There was discussion about what needs to happen in order to reach compliance and end the case.

➤ 10/8/2021: Conference Call with the Court
- The Court requested a status report from the Defendants on four issues and the discussion was related to ISCs, On-site visits, COVID-19,

Environmental/ Climate impact on People receiving services. Responses were:

- The State supports increased visits each year to insure ISC staff have adequate interaction to be a support and guide for people receiving services. The State reviewed how to address these concerns in the upcoming contract extension beginning July 2022. <u>On January 4, 2022, DHS announced that as of July 1, 2022 ISCs will be making 4 visits per year instead of 2 (pending Federal CMS approval)</u>.

- Based upon COVID-19, life safety and health issues have been addressed in person all along but for regular check-in visits there were different rules. As of 10/1/2021: ISCs returned to in person visits and meetings as of 5/1/21; BQM was to return to the field on 10/18/21; DDD nursing unit returned to in person on 9/27, 2021; BALC is doing live virtual reviews; OIG was to return to onsite investigations on 11/18/21; IDPH returned to in person visits on 6/1/20 for complaints of abuse and neglect and on 1/15/2021 for onsite surveys of ICFs/DD and SODCs. The State continues to follow federal and state guidelines and mandates regarding mitigation, vaccines, PPE.

- There was a temporary CILA Per-Diem rate increase of 5% which was extended through 12/31/2021.

- For Community Day Services, restrictions remain in place based on guidance from IDPH and the 15% temporary increase was extended to 12/31/2021.

- ISC agency case managers are responsible for ensuring that environmental conditions of an individual's home meet the individual's needs and are appropriate; BALC reviews every HCBS waiver funded CILA and CDS site every two years and responds to individual complaints about the conditions of a home, including environmental conditions.

- IDPH has developed guidelines for acceptable indoor air quality and monitors SODCs for regular compliance and life/safety surveys which focus on the environment.

- The Judge requested that a plan be in place by this time next year to address compliance issues and further need for monitoring by the Court.

## B. Guidehouse Final Report and Timelines

Although there is information regarding the Guidehouse report in the section herein regarding status reports, the Monitor is concerned enough about implementation of the recommendations and timelines to address it in more detail. The most recent revision of the State's Projected Guidehouse Developmental Disability Services Rate Study Timeline is dated November 12, 2021. The "Caveats To Timeline" section states in part that "there are a number of caveats that must

47

be made, any of which may prevent the State from implementing any or all of the timeline outlined below." These include State Revenues and Other Budgetary Demands, DDD Budgetary Items outside the Guidehouse Report, General Assembly Appropriations, Federal Approvals and Programmatic Implementation. It is also indicated that implementation of the timeline is subject to "change, the above caveats and other future events." Further, despite crises being experienced due to the staffing shortage and other inadequacies herein, the State's timeline extends to 2027, as opposed to the recommended 2026. The Monitor will appreciate engaging further in conversations with the Parties, Intervenors, and other stakeholders to address these concerns.

### C. Parties' Meetings

Between 3/12/20 and 1/31/22, the Parties, Intervenors and the Monitor have engaged in 11 Parties' Meetings and countless subject matter discussions, several of which were related to COVID-19.

### D. Work Groups

DDD has devoted a great deal of time developing and engaging in work groups related to compliance with both the Consent Decree and Home and Community Based Services (HCBS). There are also work groups to address specifically Home-

Based Services and Wages. The Monitor appreciates the opportunity to attend these meetings as often as possible.

### E.  Monthly Meetings

 Monthly meetings among Equip for Equality, DDD and the Monitor have been taking place for many years and are extremely helpful in addressing issues regarding individual Class Members. Recently there is concern that some of these individuals are being admitted to SODCs due to lack of alternatives.

### F.  Ligas Compliance Measures

The Ligas Compliance Measures review process that occurred beginning in January 2019 is detailed in the Ligas Implementation Plan FY22 Revision and in the Monitor's Status Report of July 2021. Therefore, full details are not repeated herein but a brief summary is provided below.

Paragraph 4 of the Consent Decree specifically states that "Defendants shall implement sufficient measures to ensure the availability of services, supports and other resources of sufficient quality, scope and variety to meet their obligations to such individuals under the Decree and the Implementation Plan consistent with such choices". In addition, the Court's order of June 6, 2018 recommends the development of a monitoring tool, "with an independent review component" to

assess adequacy of services.  With this justification, the Monitor initiated multiple meetings with the Division of Developmental Disabilities, Bureau of Quality Management (BQM), Ligas Parties and others with whom the Monitor had previously engaged in such efforts.  Once the IDHS (Illinois Department of Human Services) selected the Council on Quality and Leadership to manage the contract for this project and the Monitor's Data and Program Analyst agreed to be involved as well, the work began to develop the tool and identify as well as train the reviewers.  Development of the Ligas Compliance Measures for People Living in CILAs continued through the end of January, 2019 and a final draft tool was issued to the Parties and the reviewers on February 8, 2019 in preparation for training reviewers and pilot testing the tool. Following completion of all reviews, including data analysis and scoring, it was determined that all 225 class members reviewed would receive an individual "scorecard" to facilitate the process of correcting the identified deficiencies.

Plans of Corrective Actions (POCAs) from all ISC agencies and CILA providers were received by the Monitor by mid-February 2021 and reviewed by the Monitor and Program Manager by April 1, 2020.  Each POCA received a rating of either *Accepted*, *Provisionally Accepted (no re-submission required)*, or *Not Accepted (returned for revision)* which was reported on POCA Feedback Forms that were submitted to BQM on June 3, 2021 for distribution to the respective ISC agencies and CILA providers.  For those rated as Provisionally Accepted, the Monitor did not require a written revision but corrective actions were to be implemented and will be verified via future review.  For POCAs rated Not Accepted, it was determined that

in one or more areas, the plans were not sufficient to remedy the deficits that led to the "not met" ratings in the 2019 compliance review. Approximately 22% of the POCAs submitted by ISC agencies and 14% of those submitted by CILA providers were rated Not Accepted and thus require re-submission. Webex meetings were held on June 18, 2021 to provide ISC and CILA agencies an opportunity to ask the Monitor and Program Manager questions and seek clarification. Corrections with substantive commentary are to be returned to the Program Manager within 30 days of receipt.

As of this report, the Monitor received all but 5 POCA's that required re-submission and has reviewed the revised plans of correction that were received. The Monitor, BQM, and DDD staff met on January 5, 2022 and January 26, 2022 to formalize the process for submission of the Monitor's completed feedback forms indicating whether the revised POCA was accepted (including provisionally accepted) or not accepted as well as the process and timeline for conducting follow-up activities to verify corrective action. The Monitor will select a sample for follow-up reviews which will be completed by two reviewers of the Monitor's choice and two BQM reviewers. Currently these reviews will not be conducted in person due to safety of visitations based upon COVID-19 restrictions. The anticipated begin date is April 2022 with completion by 6/30/22. If there are any negative findings from the follow-up reviews, the Monitor will work with BQM and DDD to communicate with the ISCs or providers involved.

As stated in the Ligas Implementation Plan FY2022 Revision, "Going forward, the parties and the Monitor will confer on modifications to the 2019 Compliance Measures tool and scorecard" in order to plan for another round of Ligas Compliance Measures Reviews utilizing both BQM and independent groups, such as a team selected by the Monitor, within FY23. After FY23, the parties and Monitor will discuss the process going forward. Part of the process going forward will be participation by the Monitor with the DDD on revising the BQM (Bureau of Quality Management) monitoring tool to reflect measures for monitoring compliance and maintenance of compliance.

## III.  CLOSING REMARKS

The time between March 3, 2020 and February 2, 2022 has been challenging, at best, for all of us. It is reassuring to see such continued commitment during a pandemic. The Monitor is grateful to everyone who provides expertise and insights to inform the Annual Reports. Many thanks to Melanie Reeves Miller for her technical assistance as well.

As stated previously, continued shared efforts with the beneficiaries of the Consent Decree and their families; Plaintiffs' Counsel, Defendants and Intervenors; advocates, providers of services and other colleagues are critical to not only the Monitor's work but also to achieving our common goals of compliance with the Consent Decree and enriching the lives of those we support.