UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Stanley Ligas, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 05 cv 4331 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| Theresa Eagleson, et al., | ) | |
| | ) | Magistrate Judge Jeffrey Cole |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE TO COURT MONITOR'S FIRST AND SECOND BRIEFS IN RESPONSE TO JUNE 15, 2023 STATUS CONFERENCE

KWAME RAOUL
Attorney General for the State of Illinois

Brent D. Stratton
Karyn L. Bass Ehler
Assistant Attorneys General
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
312-814-3000
*Attorneys for Defendants*

## Table of Contents

INTRODUCTION ............................................................................................................. 4

   I.    Proposed Path to Ending the Decree.............................................................................. 4

     a.    Rule 60(b)(5) standard .............................................................................. 5

     b.    The Defendants are in substantial compliance with the terms of the Decree and they have implemented a durable remedy ............................................................................ 6

       i.    Substantial compliance with sufficient resources obligation – generally.................... 7

       ii.    Substantial compliance with sufficient resources obligation – 2017 Joint Motion .. 8

       iii.    Substantial compliance with sufficient resources obligation – Compliance Measures Review ............................................................................ 12

       iv.    Substantial compliance with sufficient resources obligation – crisis services ....... 13

         1.    Description of crisis services process.............................................................. 14

         2.    Provision of crisis services overall.................................................... 16

         3. Class Members in crisis being placed in SODCs.................................... 17

         4. Response to Monitor's comments about crisis services and SODCs ...................... 17

   II.    Proposed Approach to Addressing Individuals Facing Crisis .......................................... 21

CONCLUSION........................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Burt v. County of Contra Costa*, 2014 U.S. Dist. LEXIS 7945 (N.D. Cal. 2014) ........................ 13

*Glover v. Johnson*, 138 F.3d 229 (6th Cir. 1998) ......................................................................... 13

*Horne v. Flores*, 557 U.S. 433, 450 (2009) .............................................................................. 5, 6

*Lewis v. Casey*, 518 U.S. 343, 361 (1996) ..................................................................................... 6

*R.C. v. Walley*, 270 F. App'x 989 (11th Cir. 2008) ...................................................................... 13

*R.C. v. Walley*, 475 F. Supp. 2d 1118 (M.D. Ala. 2007) ............................................................. 13

*Shakman v. Pritzker*, 43 F.4th 723 (7th Cir. 2022) ................................................................. 5, 13

**Rules**

59 Ill. Admin. Code 115.200, 47 Ill. Reg. 8485 ........................................................................ 19

# INTRODUCTION

After the June 15, 2023 status hearing, this Court requested further briefing to clarify the scope of certain issues identified by the Court and "best next steps." (Dkt. No. 806). In its June 15 minute order, the Court identified two principal issues: "[H]ow can the parties seek to resolve this matter such that the consent decree is no longer needed? And how can the parties address the issue of individuals facing crisis who have been placed in SODCs rather than the interim housing provided for in the consent decree?" The Court noted additional issues that relate to the two principal ones, including the scope of the class and the scope of the Defendants' obligations under the Decree. As directed by the Court, the Monitor filed on July 13, 2023 a brief that contains her report on the Compliance Measures Review conducted during 2022-2023 (Dkt. No. 807), and she filed a second brief on August 15, 2023 to address the issues the Court identified following the June 15, 2023 status hearing (Dkt. No. 808). This serves as the Defendants' response to the Monitor's two briefs and to address the issues this Court identified in June.

In answer to the Court's first question, the Defendants believe that there is a clear path to resolving this matter and ending the Decree. A description of that path, which includes addressing concerns the Monitor raised in her two briefs, is set out in detail below.

In answer to the Court's second question, the Defendants believe there is a feasible approach, consistent with the Defendants' obligations under the Decree, to address individuals facing crisis who are placed in SODCs. A description of that approach, which also will address the scope of the class, is also set out in detail below.

## I. Proposed Path to Ending the Decree

The Defendants propose that the path to ending the Decree is to brief a motion to vacate the Decree under Fed. R. Civ. P. 60(b)(5). That rule provides a standard for the Court to assess

whether the Decree should end, and court decisions in this circuit and elsewhere provide helpful guidance for engaging in that assessment.

### a. Rule 60(b)(5) standard

Rule 60(b)(5) authorizes a district court to relieve a party from a judgment or order if either (1) "the judgment has been satisfied, released, or discharged" or (2) "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The Supreme Court has explained that, in the institutional reform context, a judgment has been satisfied when the defendant has shown that it has achieved the objective of the judgment and implemented a durable remedy. *Horne v. Flores*, 557 U.S. 433, 450 (2009).

Following *Horne*, the Seventh Circuit last year provided additional guidance regarding application of the Rule 60(b)(5) standard. In *Shakman v. Pritzker*, 43 F.4th 723 (7th Cir. 2022), which unlike *Horne* but like *Ligas* involved an institutional reform consent decree,[1] the court first explained that achievement of a decree's objectives is shown where there have been no recent significant violations of the decree, emphasizing the lack of "recurring" or "systemic" violations. *Id*. at 728-30. Second, the court explained that the Governor's remedial measures constituted a "durable remedy" where those measures "minimize the risk" of violations, even though the Governor arguably could "do more to implement specific measures to further reduce the risk" of future violations. *Id*. at 729. The court described the Governor's durable remedy as being "adequate…to avoid future…violations" and "in large part…effective." *Id*. at 729-30. The court concluded that the Governor had "instituted durable remedies to help ensure that compliance sticks…. We cannot let perfect be the enemy of the constitutionally adequate." *Id*. at

---

[1] Although not relevant to the Seventh Circuit's ultimate ruling, the *Shakman* case did not originally involve an institutional reform decree like the one entered in *Ligas*, but as eventually litigated against the Governor, it was treated as such.

731. Thus, to meet the standard for vacating a decree, a defendant need not show the absence of any individual violations of federal law but only that there are no longer any significant, systemic violations. And, the defendant's durable remedy need not be so complete and effective as to eliminate all risk of future violations; the remedy need only be adequate and in large part effective to minimize the risk of future violations. *See id*. at 729-30.

The *Shakman* court also addressed the second basis under Rule 60(b)(5) for vacating a decree – that "applying it prospectively is no longer equitable." In its discussion, the court explained that "extended federal judicial oversight…should not serve as a primary means of ensuring state officials comply with duties imposed by federal law. Doing so, the Supreme Court has cautioned, risks courts . . . 'becoming enmeshed in the minutiae of [state] operations . . . .'" *Id*. at 731 (quoting *Lewis v. Casey*, 518 U.S. 343, 361 (1996) (brackets in original)). "Once a party has shown that it has substantially complied with the terms of the decree and implemented a durable remedy, 'continued enforcement of the order is not only unnecessary, but improper.'" *Id*. at 728 (quoting *Horne*, 450 U.S. at 450).

### b. The Defendants are in substantial compliance with the terms of the Decree and they have implemented a durable remedy

In any future motion to vacate, the Defendants will lay out in detail their showing of substantial compliance, so this is merely a brief overview. As the Defendants stated in their December 16, 2022 filing (Dkt. No. 787), there are six fundamental objectives in the Decree:

> (1) maintain a database of all Class Members, both in ICF/DDs and at home, who request [Community-Based Settings and receive Community-Based Services (collectively, CBS)]; (2) prepare Transition Plans for Class Members who will move from ICF/DDs or their family homes; (3) over a six year period, transition 100% of the Class Members in ICF/DDs who request CBS and transition to the community; (4) for those Class Members at home, place them on a waiting list and provide CBS to 3,000 of them over the initial six year period; (5) after the sixth year, provide at a

6

> reasonable pace CBS to Class Members on the waiting list; and (6)
> develop services, supports, and resources of sufficient quality,
> scope and variety to meet the Defendants' obligations under the
> Decree.

Dkt. No. 787 at 2. Defendants unquestionably have satisfied the first five of these obligations.

Thus, the substantial compliance assessment should be limited to the sixth obligation, which was

at issue in Plaintiffs' and Intervenors' Joint Motion to Enforce the Consent Decree filed six years

ago, in 2017 (Joint Motion) (Dkt. No. 666), and the Court's two rulings on the Joint Motion

(Dkt. No. 695 [granting the joint motion]; Dkt. No. 710 [finding Defendants' proposed

compliance plan inadequate and directing the Defendants, working with Plaintiffs, Intervenors,

and Court Monitor, to develop an adequate compliance plan]).

### i. Substantial compliance with sufficient resources obligation – generally

The Defendants believe – and will show in their motion to vacate – that they are in

substantial compliance with the obligation to provide sufficient resources to meet their other

Decree obligations. Substantial compliance with this obligation – true with all obligations but

especially important for an overarching "sufficient resources" obligation – must be assessed at

the systemic level. The Defendants should be found in substantial compliance if the system, as a

whole, provides sufficient resources, even if a small percentage of individuals served by the

system do not receive all of the specific services and supports that they request or need. Assessed

through a systemic lens, the Defendants have substantially complied with their obligation to

provide sufficient resources. From FY2011 to FY2024 (running through June 30, 2024), the

Defendants have increased annual spending on community-based settings and community-based

services (CBS) from about $672.4 million to an estimated $1.7 billion, an increase of 152%. The

investment in the Adult with Developmental Disabilities Waiver spending grew from

7

$852,300,000 in FY2020 to a projected $1,486,120,000 in FY2024.[2]  Since 2011, the capacity of

the Home and Community Based Services (HCBS) waiver has increased from 15,225 to 25,859,

an increase of 69%, and the number of individuals receiving waiver services has increases from

13,432 to 23,153, an increase of 72%. In addition to significant increased funding and growth in

the number of people being served through the waiver, the Defendants have expanded

programming, including addressing the following specific issues:

- Creation of 10 short-term stabilization homes;
- Creation of 6 long term stabilization homes;
- Creation of 4 transition homes;
- Expansion of Support Services Teams (SST) to support people transitioning from institutions;
- Creation of a Technical Assistance Unit for providers;
- Expansion of the New Provider Orientation and support process for providers;
- Development of Housing Navigators to help support people transitioning to affordable supportive housing with waiver services;
- Planning Grant for Money Follows the Person Program – funding for case management and transition supports to move people out of institutions and into waiver services; and
- Emergency Respite expansion through federal grant.

### ii. Substantial compliance with sufficient resources obligation – 2017 Joint Motion

Following the Court's granting of the 2017 Joint Motion and the Court's direction to the

Defendants to develop an adequate compliance plan, there were additional discussions among

the parties, Monitor, and the Court as to what would be included in the compliance plan.

Ultimately, there was agreement that the compliance plan would include four components: (1)

the Defendants would convene a group to study and propose recommendations for changing the

State's methodology for setting payment rates for services provided in ICF/DDs and CBS, which

---

[2] The Court correctly ruled in its August 11, 2017 order on the Joint Motion that it "does not have the authority to order an increase in wages." Dkt. No. 695 at 2. Although the Defendants believe that the State's increased spending is not something that could be ordered by the Court, the Defendants' commitment to that increased funding is significant evidence of their substantial compliance with their Decree obligation to provide sufficient resources.

recommendations would include increasing the payment rates; (2) the Monitor would evaluate the adequacy of services provided in community-based settings; (3) although the hourly wage rate for Direct Service Providers (DSPs) would be addressed as part of the overall rate study, the State would address those DSP hourly wage rates in the interim; and (4) the parties and Monitor would work to reach agreement on reasonable pace for individuals to come off of the PUNS list and to receive home- or community-based services. *See, e.g*., Dkt. No. 712.

As noted earlier, the Defendants are in substantial compliance as to the fourth component – reasonable pace. An agreement was reached in 2019 (Dkt. No. 719, p. 22 of 30), and the Defendants have exceeded their reasonable pace obligation in every year since. The second component of the compliance plan – the Monitor's evaluation of the adequacy of services in community-based settings – is addressed below.

The Defendants believe – and will show in their motion to vacate – that they are in substantial compliance with the first and third components – the rate study and DSP hourly wage rates. The Defendants convened a Rates Oversight Committee, which began meeting in August 2018 and issued its final report on November 13, 2019. Its report is filed at Docket No. 747-1. The Defendants subsequently engaged a consultant, Guidehouse, to build on the Committee's recommendations and to make its own specific recommendations for, *inter alia*, new rate methodologies for both CBS and ICF/DD services. The final Guidehouse report was released on November 30, 2020 and is filed at Docket No. 747-2.

Since November 2020, the Defendants have been implementing the Guidehouse recommendations, and they have regularly advised the Court, Monitor, and parties of the progress of that implementation. In brief, by the end of the current fiscal year, June 30, 2024, the Defendants will have implemented the following:

| Fiscal Year | Funding Increase – HCBS | Funding Increase – ICF | Implementation | Effective Date |
|---|---|---|---|---|
| 2018 | $0.75/hour wage increase | $0.75/hour wage increase | Pass-through to front-line staff (HCBS); pass-through to staff through program and support components of rate (ICF) | 08/01/2017 (Both) |
| 2019 | $0.50/hour wage increase; additional $0.04 for Chicago | $0.50/hour wage increase | Pass-through to front-line staff (HCBS); pass-through to staff through program and support components of rate (ICF) | 10/01/2018 (Both) |
| 2020 | 3.5% rate increase | 3.5% rate increase | Rate increase/COLA | 07/01/2019; 08/01/19 for ICF |
| 2020 (mid-year, non-legislative) | $0.58 and $0.62/hour wage increase | $0.24/hour wage increase | Wage increase (not required to be passed through) | 01/01/20; est. 06/01/20 for ICF |
| 2021 | $1.00/hour wage increase $0.50/hour wage increase | $1.00/hour wage increase $0.50/hour wage increase | $0.80/hour and $0.40/hour, respectively, required to be passed through to non-executive staff | 07/01/20 and 01/01/21 |
| 2022 | $170 million total $1.50/hour wage increase | $170 million total $1.50/hour wage increase | 50% pass-through, 50% flexible for wages | 07/01/2021 (ICF) and 01/01/2022 (CMS approval required) |
| 2023 | $207 million total $1.00/hour wage increase | $207 million total $1.00/hour wage increase | 50% pass-through, 50% flexible for wages | 01/01/23 (CMS approval required) |

| Fiscal Year | Funding Increase – HCBS | Funding Increase – ICF | Implementation | Effective Date |
|---|---|---|---|---|
| 2024 | $196.7 million total (see above for detail) $2.50/hour wage increase | $196.7 million total (see above for detail) $2.50/hour wage increase | 50% pass-through, 50% flexible for wages | 01/01/24 (CMS approval required) |

The Defendants have implemented much of the Guidehouse recommendations. The Defendants' Guidehouse Projected Timeframe anticipates funding the remaining $3.00 per hour for DSPs in the next three years, the zero-hour model to fully fund DSP staffing for 24 hours, and an expanded array of day program services. Although the Guidehouse recommendations anticipated an implementation of all rate increases and changes to rate methodologies at one time, the Defendants believe that completing implementation by no later than FY2027 constitutes substantial compliance. Neither the Decree's "sufficient resources" obligation nor this Court's orders on the 2017 Joint Motion contains a specific timeframe; in the Defendants' view, their 152% increase in spending since 2011 and commitment to additional increases through FY2024 amounts to an enormous investment in the DD system that shows substantial compliance with the sufficient resources obligation.

Regarding DSP hourly wage rates, specifically, from FY2020 (before the implementation of the Guidehouse recommendations) to FY2024 (assuming FY2024 increases are approved by the Federal Centers for Medicare and Medicaid Services (federal CMS)), the Defendants have increased DSP rates by $5.00 per hour from approximately $14.50/hour to $19.50/hour with Chicagoland DSPs receiving $22.50 due to the implementation of Regionalization. In addition, over the next three years, through FY2027, Defendants have committed to funding the following Guidehouse recommendations: the remaining $3.00/hour for DSPs, the zero-hour model to fully fund 24-hour DSP staffing, and an expanded array of day program services.

### iii. Substantial compliance with sufficient resources obligation – Compliance Measures Review

Based on the Court's ruling on the Joint Motion, the Monitor undertook a compliance measures review of services provided in Community Integrated Living Arrangements (CILAs). That review was conducted in 2019, was discussed in the Monitor's Seventh Annual Report filed on March 3, 2020 (Dkt. No. 737), and the final report was filed as an exhibit to that Seventh Annual Report (Dkt. No. 737-2).

After the Monitor filed her report of the 2019 Compliance Measures Review (2019 Review), agreement was reached to conduct a second review. That review began in November 2022 and was completed in May 2023. The Monitor's report on that review (2023 Review) was filed at Docket No. 807.

Based on the Monitor's report on the 2023 Review, the Defendants believe – and will show in their motion to vacate – that they are in substantial compliance with the final area identified in the Court's ruling on the Joint Motion – the adequacy of services provided to Class Members in CILAs. Related to but separate from the Joint Motion, Defendants believe that the 2023 Review also demonstrates the Defendants' substantial compliance with the sufficient resources obligation set out in Paragraph 4 of the Decree.

Whether or not assessed according to a numeric or percentage metric, Defendants believe that the 2023 Review demonstrates their substantial compliance with their Decree obligation to provide to Class Members services, supports, and resources of sufficient quality, scope and variety. The Monitor decided that, in order "to be determined in compliance, within a given section each measure must be rated 85% or above…." Dkt. No. 807 at p. 5 of 36. Thus, for example, in Domain No. 7 (Personal Funds Management), there is a finding of non-compliance on subpart A (74%), but a compliance finding as to the overall domain (94%). *Id.* at p. 20 of 36.

12

The Defendants do not agree that 85% should be the measure for determining their substantial compliance, at least for purposes of determining their substantial compliance with the Decree as a whole, under Rule 60(b)(5). The Defendants believe that, under relevant caselaw, the Court may assess the Defendants' substantial compliance without using any percentage metric. For example, in the *Shakman* case, the court found that the Governor was in substantial compliance without using any percentage metric and ruled that it is enough that the Governor's durable remedy is "adequate." 43 F.4th at 729-31. Any common understanding of the word "adequate" suggests a compliance percentage well below 85%. If the Court decides that a percentage metric is necessary or at least useful, the Defendants believe that a percentage lower than 85% is more consistent with controlling caselaw.[3]

### iv. Substantial compliance with sufficient resources obligation – crisis services

Although the Decree includes a provision describing the Defendants' obligation to serve class members in crisis, crisis services have never been a central focus of this case and Decree. As the Defendants explained in an earlier filing (Dkt. No. 787), the word "crisis" does not appear in the original complaint or amended complaint and appears only once in the thirty pages of the second amended complaint. Dkt. No. 436 at 20.

---

[3] Although the Defendants are aware of courts in other circuits using percentage metrics, including 85%, in assessing substantial compliance with consent decree obligations, the Defendants are not aware of any court in this circuit ruling that 85%, or some other percentage, is the appropriate, much less mandated, metric for assessing substantial compliance. And, courts in other circuits have found substantial compliance using percentage metrics as low as 70%. *See, e.g.*, *Burt v. County of Contra Costa*, 2014 U.S. Dist. LEXIS 7945 (N.D. Cal. 2014) (the Court granted the motion to vacate the consent decree where the city had a 70% rate of compliance (rather than the numerical test of 80% identified in the decree) in all categories); *R.C. v. Walley*, 475 F. Supp. 2d 1118 (M.D. Ala. 2007), *affirmed R.C. v. Walley*, 270 F. App'x 989 (11th Cir. 2008) (granting motion to terminate consent decree and finding that "[i]t would be superficial . . . to predicate a finding on a pure percentage basis, i.e., to say that a compliance ratio of . . . 70 percent either does or does not equate substantial compliance."). *See also Glover v. Johnson*, 138 F.3d 229 (6th Cir. 1998) (finding substantial compliance if defendants met 75% of the binding provisions).

There is an obvious reason why crisis services are not a central focus of the Decree. The State has long had an obligation – independent of the Decree – to provide appropriate supports and services to individuals with developmental or intellectual disabilities who find themselves in crisis, and that obligation will continue after this Decree is terminated. When this case began, there were systemic barriers that prevented ICF/DD residents from transitioning to community-based settings and receiving community-based services, and thus that issue always has been the central focus of the case and Decree. In contrast, while there have been a handful of individual exceptions, there were no systemic barriers to providing community-based services to individuals in crisis, and there are no such systemic barriers now. Therefore, although it made sense to include crisis services among the Decree obligations so that class members in crisis would be served consistent with the state's independent obligation to provide crisis services, the Defendants' substantial compliance with the Decree should not rise or fall on their obligation to provide crisis services. That said, the Defendants believe – and will show in their motion to vacate – that they are in substantial compliance with the Decree's obligation to provide crisis services to class members.

### 1. Description of crisis services process

Under paragraph 21(a) of the Decree, an individual in "crisis" is defined as someone who is at imminent risk of abuse, neglect, or homelessness. Once an Independent Service Coordination agency (ISC) learns of an individual in crisis, the ISC, working with the Illinois Department of Human Services' Division of Developmental Disabilities (DDD), first must determine whether the individual already has been found both clinically eligible for DD services and Medicaid eligible, and, if not, must make those determinations. Determining eligibility for waiver services includes gathering school records, doctors' assessments, and other very specific

14

documentation, as well as potentially scheduling additional evaluations. Once determined eligible, the ISC presents the individual (plus guardian, if any) with all available service options, which, depending on the individual's needs, circumstances, and preferences,[4] could include a community-based setting such as a CILA, or placement in an ICF/DD. If CBS is requested and available, then the ISC will work to secure and DDD to approve CBS. If CBS is requested but not immediately available, then ICF/DD placement is offered if available. SODCs are typically the placement of last resort. Ultimately, it is the individual's (or guardian's) choice, although options might be limited for immediate placements. And, the priority for the ISC and DDD is to find a placement that removes the individual from the crisis situation as soon as possible, even if they are not able to immediately move the individual into their preferred placement.

Because the priority is to remove an individual from a crisis situation as soon as possible, the crisis services process includes the option of providing interim emergency services, including interim placement in an ICF/DD. The Decree specifically permits this option. Although the Decree requires that class members in crisis who request CBS receive CBS "expeditiously," the Decree does not define that term. The Defendants believe that they have been operating under an agreed definition of "expeditiously" for interim services – that they be provided within 24-72 hours after an individual has been determined eligible for crisis services. But, the parties and Monitor have not agreed on defining "expeditiously" for the provision of requested CBS. To the extent that the Monitor or Plaintiffs believe that the Decree requires the provision of all requested CBS within 72 hours of an eligibility determination, the Defendants disagree that there is such a Decree requirement or that any such requirement would be at all realistic.

---

[4] Although SODCs are classified as ICF/DDs for Medicaid purposes, the Decree's definition of ICF/DD is limited to those that are privately-run. But, when an ISC is looking for a placement for an individual in crisis, the ISC will include SODC placement as a last resort.

Requiring all requested CBS to be provided within 72 hours is unrealistic – to the point of being practically impossible – because of the wide range of the needs, preferences, and circumstances of individuals in crisis. Many such individuals are in crisis precisely because of unique behavioral and/or medical conditions that require additional and/or more specially trained staff. Many such individuals (or their guardians) have very specific and very narrow preferences, such as geographical location, size of CILA, specific providers, and even specific CILA homes. Before providing waiver services, certain activities must occur that are required through the State's Adults with Developmental Disabilities Waiver. This includes establishing eligibility, developing personal plans, reaching out to providers to identify service options, creating waiver packets and developing implementation strategies. To be able to provide all requested CBS within 72 hours would require the State to have dozens, if not hundreds, of empty and fully-staffed CILAs all across Illinois so that the instant the next individual presented in crisis, there would be an immediately-available placement meeting all preferences. Even if feasible (which it is not), neither the Decree nor federal law require the State to make substantial expenditures every year just to maintain that additional, unfilled capacity.

## 2. Provision of crisis services overall

As has been previously reported to the Court, while the Decree has been in place, DDD has provided crisis services on a timely basis to thousands of individuals, which shows the Defendants' substantial compliance with their Decree obligation. In their December 16, 2022 filing, the Defendants reported that they have served nearly 3,700 individuals in crisis while the Decree has been in place, which represents 93% of all requests for crisis services during that time period. In 2021-2022, the State fulfilled 99% of Class Members' crisis services requests; for 86% of those Class Members, the State provided CBS. Dkt. 787 at 5. In FY2023, 201 individuals

16

in crisis were placed in waiver services, raising to 3,911 the total number of individuals in crisis since 2011 who have received services.

### 3. Class Members in crisis being placed in SODCs

As has also been previously reported to the Court, of the total number of class members who request crisis services, only small percentage are admitted to SODCs as an interim placement, and an even smaller percentage request CBS after SODC placement. As of September 26, 2023, 558 individuals have been admitted to SODCs since January 1, 2017, but only 44 of those are class members who were admitted as an interim placement in response to a request for crisis services with eight having been discharged as of September 2023. Of the 205 class members currently in SODCs, only 53 have requested CBS, which represents less than two percent of the individuals who have received crisis services since 2011. A total of 25 individuals not on PUNs but at home went into crisis and into an SODC.[5] Two have been discharged and three are currently looking for placement. Although there certainly are a number of SODC residents who would prefer CILA placements but are unable to move due to the unavailability of appropriate and preferred CILA placements,[6] the State's track record of serving more than 98% of individuals in crisis since 2011 demonstrates the Defendants' substantial compliance.

### 4. Response to Monitor's comments about crisis services and SODCs

In her August 15, 2023 filing (Dkt. No. 808), the Monitor summarizes the Defendants' performance in providing crisis services between July 1, 2021 and December 31, 2022. She notes

---

[5] Plaintiffs' counsel has asked the Defendants to agree that individuals in this category – not on PUNS but at home and experiencing a crisis – should be considered class members under the Decree. The Defendants do not agree that they meet the class member definition regarding crisis services, although the Defendants are willing to continue to discuss that issue with Plaintiffs' counsel and the Monitor.

[6] Depending on the location of an available CILA, and its proximity to a class member's family, some families choose an SODC for geographic location, amongst other reasons. *See*, *e.g.*, Ex. 1.

that there were 301 requests for crisis services, and that the State conducted the review of those requests within 72 hours or less for 291 out of 301 (96%) (Dkt. No. 808 at p. 8). The State also provided some services within 72 hours for 78% of the individuals and within an additional 4-9 days for an additional 13%. The Defendants believe that this data supports their position that they are in substantial compliance with their crisis services obligation.

At page 10 of her brief, the Monitor describes what she calls a "dual system for processing and authorizing services for individuals in crisis" and asserts that this dual system "is discriminatory and perpetuates a crisis situation where, in many cases, the only option for safety is institutionalization in a State Developmental Center." The Defendants disagree that the crisis services system is a dual system that discriminates against any individual seeking crisis services.

Initially, the Defendants note that they are not sure what the Monitor means by a "dual system." The crisis services process described above is one system used for all individuals who request crisis services, whether or not they are class members and regardless of their current living situation (*e.g.*, family home, CILA, ICF/DD, etc.). The Defendants do not dispute that those who go through the process might experience different timelines in having their requests processed and might have different interim and ultimate outcomes, but that is not because there is a discriminatory dual system. Different timelines and outcomes result from the unique and varied circumstances that accompany the individuals who request services. For example, some approvals of services will take longer because of delays in determining an individual's clinical and/or Medicaid eligibility, which in turn might be delayed because the ISC and/or DDD is waiting for the individual and/or their guardian to provide records or other information that only they can provide. Or, the individual and/or guardian might request one placement or provider and then change their mind.

18

The other significant variable that affects both the timeline and ultimate outcome is finding an appropriate provider that can meet the individual's needs and preferences, and that has the capacity and willingness to accept a new resident.[7] An individual's preferences and unique needs (*e.g*., behavioral and/or medical) can greatly narrow the number of appropriate and willing providers, especially for an individual in crisis who needs a new living situation on very short notice. Thus, while the Defendants agree with the Monitor that there are some individuals who are waiting for approval of services or waiting for an appropriate provider, those delays are not the result of a discriminatory dual crisis services system.

At pages 16-17 of her brief, the Monitor states:

As recommended in the Monitor's 8th Annual Report, it is imperative that the Defendants provide the Monitor with immediate notification of SODC admission of a class member, ongoing updates of the database, including information collected by DDD with regard to ensuring class members in SODCs understand all options relative to non-SODC residential options (including Waiver services). Additionally, the Defendants should ensure prompt planning for class members in SODC's to return to the community. The inconsistency with data collection and management is prohibitive of effective diversion to admission and discharge planning.

The Defendants have several responses to these statements. First, DDD gives the Monitor and Plaintiffs' counsel monthly updates on all class member admissions to SODCs, including an updated spreadsheet of all individuals admitted to SODCs from FY2018 to the present.

Second, the Defendants have had numerous discussions with the Monitor and Plaintiffs' counsel about ensuring that class members in SODCs understand all of their service options. The Defendants have committed to providing additional outreach to SODC residents and their guardians, including activities not required by the Decree, to communicate those options to class

---

[7] The law does not permit the State to require a CILA provider to take a new resident that the provider does not believe it has the capacity, resources, or staff to handle. See 59 Ill. Admin. Code 115.200, 47 Ill. Reg. 8485.

members in SODCs, all of which has been discussed and reviewed with the Monitor and

Plaintiffs' counsel. In addition, as has been discussed with Plaintiffs' counsel and the Monitor

previously, there are many guardians of class members in the SODCs who have made clear that

the SODCs are their preferred placement. *See*, *e.g.*, Exhibit 1.

Third, the Defendants provide as prompt community transition planning as possible, but

with the qualification that prompt community transitions are not always possible, given, as

described above, the challenges of finding appropriate and willing CILA providers to serve class

members with unique needs and preferences.

Fourth, although the Defendants do not understand the Monitor's reference to

inconsistent data collection and management, they disagree that there is any such inconsistency

that is allowing class members to be admitted to SODCs or preventing them from being moved

from SODCs to community-based settings. As discussed earlier, while there are challenges in

finding appropriate community-based settings for a small number of the class members in

SODCs, those challenges are not the result of inconsistent data collection or management.

At pages 19-20 of her brief, the Court Monitor made recommendations for building

community capacity. The Defendants are taking steps consistent with many of these

recommendations, including updating the DSP training required for all DSPs and exploring

funding for de-escalation training for frontline staff. Providers already can hire nursing staff as

full-time and part-time employees. The Defendants are focused on increases in rates and wages

through funding of the Guidehouse recommendations with the focus on moving DSP wage

reimbursement to 150% of minimum wage. Also, in line with the Guidehouse recommendations,

the Defendants are updating the rate model, which ensures consistency and reflects the greater

needs of some individuals. The implementation of the recommendations also reflects increases in

funding in nursing and behavioral health add-ons. In addition, the Defendants currently offer assistive technology funding that includes home modifications to address accessibility concerns. Finally, over the past year, the Defendants updated the person-centered planning process and templates, offering significant training to the ISCs and providers as well as other stakeholders to better ensure that the plans result in services individuals want and need.

At pages 21-23 of her brief, the Monitor describes her visits to the Kiley and Shapiro SODCs, her interactions with some of the residents at those SODCs, and a summary of investigations of complaints about some of the SODCs.[8] Because the Decree does not cover the SODCs, including their condition, services and complaints, the Defendants do not respond to the substance of this section of the Monitor's brief. Although the Defendants have a Decree obligation to those class members in SODCs who request CBS, that obligation flows from their status as class members before their SODC admission, not from their current placement in an SODC. As has been explained to the Court, Monitor, and Plaintiffs' counsel previously, all SODC residents, whether or not class members, have top priority to obtain community transition simply by being SODC residents.

## II.     Proposed Approach to Addressing Individuals Facing Crisis

In response to the Court's question about addressing individuals facing crisis who are then placed in SODCs at least as an interim placement, the Defendants believe that their current process, described herein, substantially complies with their Decree obligations. There is substantial compliance because, as described above, only a small percentage of class members

---

[8] The Court Monitor references "failures" in annual certifications of specific SODCs. The Defendants disagree with this framing. Although Illinois Department of Public Health (IDPH) identified findings during these reviews, the overall reviews were not considered failures and the SODCs were able to address findings identified by IDPH with action plans to improve areas.

(or even all individuals) requesting crisis services are placed in SODCs as an interim placement. For substantial compliance purposes, the law does not require a State defendant to meet a Decree objective with anywhere near that level of compliance, much less more than that. However, the Defendants are open to discussing whether additional reasonable undertakings, even if strictly beyond the Decree, would resolve this issue to the Court's satisfaction.

As noted earlier, every SODC resident who expresses a desire to move to a CILA has the highest priority for such a transition – whether or not that resident is a class member and whether or not that resident was admitted to the SODC as a result of a crisis situation. Highest priority means just that. Delays in accomplishing community transitions for SODC residents are not due to any systemic barriers but are due to the challenges described above – unique needs and/or preferences of the residents and/or their guardians and finding appropriate and willing providers who are being asked to accept new residents with unique and often higher-level needs.

In addition to ensuring that individuals and their guardians are educated about their living options, including community living, the Defendants have expanded the number of transition staff in the DD Division and expanded the ISC staff funded to help with identifying community providers, specifically for people transitioning out of SODCs. The Defendants have expanded supports for people as they transition to new homes through the Supports Services Team, and are working to expand training for providers serving individuals with high behavioral needs. Efforts are being made to expand smaller home options in the community and grow residential options in more rural areas.

## CONCLUSION

In conclusion, the Defendants believe they have fully addressed this Court's principal questions and have responded to the Monitor's two briefs. As set out above, the Defendants

believe they are in substantial compliance with their Decree obligations, including crisis services, and that there is a clear path to ending the Decree. The Defendants welcome the opportunity to discuss these matters more fully with the Court.[9]

Dated: October 18, 2023                          Respectfully submitted,

                                                 **For Defendants:**

                                                 By: /s/ Brent D. Stratton
                                                 Brent D. Stratton
                                                 Karyn L. Bass Ehler
                                                 Office of the Illinois Attorney General
                                                 100 W. Randolph St., 12th Floor
                                                 Chicago, IL 60601

---

[9] At the October 18, 2023 hearing on the motions for leave to file oversized briefs, the Court explained that the 20 pages allowed in the Court's minute order (Dkt. No. 827) was for text in the motion, not including cover page, table of contents, or table of authorities. Although Defendants' response is 24 pages long in total, the text is 19 pages plus three lines on the following page.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney of record, hereby certifies that, on October 18, 2023, he caused to be filed through the Court's CM/ECF system a copy of **DEFENDANTS' RESPONSE TO COURT MONITOR'S FIRST AND SECOND BRIEFS IN RESPONSE TO JUNE 15, 2023 STATUS CONFERENCE**. Parties of record may obtain a copy of this filing through the Court's CM/ECF system.

/s/ Brent D. Stratton
Brent D. Stratton