# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Stanley Ligas, et al.,         )
                               )
          Plaintiffs,     )
                               )     Case No. 05 cv 4331
      v.                 )
                               )     Judge Sharon Johnson Coleman
Theresa Eagleson, et al.,    )
                               )
         Defendants.    )

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO VACATE THE CONSENT DECREE

**KWAME RAOUL**
Attorney General for the State of Illinois

Brent D. Stratton
Karyn L. Bass Ehler
Assistant Attorneys General
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
312-814-3000
*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

I.     THE OBJECTIVE AND TERMS OF THE DECREE ...................................... 2

II.    FACTUAL AND PROCEDURAL BACKGROUND ........................................ 3

III.   ARGUMENT ................................................................................................... 5

   A.   Legal Standard Under Rule 60(b)(5) ......................................................... 5

   B.   The Defendants have achieved the fundamental objective of the Decree. ..................... 8

      1.   Substantial compliance with sufficient resources obligation – generally .............. 12

      2.   Substantial compliance with sufficient resources obligation – implementation of compliance plan in response to 2017 Joint Motion .......................... 13

      3.   Substantial compliance with sufficient resources obligation – Compliance Measures Review ............................................... 18

      4.   Substantial compliance with sufficient resources obligation – crisis services ....... 21

         a.   Description of crisis services process ............................................. 222

         b.   Provision of crisis services overall ............................................... 25

         c.   Class Members in crisis being placed in SODCs ............................. 26

      5.   Class Members with higher needs ............................................... 311

   C.   The Defendants have implemented a durable remedy. ................................. 333

   D.   Equitable considerations support vacating the Decree. ............................... 33

CONCLUSION ...................................................................................................... 355

## TABLE OF AUTHORITIES

**Cases**

*Burt v. County of Contra Costa*, 2014 U.S. Dist. LEXIS 7945 (N.D. Cal. 2014) ...................... 20

*Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004) ......................................................... 6

*Frew v. Janek*, 780 F.3d 320 (5th Cir. 2015) ................................................................. 5

*Glover v. Johnson*, 138 F.3d 229 (6th Cir. 1998) ......................................................... 20

*Horne v. Flores*, 557 U.S. 433 (2009) ................................................................. passim

*Illinois League of Advocates for the Developmentally Disabled, et al. v. Illinois Dept. of Human Services*, 803 F.3d 972 (7th Cir. 2015) ...................................................... 28

*Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176 (10th Cir. 2018) ...................................... 6

*Jeff D. v. Otter*, 643 F.3d 278 (9th Cir. 2011) ............................................................. 5

*John B. v. Emkes*, 710 F.3d 394 (6th Cir. 2013) ........................................................... 6

*Lewis v. Casey*, 518 U.S. 343 (1996) ................................................................... 6, 7

*Olmstead v. L.C.,* 527 U.S. 581 (1999) ............................................................... 1, 22

*Peery v. City of Miami*, 977 F.3d 1061 (11th Cir. 2020) ........................................... 5, 6, 12

*People Who Care v. Rockford Bd. of Ed.*, 246 F.3d 1073 (7th Cir. 2001)............................. 10, 11

*Pottinger v. City of Miami*, 359 F. Supp. 1177 (S.D. Fla. 2019) .................................... 12, 28

*R.C. v. Walley*, 270 F. App'x 989 (11th Cir. 2008) ..................................................... passim

*R.C. v. Walley*, 475 F. Supp. 2d 1118 (M.D. Ala. 2007) ................................................ passim

*Salazar by Salazar v. District of Columbia*, 896 F.3d 489 (D.C. Cir. 2018)........................ passim

*Shakman v. Pritzker*, 43 F.4th 723 (7th Cir. 2022) .................................................... passim

**Rules**

Federal Rule of Civil Procedure 60 ..................................................................... passim

59 Ill. Admin. Code 120.110 (i) (1) (B)..................................................................... 23

59 Ill. Admin. Code 115.200 ............................................................................... 25

## INTRODUCTION

The *Ligas* lawsuit was filed in 2005 and the Consent Decree was entered in 2011 in order to remedy what were then systemic barriers to *Olmstead* compliance[1] for a class of adults with developmental or intellectual disabilities (DD) living in privately-run Intermediate Care Facilities for Individuals with Developmental Disabilities (ICFs-DD)[2] or in their family homes. Through the careful oversight of the Court and Court-appointed Monitor, the vigilant advocacy of counsel for the class and for Intervenors, and the dedicated efforts of the Defendants' staff, the Decree has accomplished that objective. The systemic barriers that were in place in 2011 no longer exist, and the State has dramatically changed and expanded its system for serving adults with DD. The number of individuals receiving Home and Community-Based Waiver services (Waiver or CBS) has increased from 13,432 in 2011 to 23,153 in 2023 (Dkt. No. 828 at 7-8), and the State's spending on community-based services has increased from $728.8 million in Fiscal Year 2011 to an estimated $1.84 billion in Fiscal Year 2024 (ending June 30, 2024). *See* Exhibit A. While no system is perfect, the current system no longer results in systemic violations of federal law, and there are programmatic structures, processes, and policies in place that ensure that the same systemic violations that led to the lawsuit and Decree will not recur. Because the Defendants have demonstrated substantial compliance with the terms and objective of the Decree and have implemented a durable remedy to prevent against future systemic violations of federal law, the Court should exercise its authority under Rule 60(b)(5) to vacate the Decree.

---

[1] Plaintiffs alleged that the Defendants violated the Americans with Disabilities Act and the Rehabilitation Act, the community integration mandates of which were affirmed in *Olmstead v. L.C.,* 527 U.S. 581 (1999), plus a similar mandate in the Social Security Act. *E.g.*, Dkt. No. 436 at 1-4.

[2] The terminology has changed since 2005, with "intellectual" often substituting for "developmental" so that such a facility is now sometimes referred to as an ICF/IID (intermediate care facility for individuals with intellectual disabilities) or just ICF/ID. Because the Decree uses the term "ICF-DD," that term will be used herein for the sake of consistency.

## I.    <u>THE OBJECTIVE AND TERMS OF THE DECREE</u>

The operative complaint in this case identifies the systemic barriers that caused the systemic violations of federal law that led to the entry of the Decree. In the second amended complaint, Plaintiffs alleged, among other things:

- Defendants do not have a comprehensive, effectively working plan for moving individuals into the community

- Defendants do not have a waiting list for community services

- Defendants approve community-based services only for individuals who are in undefined "emergency" situations

- Defendants do not inform eligible individuals of community-based service options and then offer them the choice between institutional and community-based settings

- Defendants do not provide community-based services with reasonable promptness

- Defendants do not use effective assessments to determine whether individuals who want to live in community-based settings could be served in those settings.

*E.g.*, Dkt. No. 436 at 2-4, 20-25. As entered, the Decree obligated the Defendants to eliminate those systemic barriers as to both Class Members living in ICFs-DD and living in their family homes, so that Class Members could receive services in either the family home or in a community-based setting, *i.e.,* a Community Integrated Living Arrangement (CILA).[3] The Decree contained six major provisions that, if met, would achieve that fundamental objective:

1. maintain a database of all Class Members, both in ICFs-DD and at home, who request [Community-Based Settings and receive Community-Based Services (collectively, CBS)];

2. prepare Transition Plans for Class Members who will move from ICFs-DD or their family homes;

---

[3] Because the Decree also covered the interests of the Intervenors, the Decree also contained a related objective, which is set out in Paragraph 4 – that adults with DD retain their choice to be served in ICFs-DD and that the sufficient resources obligation that applies to Class Members also applies to Intervenors.

3. over a six-year period, transition 100% of the Class
   Members in ICFs-DD who request CBS;

4. for those Class Members at home, place them on a
   waiting list and provide CBS to 3,000 of them over the
   initial six-year period;[4]

5. after the sixth year, provide at a reasonable pace CBS to
   Class Members on the waiting list; and

6. develop services, supports, and resources of sufficient
   quality, scope and variety to meet the Defendants'
   obligations under the Decree.

Dkt. No. 549 at 9-16 of 41. The Defendants unquestionably have satisfied the first five of these

provisions. And as discussed below, Defendants are in substantial compliance with the sixth

provision.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

On November 20, 2008, Plaintiffs and Defendants filed their first motion for preliminary

approval of the consent decree they had negotiated. Dkt. Nos. 298, 299. Objections were filed

by, among others, counsel for Intervenors, who also had filed motions to intervene. *E.g.*, Dkt.

Nos. 303, 305. Other objectors included "485 guardians, parents and family members" of

individuals with DD living in Illinois' State Operated Developmental Centers (SODCs). Dkt. No.

407. On March 31, 2009, the Court preliminarily approved the proposed decree, Dkt. No. 326,

and on July 1, 2009, the Court held a fairness hearing. Dkt. No. 416. Then, on July 7, 2009, the

Court denied final approval of the proposed decree. Dkt. No. 420.

After Plaintiffs filed a Second Amended Complaint, Dkt. No. 436, Plaintiffs and

Defendants engaged in additional negotiations, agreed to a revised consent decree, and filed a

---

[4] Included within this fourth obligation regarding Class Members at home is a distinct obligation
regarding Class Members who are determined to be in a situation of crisis (Decree ¶21). The Defendants'
obligation as to Class Members in crisis is addressed *infra* at 21.

second motion for preliminary approval on January 25, 2010. Dkt. Nos. 455, 456. Objections

were filed, as well as renewed motions to intervene, again including by counsel for Intervenors.

*E.g.*, Dkt. Nos. 463, 464. On April 7, 2010, the Court granted limited intervention, Dkt. No. 479,

and then denied preliminary approval of the proposed decree on April 8, 2010. Dkt. No. 480.

 Plaintiffs and Defendants renewed their negotiations regarding a proposed decree, this

time with the participation of Intervenors and the assistance of Magistrate Judge Cole, and on

January 11, 2011, a third motion for preliminary approval was filed. Dkt. No. 521. On June 15,

2011, the Court gave final approval of and entered the proposed decree. Dkt. Nos. 547, 548, 549.

 On July 19, 2011, the Court appointed the first monitor. Dkt. No 558. On June 17, 2015,

this case was reassigned. Dkt. No. 590. On June 24, 2015, the Court appointed the successor (and

still current) monitor. Dkt. No. 593.

 On April 7, 2017, Plaintiffs and Intervenors filed Plaintiffs' and Intervenors' Joint

Motion to Enforce the Consent Decree (Joint Motion). Dkt. Nos. 665, 666. The Court granted the

Joint Motion on August 11, 2017, Dkt. No. 695, and, on June 6, 2018, entered a subsequent order

regarding the Joint Motion in which the Court found that Defendants' proposed compliance plan

was inadequate and directed the Defendants, working with Plaintiffs, Intervenors, and Court

Monitor, to develop an adequate compliance plan. Dkt. No. 710. Agreement was ultimately

reached as to what would constitute an adequate compliance plan. *E.g.*, Dkt. No. 712.

Defendants have worked diligently toward achieving the goals set forth in the compliance plan,

as evident by serving Class Members through the enormous investments in the system and the

rate increases since that time.

### III.     ARGUMENT

#### A.  Legal Standard Under Rule 60(b)(5)

Rule 60(b)(5) authorizes a district court to relieve a party from a judgment or order if either (1) "the judgment has been satisfied, released, or discharged" or (2) "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The Supreme Court has explained that, in the institutional reform context, a judgment has been satisfied when the defendant has shown that it has achieved the objective of the judgment. *Horne v. Flores*, 557 U.S. 433, 450 (2009). Achievement of the objective is shown in part by a durable remedy that was implemented to address the violations of federal law that led to the judgment. *See id.*

The courts have expounded on the Rule 60(b)(5) standard specifically as to institutional reform consent decrees. A court should vacate a consent decree if the defendant "is in substantial compliance with the consent decree." *Peery v. City of Miami*, 977 F.3d 1061, 1075 (11th Cir. 2020); *accord Frew v. Janek*, 780 F.3d 320, 330 (5th Cir. 2015); *Jeff D. v. Otter*, 643 F.3d 278, 284 (9th Cir. 2011). Substantial compliance "exists when the consent decree's fundamental purpose has been accomplished….'" *Peery*, 977 F.3d at 1075 (quoting *Jeff D.*, 643 F.3d at 288). A State "cannot be subjected to ongoing classwide structural relief simply because a problem has not been 100% eradicated." *Salazar by Salazar v. District of Columbia*, 896 F.3d 489, 500 (D.C. Cir. 2018).

The courts have emphasized that consent decrees must be limited to addressing on-going, systemic violations of federal law and thus must be vacated when those on-going, systemic violations no longer exist. As the Supreme Court explained in *Horne*, "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate" federal law. 557 U.S. at 450. A court considering a motion to terminate a consent decree must

therefore "ascertain whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law." *Id.* at 454; *see Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004) (federal courts should not maintain their "oversight of state programs for long periods of time . . . absent an ongoing violation of federal law"); *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1192-93 (10th Cir. 2018) ("[F]ederal consent decrees are temporary solutions that may be kept in place only as long as necessary to cure an unlawful condition."). Such violations must be "systemwide," *Lewis v. Casey*, 518 U.S. 343, 359-60 (1996); "[e]xpansive, classwide structural relief that judicially superintends local government operations cannot issue" based only on "one-off errors," *Salazar*, 896 F.3d at 500. If there are no ongoing, systemic legal violations because a "durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Horne*, 557 U.S at 450.

Some courts have applied a two-step standard for implementing *Horne*. These courts ask (1) "whether the state has achieved compliance with the federal-law provisions whose violations the decree sought to remedy," and (2) "whether the State would continue that compliance in the absence of continued judicial supervision." *John B. v. Emkes*, 710 F.3d 394, 412 (6th Cir. 2013); *accord Peery*, 977 F.3d at 1075 (defendant must show "current substantial, good faith compliance" and that it is "unlikely . . . [to] return to its former ways absent the consent decree").

Following *Horne*, the Seventh Circuit last year provided additional guidance regarding application of the Rule 60(b)(5) standard. In *Shakman v. Pritzker*, 43 F.4th 723 (7th Cir. 2022),[5]

---

[5] Although the *Shakman* case involved a different type of institutional reform than in the *Ligas* case, the *Shakman* decree's breadth was as great if not greater than the *Ligas* decree because the *Shakman* decree covered all employment policies, practices, and procedures of all State agencies under the Governor's jurisdiction, thus governing more than 50,000 individuals. And, although the *Shakman* case spanned more than fifty years, the timespan of monitoring and implementation of the decree as to the Governor was considerably shorter. The *Shakman* plaintiffs filed their Amended Motion for Entry of Supplemental Relief with respect to the Governor of Illinois in April, 2014. The court granted that motion in October 2014 and appointed a Special Master on November 18, 2014. Thus, when the Governor filed his motion

the court explained that achievement of a decree's objectives is shown where there have been no recent significant violations of the decree, emphasizing the lack of "recurring" or "systemic" violations. *Id*. at 728-30. The court also explained that the defendant Governor's remedial measures constituted a "durable remedy" where those measures "minimize the risk" of violations, even though the Governor could "do more to implement specific measures to further reduce the risk" of future violations. *Id*. at 729. The court described the Governor's durable remedy as being "adequate…to avoid future…violations" and "in large part…effective." *Id*. at 729-30. The court concluded that the Governor had "instituted durable remedies to help ensure that compliance sticks…. We cannot let perfect be the enemy of the constitutionally adequate." *Id*. at 731.

Thus, to meet the standard for vacating a decree, a defendant need not show the absence of individual violations of federal law but only that there are no longer any significant, systemic violations. And, the defendant's durable remedy need not be so complete and effective as to eliminate all risk of future violations; the remedy need only be adequate and in large part effective to minimize the risk of future violations. *See id*. at 729-30.

The *Shakman* court also addressed the second basis under Rule 60(b)(5) for vacating a decree – that "applying it prospectively is no longer equitable." In its discussion, the court explained that "extended federal judicial oversight…should not serve as a primary means of ensuring state officials comply with duties imposed by federal law. Doing so, the Supreme Court has cautioned, risks courts . . . 'becoming enmeshed in the minutiae of [state] operations. . . .'" *Id*. at 731 (quoting *Lewis*, 518 U.S. at 361 (brackets in original)); *see also Horne*, 557 U.S. at 454

---

to vacate in July 2020, implementation monitoring had been taking place for less than six years, which is less than half of the time the Court has been overseeing implementation in the *Ligas* case. As a result, the *Shakman* court's application of the Rule 60(b)(5) standard applies with full force here despite the unique history of that case.

("relief may be warranted [on equitable grounds] even if [defendants] have not 'satisfied' the original order").

As will be discussed in more detail below, the Defendants have achieved the objective of the Decree by eliminating the systemic barriers that resulted in violations of federal law, and they have substantially complied with the Decree's terms. They also they have implemented a durable remedy that will, going forward, minimize the risk of the same systemic violations of federal law that led to the Decree. And, given the Defendants' substantial compliance and durable remedy, termination of the Decree is fully supported by the equitable concerns that guide federal court oversight of institutional reform decrees.

**B.  <u>The Defendants have achieved the fundamental objective of the Decree.</u>**

As set out above, the Plaintiffs' second amended complaint alleged several systemic barriers for adults with DD living in their family homes or in ICFs-DD to obtaining community-based services. As a result of these allegations, the fundamental objective of the Decree was to require the Defendants to remove these systemic barriers. The Defendants have achieved that fundamental objective. As a result of the work since 2011, none of these systemic barriers exist today. The Defendants have a comprehensive, effectively working system (not just a plan) that: (1) informs individuals (and their guardians) of the full range of available community-based services and settings;[6] (2) assesses individuals to determine their clinical eligibility and appropriateness for such services and settings;[7] (3) offers individuals the choice between community-based and institutional (*i.e.*, ICF-DD) services;[8] (4) approves community-based

---

[6] *See* https://www.dhs.state.il.us/page.aspx?item=53029

[7] *See* https://www.dhs.state.il.us/page.aspx?item=53018

[8]*See* https://www.dhs.state.il.us/page.aspx?item=53029

services without requiring the existence of an "emergency" or crisis situation (and not imposing monthly caps on crisis services);[9] (5) for those individuals who are not served quickly, places those individuals on a waiting list;[10] and (6) moves individuals off the waiting list and into services with reasonable promptness – *i.e.*, at a reasonable pace.[11] There should not be any dispute that the State has had these systems and processes in place for many years, and that they have been subject to the on-going oversight and monitoring by the Court, the Monitor, Plaintiffs, and Intervenors.

As noted earlier, the most fundamental objective of the lawsuit and thus the Decree was to eliminate the systemic barriers that existed in 2005 that prevented ICF-DD residents from moving to community-based settings. The Decree ultimately contained a companion objective – to offer the same access to community-based services to Class Members living in their family homes, which those Class Members could receive in either the family home or in a community-based setting, *i.e.,* a Community Integrated Living Arrangement (CILA). As entered, the Decree contained six major provisions, listed *supra* at 2-3, would achieve these two fundamental objectives.

Defendants unquestionably have satisfied the first five of these provisions and Plaintiffs have not argued otherwise. And Defendants have substantially complied with the sixth provision, which was also at issue in the 2017 Joint Motion (Dkt. No. 666) and addressed in the Court's two rulings on the Joint Motion (Dkt. Nos. 695 and 710).

---

[9] *See* https://www.dhs.state.il.us/onenetlibrary/12/documents/Forms/IL462-0140.pdf

[10] *See* https://www.dhs.state.il.us/page.aspx?item=115416#a_toc7; Section 4: PUNS for Persons with Developmental Disabilities

[11] *See* https://www.dhs.state.il.us/page.aspx?item=115416#a_toc7; Section 4: PUNS for Persons with Developmental Disabilities

And, because the substantial compliance assessment should be limited to the sixth provision set out above – the "substantial resources" obligation – the question for the Court is whether, having removed the systemic barriers, the Defendants are providing sufficient resources to Class Members and Intervenors to satisfy the substantial compliance standard. The Defendants will explain below how they satisfy that standard at a general level but also through the lens of this Court's more specific rulings on the Joint Motion. And, because there have been more recent discussions with the Court about the provision of services to Class Members in crisis and with higher needs, including the placement of some Class Members in State Operated Developmental Centers (SODCs), the Defendants also will address how they are providing sufficient resources for those two subgroups of Class Members.

At the outset of this discussion, it is important to emphasize that the sufficient resources obligation should not be allowed to take on outsized significance. When assessing the Defendants' obligation to provide sufficient resources, the Court must look at the Defendants' work on all of the Decree obligations. As described herein, the Defendants have significantly – and repeatedly over many years – increased investments in all of the services involved in meeting the needs of Class Members. Given this work, the Court can find that the Defendants have met the sufficient resources obligation, even if the Court finds that work remains to be done (because there *always* will be more work to be done). *See Horne*, 557 U.S. at 454 ("relief may be warranted [on equitable grounds] even if [defendants] have not 'satisfied' the original order"); *Shakman*, 43 F.3d at 730 (decree vacated even though "[d]oubtless more can be done to further reduce risk, improve existing controls, and respond to any allegations of constitutional violations…"); *People Who Care v. Rockford Bd. of Ed*., 246 F.3d 1073, 1076 (7th Cir. 2001) ("At some point…the continuing and ineliminable traces of an earlier violation are too slight to

10

justify continued federal judicial control of public education." (internal citation omitted)); *R.C. v. Walley*, 270 F. App'x 989, 992 (11th Cir. 2008) ("after eighteen years. . ., the . . . child welfare system had undergone radical changes and was on secure footing to continue its progress in the years to come, without court supervision. The system is not yet perfect and may never be, but its improvement has been tremendous. Although . . . the court recognized some . . .deficiencies in the system, th[ose] . . . do not require continuation of the consent decree.").

Relatedly, it is also critical to set outer limits on this Decree obligation. Although the Defendants are obligated to provide sufficient resources, that obligation is not limitless and does not extend to solving larger societal problems that impact the Defendants' ability to provide resources. For example, the parties and the Court have several times discussed such larger issues – a nationwide workforce shortage, a statewide affordable housing shortage, and the annual limitations in the State budget. This Decree was never intended to solve larger societal problems, and a finding of non-compliance cannot be based on the Defendants' inability to solve those problems. *See People Who Care*, 246 F.3d at 1076 ("The [school] board has no legal duty to remove those vestiges of societal discrimination for which it is not responsible."); *R.C. v. Walley*, 475 F. Supp. 2d 1118, 1141 (M.D. Ala. 2007), *aff'd R.C. v. Walley*, 270 F. App'x 989 ("The court finds that the persistent and repeated observations by the court monitor and the evidence submitted by Defendant concerning the rise in methamphetamine use in Alabama and its devastating effect on families and children explain, in large measure, the rise in out-of-home placements. In other words, the court finds that the increase in the number of children in out-of-home care is not attributable to any systemic defect, but rather to an external cause outside of

11

DHR's control.");[12] *Pottinger v. City of Miami*, 359 F. Supp. 1177, 1196 (S.D. Fla. 2019), *aff'd*,

*Peery v. City of Miami*, 977 F.3d 1061 ("This is not to say that more cannot be done to achieve

the goal of eradicating homelessness. The goal of the Consent Decree, however, was not to solve

homelessness. Rather, the goal of the Consent Decree was to reform the manner that City Police

treated the homeless. That goal has been achieved…."). As in these cases, there are external

societal problems that impact the Defendants' ability to meet all needs for all individuals at all

times. But, that cannot be the measure of substantial compliance.

### 1. Substantial compliance with sufficient resources obligation – generally

Assessing the DD system as a whole – which was already serving thousands and

thousands of individuals when the Decree was entered – the Defendants are in substantial

compliance with the obligation to provide sufficient resources to meet their other Decree

obligations. Substantial compliance with this obligation – true with all of them but especially

important for an overarching "sufficient resources" obligation – must be assessed at the systemic

level. The Defendants are in substantial compliance because the system, as a whole, provides

sufficient resources, even if a small percentage of the individuals served by the system do not

receive all of the specific services and supports that they request or need as quickly as others. *See*

---

[12] In the *R.C.* case, the district court also stated: "It is clear that maintaining appropriate caseloads is and, quite frankly, always will be a tremendous challenge for DHR. If DHR had an infinite supply of money and resources, it could double or triple its workforce, increasing twofold or threefold its labor pool of licensed social workers in each county, to ensure that at all times each of Alabama's sixty-seven counties had at its immediate disposal a qualified, backup stockpile of workers to cover the multitude of human circumstances and frailties, some of which are expected but others of which are unanticipated, which cause not only absences and vacancies in DHR's child welfare staff, but also cause the continual, and often erratic, rise and fall in the number of children needing DHR's care at any given time. The ideal scenario, for obvious reasons, is not possible, even if it were court ordered." 475 F. Supp. at 1164.

*R.C. v. Walley*, 475 F. Supp. at 1144 ("the record does not support the conclusion that these [two] tragedies exemplify systemwide failures, as opposed to "isolated" occurrences. … Although the court, and certainly DHR, desires every child in every county to achieve optimal success under DHR's system of care, the court realizes that such a goal is neither realistic nor possible, and this is the reason the Consent Decree embodies a standard of substantial, rather than complete, compliance."). Assessed through a systemic lens, the Defendants have substantially complied with their obligation to provide sufficient resources.

One measure of substantial compliance with the sufficient resources obligation is the increase in service capacity. Since 2011, the capacity of the Home and Community Based Services (HCBS) Waiver (which includes both in-home services and CILAs) has increased from 15,225 to 25,859, an increase of 69%, and the number of individuals receiving waiver services has increased from 13,432 to 23,286, an increase of 73%. Dkt. No. 828 at 7-8.[13]

This significant increase in capacity required an even greater increase in spending, including paying significantly higher wages to direct service providers (DSPs), which the Defendants have done. From FY2011 to FY2024 (ending June 30, 2024), the Defendants have increased annual CBS spending from $728.8 million to an estimated $1.84 billion, an increase of 152%. *See* Exhibit A. These significant increases in capacity, individuals served and the resultant spending are powerful evidence of the Defendants' substantial compliance with their sufficient resources obligation.

2. **Substantial compliance with sufficient resources obligation – implementation of compliance plan in response to 2017 Joint Motion**

---

[13] It is important to note that Waiver capacity will always be slightly higher than the number of individuals served so that individuals in crisis and other individuals new to the Waiver can be served without exceeding the allowable Waiver capacity in a given year.

Another measure of substantial compliance is the plan the Defendants developed and then implemented after this Court's orders in response to the 2017 Joint Motion, which focused on the Defendants' failure to provide sufficient resources. *E.g.*, Dkt. No. 663-1 at 4-5, 8, 41-42. Following the Court's granting of the Joint Motion and the Court's subsequent direction to the Defendants to develop an adequate compliance plan, there were additional discussions among the parties, Monitor, and the Court as to what that plan would include. Ultimately, there was agreement that the compliance plan would include four components: (1) the parties and Monitor would work to reach agreement on reasonable pace for individuals to come off of the PUNS[14] list and to receive waiver-based home- or community-based services; (2) the Defendants would convene a group to study and propose recommendations for changing the State's methodology for setting payment rates for services provided in ICFs-DD and CBS, including recommendations for increasing the payment rate for both waiver-based CBS and ICF-DD providers; (3) although the hourly wage rate for DSPs would be addressed as part of the overall rate study, the State would address those DSP hourly wage rates in the interim before any recommendations from the rate study were implemented; and (4) the Monitor would evaluate the adequacy of services provided in community-based settings. *See, e.g.*, Dkt. No. 712. The Court has not yet been asked to find that the Defendants have complied with these four directives, but it is now appropriate for the Court to do so because the Defendants are in fact in substantial compliance.

Addressing these in order, the Defendants are in substantial compliance as to the first component – reasonable pace. An agreement was reached in 2019 (Dkt. No. 719 at 22 of 30), wherein Defendants agreed that, by FY2025, there would be a maximum 60 month wait on the

---

[14] PUNS stands for Prioritization of Urgency of Need for Services. With the agreement of Plaintiffs and the Monitor, Defendants have used the PUNS list as the reasonable pace waiting list.

PUNS list for an individual to enter services.  Since that time, Defendants have exceeded their

reasonable pace obligation every year, and in fact achieved the 60 month limit prior to FY2023.

*See* Dkt. No. 771 at 3).

The Defendants also are in substantial compliance with the second and third components

– the rate methodology study and DSP hourly wage rates. The Defendants convened a Rates

Oversight Committee, which began meeting in August 2018 and issued its final report on

November 13, 2019. The Committee's report is filed at Docket No. 747-1. The Defendants

subsequently engaged a consultant, Guidehouse, to build on the Committee's recommendations

and to make its own specific recommendations for, *inter alia*, new rate methodologies for both

CBS and ICF-DD services. The final Guidehouse report was released on November 30, 2020 and

is filed at Docket No. 747-2.

It is important to note that implementation of the recommendations, including increasing

DSP rates, is not required by federal law, or by the Decree, or by this Court's 2017 and 2018

orders (which required only that the Defendants procure recommendations). That said, since

November 2020, the Defendants have been implementing the Guidehouse recommendations, and

they have regularly advised the Court, Monitor, and parties of the progress of that

implementation. In brief, by the end of the current fiscal year, June 30, 2024, the Defendants will

have implemented the following rate and/or funding increases since this Court's ruling on the

Joint Motion:

15

| Fiscal Year | Funding Increase – HCBS | Funding Increase – ICF | Implementation | Effective Date |
|---|---|---|---|---|
| 2018 | $0.75/hour wage increase | $0.75/hour wage increase | Pass-through to front-line staff (HCBS); pass-through to staff through program and support components of rate (ICF) | 08/01/2017 (Both) |
| 2019 | $0.50/hour wage increase; additional $0.04 for Chicago | $0.50/hour wage increase | Pass-through to front-line staff (HCBS); pass-through to staff through program and support components of rate (ICF) | 10/01/2018 (Both) |
| 2020 | 3.5% rate increase | 3.5% rate increase | Rate increase/COLA | 07/01/2019; 08/01/19 for ICF |
| 2020 (mid-year, non-legislative) | $0.58 and $0.62/hour wage increase | $0.24/hour wage increase | Wage increase (not required to be passed through) | 01/01/20; est. 06/01/20 for ICF |
| 2021 | $1.00/hour wage increase $0.50/hour wage increase | $1.00/hour wage increase $0.50/hour wage increase | $0.80/hour and $0.40/hour, respectively, required to be passed through to non-executive staff | 07/01/20 and 01/01/21 |
| 2022 | $170 million total $1.50/hour wage increase | $170 million total $1.50/hour wage increase | 50% pass-through, 50% flexible for wages | 07/01/2021 (ICF) and 01/01/2022 (CMS approval required) |
| 2023 | $207 million total $1.00/hour wage increase | $207 million total $1.00/hour wage increase | 50% pass-through, 50% flexible for wages | 01/01/23 (CMS approval required) |

| Fiscal Year | Funding Increase – HCBS | Funding Increase – ICF | Implementation | Effective Date |
|---|---|---|---|---|
| 2024 | $196.7 million total (see above for detail) $2.50/hour wage increase | $196.7 million total (see above for detail) $2.50/hour wage increase | 50% pass-through, 50% flexible for wages | 01/01/24 (CMS approval required) |

Although the Guidehouse recommendations anticipated implementation of all rate increases and changes to rate methodologies over a five-year period, the Defendants have committed to completing implementation by no later than FY2027, which unquestionably constitutes substantial compliance. Neither the Decree's "sufficient resources" obligation nor this Court's orders on the 2017 Joint Motion contains a specific timeframe; Defendants' 152% increase in spending since 2011 and commitment to additional increases through FY2027 amounts to an enormous investment in the DD system that, along with nearly doubling the number of individuals served, shows substantial compliance with the sufficient resources obligation.

Regarding DSP hourly wage rates, specifically, from FY2020 (before the implementation of the Guidehouse recommendations) to FY2024 (assuming FY2024 increases are approved by the Federal Centers for Medicare and Medicaid Services (federal CMS)), the Defendants have increased DSP rates by $5.00 per hour from approximately $14.50/hour to $19.50/hour, with Chicago area DSPs receiving $22.50/hour due to the implementation of Regionalization.[15] In

---

[15] Plaintiffs have asserted that "Defendants have even refused to take the essential step of setting a floor for what [DSPs] must be paid." Dkt. No. 829 at 9 of 24. Plaintiffs appear to be suggesting that the Defendants are ignoring the Guidehouse recommendations regarding DSP hourly wage rates. To the contrary, Guidehouse's recommendation was that the Defendants "[a]dopt a standard for DSP wages that establishes wage assumptions at 150 percent of the statewide minimum wage." Dkt. No. 747-2 at 11 of 102. Although the Defendants have been implementing that recommendation, it is inaccurate to suggest that Guidehouse recommended mandating a rate that DSPs must be paid. And, the Guidehouse recommendations aside, Plaintiffs' assertion also inaccurately suggests that the Defendants can legally tell

addition, over the next three years, through FY2027, Defendants have committed to funding the following Guidehouse recommendations: the remaining $3.00/hour for DSPs, the zero-hour model to fully fund 24-hour DSP staffing, and an expanded array of day program services. All of these past and committed-to increases in DSP hourly wage rates demonstrate the Defendants' substantial compliance.

### 3. Substantial compliance with sufficient resources obligation – Compliance Measures Review

In its 2018 order, the Court directed the Defendants to "develop a monitoring tool to assess adequacy of services, funding, and administration" for CILA residents and that "the monitoring tool include an independent review component." Dkt. No. 710 at 2. The Defendants accomplished that objective, which gives the Court a basis for finding the Defendants in substantial compliance. If, however, the Court goes on to consider the Monitor's findings regarding the adequacy of services, a finding of substantial compliance is also justified. *See R.C. v. Walley*, 270 F. App'x at 992 ("The system is not yet perfect and may never be, but its improvement has been tremendous. Although it is true … that the [district] court recognized some present deficiencies in the system, these deficiencies alone do not require continuation of the consent decree.").

The Monitor conducted her first review in 2019, and the results were discussed in the Monitor's Seventh Annual Report filed on March 3, 2020 (Dkt. No. 737) and were filed as an exhibit to that Seventh Annual Report (Dkt. No. 737-2). After the Monitor filed her report of the

---

providers that they must pay a specific hourly rate. That said, the Defendants have negotiated with legislators, providers and the unions that represent some of the DSPs to ensure that 50% of certain funding increases be used specifically for hourly wage increases, with the other 50% available for providers to use for other purposes, such as retention bonuses, start up bonuses, and longevity bonuses. *See* IDHS: Rate Changes for DDD Waiver Funded and ICF Programs, www.dhs.state.il.us/page.aspx?item=147694.

2019 Compliance Measures Review (2019 Review), agreement was reached to conduct a second review. That review began in November 2022 and was completed in May 2023. The Monitor's report on that review (2023 Review) was filed at Docket No. 807.

Based on the Monitor's report on the 2023 Review, the Defendants are in substantial compliance regarding the adequacy of services provided to Class Members in CILAs. Related to but separate from the Joint Motion, the 2023 Review also demonstrates the Defendants' substantial compliance with the sufficient resources obligation to provide Class Members services, supports, and resources of sufficient quality, scope, and variety, although the appropriate way to measure that compliance likely is an open question. The Monitor decided that, in order "to be determined in compliance, within a given section each measure must be rated 85% or above…." Dkt. No. 807 at 5 of 36. Thus, for example, in Domain No. 7 (Personal Funds Management), there is a finding of non-compliance on measure A (74%), but a finding of compliance as to the overall domain (94%). *Id.* at 20 of 36.

The Defendants do not agree that 85% should be the measure for determining their substantial compliance, at least, under Rule 60(b)(5), for purposes of determining their substantial compliance with the Decree as a whole. Numerous cases establish that the Court may assess the Defendants' substantial compliance without using any percentage metric. For example, in the *Shakman* case, the court found that the Governor was in substantial compliance without using any percentage metric. The court found that there was substantial compliance where there was no evidence of recent significant violations of the decree, emphasizing the lack of "recurring" or "systemic" violations. 43 F.4th at 728-30. And, the Court ruled that it is enough that the Governor's durable remedy is "adequate." *Id.* at 729-31. Any common understanding of the word "adequate" suggests a compliance percentage well below 85%. If the Court decides that

a percentage metric is necessary or at least useful, the Defendants believe that a percentage lower than 85% is more consistent with controlling caselaw.[16]

Even if the Court were to assess the Defendants' substantial compliance through an analysis of the Monitor's 2023 Review and to use a metric at or near the Monitor's 85% metric, the Defendants believe they still meet the substantial compliance standard. Dkt. No. 807. The Monitor reviewed information for a sample of 215 Class Members, and each review included 17 separate domains, ranging from employment and transportation, safety and healthcare. Within those 17 domains were 164 separate measures that were each graded by the Monitor and her team. For 82% of the domains (14 of 17), the overall compliance percentage was between 72% and 94%, with an average percentage of 85% for those 14 domains. The three domains lower than 72% were at 68%, 53%, and 29%,[17] and 75% of the 164 separate measures had compliance percentages of 70% or higher.

What is also significant about the findings in the 2023 Review is that they show significant improvement over the 2019 Review. The average compliance percentage for the 17 domains in 2023 is 79%, compared to 61% in 2019. Dkt. 807 at 36. And, as the Monitor noted,

---

[16] Although the Defendants are aware of courts in other circuits using percentage metrics, including 85%, in assessing substantial compliance with consent decree obligations, the Defendants are not aware of any court in this circuit ruling that 85%, or some other percentage, is the appropriate, much less mandated, metric for assessing substantial compliance. And, courts in other circuits have found substantial compliance using percentage metrics as low as 70%. *See, e.g.*, *Burt v. County of Contra Costa*, 2014 U.S. Dist. LEXIS 7945 (N.D. Cal. 2014) (the Court granted the motion to vacate the consent decree where the city had a 70% rate of compliance (rather than the numerical test of 80% identified in the decree) in all categories); *R.C. v. Walley*, 475 F. Supp. 2d 1118 (M.D. Ala. 2007), *affirmed R.C. v. Walley*, 270 F. App'x 989 (11th Cir. 2008) (granting motion to terminate consent decree and finding that "[i]t would be superficial . . . to predicate a finding on a pure percentage basis, i.e., to say that a compliance ratio of . . . 70 percent either does or does not equate substantial compliance."). *See also Glover v. Johnson*, 138 F.3d 229 (6th Cir. 1998) (finding substantial compliance if defendants met 75% of the binding provisions).

[17] Two of the domains under 72% were Employment/Day Activities/Community Integration (53%) and Independent Service Coordination (68%). Notably, the domain with 29% compliance, which pertained to additional services (Occupational Therapy, Physical Therapy, Speech, etc.), had sample sizes ranging from 12-42 out of a maximum of 215 for the five measures in that domain.

the Defendants have implemented new processes and policies to specifically address some of the areas of concern in both reviews, and the Monitor acknowledges that the results of the 2023 Review do not reflect additional changes to the service planning process and forms, or additional quarterly training that have been implemented to ensure continued improvement. *Id*. at 35-36. Those improvements further demonstrate the Defendants' on-going commitment to maintaining substantial compliance.

### 4. Substantial compliance with sufficient resources obligation – crisis services

To the extent that the Court looks at crisis services as a separate obligation under a substantial compliance assessment, the Defendants also are in substantial compliance with that obligation. When the *Ligas* lawsuit was filed, there was a systemic barrier preventing Defendants from fully providing appropriate supports and services to individuals with DD who found themselves in crisis. As Plaintiffs' counsel explained at the October 30, 2023 status hearing, when the lawsuit was filed, "crisis [services were] capped. So if you were [in] a crisis early in the month, you would get services. If you were [in] a crisis later in the month, you didn't get services. And the state agreed, and this was a wonderful thing, to uncap services. So now crisis is not capped." *See* transcript of October 30, 2023 status hearing, at 25.[18] Having since removed that systemic barrier that limited crisis services, the Defendants' substantial compliance with the Decree as a whole should not rise or fall on whether they are providing immediate community-based crisis services to each of the hundreds of individuals who annually request those services. However, looking at just the Defendants' obligation to provide crisis services, the Defendants are in substantial compliance because they provide prompt, interim care for the individuals in crisis

---

[18] The transcript of the October 30, 2023 status hearing has not yet been docketed, but Defendants expect it will be soon.

and then engage in the process to assess the individuals' needs and preferences in accordance with the requirements for providing community-based services.

### a. Description of crisis services process

To assess the Defendants' substantial compliance with the crisis services obligation, the following background is helpful. Under paragraph 21(a) of the Decree, an individual in "crisis" is defined as someone who is at imminent risk of abuse, neglect, or homelessness. Once an Independent Service Coordination agency (ISC) learns of an individual in crisis, the ISC, working with the Illinois Department of Human Services' Division of Developmental Disabilities (DDD), first must determine whether the individual already has been found both clinically eligible for DD services and Medicaid eligible, and, if not, must make those determinations. Determining eligibility for Medicaid waiver services for individuals with DD includes gathering school records, doctors' assessments, and other very specific documentation, as well as potentially scheduling additional evaluations.

Once determined eligible, the ISC presents the individual (plus their guardian, if any) with all available service options, which, depending on the individual's needs, circumstances, and preferences, could include a waiver-based community-based setting such as a CILA, or placement in an ICF-DD. If CBS is requested and available, then the ISC will work to secure DDD approval of CBS. If CBS is requested but not immediately available, then ICF-DD placement will be offered if available.[19] However, providers may decline to accept an individual, and under Medicaid law, Defendants do not have the ability to force any provider, whether it be

---

[19] ISCs do contact private ICFs-DD for placement in crisis situations. However, in many instances where there may be substantial behavioral or medical concerns, private ICFs-DD generally decline admission of individuals in crisis.

an ICF-DD or CBS provider, to accept an individual for services.[20] SODCs are typically the placement of last resort. Ultimately, it is the individual's (or guardian's) choice, although options might be limited for immediate placements. And just as with a provider, the Defendants cannot force an individual or guardian to accept a placement they do not want. *Olmstead v. L. C.*, 527 U.S. 581, 587 (1999). And, the priority for the ISC and DDD is to find a placement that removes the individual from the crisis situation as soon as possible, even if they are not able to immediately move the individual into their preferred placement.

Because the priority is to remove an individual from a crisis situation as soon as possible, the crisis services process includes the option of providing interim emergency services, including interim placement in an ICF-DD.[21] Although the Decree specifically permits this option, the law does not allow the Defendants to compel an ICF-DD to accept an individual, even if that is the individual's – and the Defendants' – preference.

The Decree requires that Class Members in crisis who request CBS receive CBS "expeditiously," but the Decree does not define "expeditiously" either for interim services or for CBS. The Defendants have been operating since 2014 under a definition of "expeditiously" for *interim services – i.e.*, that interim services be provided within 24-72 hours after an individual has been determined eligible for crisis services. But, the parties and Monitor have never agreed on defining "expeditiously" for the provision of requested CBS. To the extent that the Monitor or Plaintiffs believe that the Decree requires the provision of *all* requested CBS within 72 hours of

---

[20] 59 Ill. Adm. Code 120.110 (i) (1) (B).

[21] Although SODCs are classified as ICFs-DD for Medicaid purposes, the Decree's definition of ICF-DD is limited to those that are privately-run. But, when an ISC is looking for a placement for an individual in crisis, the ISC will include SODC placement as a last resort.

23

an eligibility determination, the Defendants disagree that there is such a legal or Decree requirement or that such a requirement would be at all possible.

Because neither the law nor the Decree require the Defendants to provide all requested CBS within 72 hours of the onset of a crisis, enforcing that requirement now as part of a substantial compliance assessment would be a unilateral modification of the Decree, which is not allowed under Rule 60. *See Salazar*, 896 F.3d at 498 ("a district court may 'tighten [a] decree' …" in order "to prevent evasion and ensure effectuation of the order it entered. But any such fortification of the injunction's terms must be in service of the consent decree's original 'intended result.' When a plaintiff seeks to enhance a consent decree's terms, courts must be careful to ensure that the new injunctive terms give effect to and enforce the operative terms of the original consent decree. Courts may not, under the guise of modification, impose entirely new injunctive relief.") (internal citations omitted).

Moreover, such a requirement would be practically impossible to achieve – for two reasons. First, before providing waiver services, certain activities must occur that are required under the State's Adults with Developmental Disabilities Waiver (and by extension, federal Medicaid requirements). This includes establishing eligibility, developing personal plans specific to the individual, reaching out to providers to identify service options, creating waiver packets and developing implementation strategies. It would be a very rare situation where all of these significant and required steps could be accomplished in 72 hours.

Second, the process for approving waiver services is often lengthened because of the understandably wide range of the needs, preferences, and circumstances of individuals in crisis. Many such individuals are in crisis precisely because of unique and very challenging behavioral and/or medical conditions that require additional and/or more specially trained staff. In addition,

24

many such individuals (or their guardians) have very specific and very narrow preferences, such as geographical location, size of CILA, specific providers, and even specific CILA homes. Under the law, the Defendants can neither force an individual to accept a placement they do not want nor force a provider to provide services to an individual who the provider does not believe it is capable of appropriately serving.[22]

To be able to provide *all* requested CBS within 72 hours would require the Defendants to have an immediately-available placement meeting all possible preferences for each of the hundreds of individuals who present in crisis each year. Even if feasible (which it is not), neither the Decree nor federal law require the Defendants to have the predictive ability to anticipate future requests or to make substantial budget expenditures every year just to maintain that additional, unfilled capacity.

### b. Provision of crisis services overall

As has been previously reported to the Court, while the Decree has been in place, DDD has provided crisis services on a timely basis to thousands of individuals, which shows the Defendants' substantial compliance with their Decree obligation. In their December 16, 2022 filing, the Defendants reported that they provided waiver-based CBS to nearly 3,700 individuals in crisis while the Decree has been in place. In 2021-2022, the State fulfilled 99% of Class Members' crisis services requests; for 86% of those Class Members, the State provided CBS. Dkt. No. 787 at 5. In FY2023, an additional 201 individuals in crisis were placed in waiver services, raising to 3,9108 the total number of individuals in crisis who received waiver-based CBS since 2011.[23] Finally, an additional 58 individuals received waiver-based CDS through

---

[22] The law does not permit the State to require a CILA provider to take a new resident that the provider does not believe it has the capacity, resources, or staff to handle. *See* 59 Ill. Admin. Code 115.200.

[23] Although data on crisis services has been reported since the inception of the Decree, the issue of crisis placements in SODCs was not raised by Plaintiffs until 2022. As a result, data on individuals who may

crisis between July 1, 2023 and October 31, 2023. This brings the total to 3,966 individuals who have received waiver-based CBS through the crisis process.

In addition, the Defendants have added or expanded services and processes specifically to enhance crisis services. Some of these enhancements are designed to prevent moving an individual in crisis into an institutional setting even on an interim basis or to expedite an individual's move out of an institution after a crisis-driven interim placement. The enhancements include the following:

- Creation of ten short-term stabilization homes;
- Creation of six long-term stabilization homes;
- Creation of four transition homes;
- Expansion of Support Services Teams (SST) to support people transitioning from institutions;
- Creation of a Technical Assistance Unit for providers;
- Expansion of the New Provider Orientation and support process for providers;
- Development of Housing Navigators to help support people transitioning to affordable supportive housing with waiver services;
- Planning Grant for Money Follows the Person Program – funding for case management and transition supports to move people out of institutions and into waiver services; and
- Emergency Respite expansion through a federal grant.

Dkt. No. 828 at 8. Thus, both the percentage of Class Members who are served and the programmatic enhancements the Defendants have made demonstrate their substantial compliance with their crisis services obligation.

### c. Class Members in crisis being placed in SODCs

There are two points regarding SODCs that are relevant to this motion to vacate. First, despite Plaintiffs' repeated efforts to include all SODCs and all SODC residents within the

---

have requested CBS but agreed to ICF-DD or SODC placement prior to 2022 is not included in the data referenced above. However, any such individual would be entitled to the same expedited processes as any other individual in moving from an SODC to CBS. Defendants have updated their tracking methods, and now provide monthly updates on all crisis data, including any individuals who enter an interim ICF/DD or SODC placement and any subsequent transition to waiver-based CBS.

Defendants' Decree obligations, the SODCs are not and never have been covered by the Decree. And, SODC residents are not covered by the Decree, except for the very small percentage of Class Members who have been placed in SODCs as interim crisis placements while the Defendants seek to move them to community-based settings, if that is their preference. Thus, as part of its substantial compliance assessment, the Court should not consider – as Plaintiffs urge (*e.g*., Dkt. No. 829) – whether Illinois should have any SODCs or the conditions in the SODCs.[24]

As noted earlier, SODCs are ICFs-DD for Medicaid classification purposes and are identical to privately-run ICFs-DD with respect to the services they are required to provide. The only difference is that they are operated by the State instead of by private providers. Because SODC residents are indeed ICF-DD residents, Plaintiffs could have included SODC residents in their proposed class. But Plaintiffs made the choice at the time the Decree was being negotiated to not include SODC residents in the proposed class because that would have drawn the vehement opposition of hundreds of guardians and family members of SODC residents, and Plaintiffs decided to focus the *Ligas* litigation on the privately-run ICFs-DD.

Including SODC residents in the proposed class would have drawn vehement opposition because: (1) at least 485 SODC guardians and family members objected to the initial proposed Decree in 2009 even though they were not included in the class (Dkt. No. 407); (2) SODC guardians and family members continue to insist that SODCs are the preferred and most appropriate placements for their wards (*e.g.,* Dkt. No. 828-1); and (3) the State's earlier attempt

---

[24] Because many Class Members are placed in CILAs, the conditions of CILAs are relevant to the Defendants' Decree obligations, and thus it was appropriate for the Court to order the Compliance Measures Reviews that the Monitor conducted as to CILA conditions. And, Intervenors are covered by the sufficient resources obligation under Paragraph 4 of the Decree, so conditions in the ICFs-DD are also covered by the Decree. However, because SODC residents are neither generally Class Members nor Intervenors, the general conditions of the SODCs are not within the scope of the Decree.

to close even one SODC was met with concrete, vehement opposition – three years of district court litigation and an appeal that halted the State's effort to close that one SODC.[25]

Despite making the clear decision to not include SODC residents in their proposed class, Plaintiffs' counsel now wants this Court to sweep all of those residents, along with the conditions of the SODCs, under the purview of the Decree. That would be improper and directly contrary to the language of the Decree and the established caselaw. *E.g., Salazar*, 896 F.3d at 498; *Pottinger*, 359 F. Supp. at 1196. To be sure, there are conditions in some of the SODCs that need to be addressed, which the State is diligently working on, just as there are conditions in some privately-run ICFs-DD and in some CILAs that need to be addressed. There are of course some SODC residents, including some Class Members, who want to move to the community and have not yet done so. But the standard for vacating a decree is substantial compliance, not 100 percent or any percentage close to 100. *See, e.g., Salazar*, 896 F.3d at 500 (A State "cannot be subjected to ongoing class-wide structural relief simply because a problem has not been 100% eradicated.")

Regarding the SODCs, Plaintiffs argued that the Defendants should be barred from moving *even one* Class Member into an SODC as an interim placement. Dkt. No. 829 at 17-18 of 24. At a March 21, 2023 status hearing, Plaintiffs' counsel told Magistrate Judge Cole: "[T]he

---

[25] "Early in 2012 Illinois launched a program to reduce the number of residents of SODCs by roughly a third. Two of the eight SODCs would be closed — and one of them was to be the [Murray Developmental Center in Centralia]." *Illinois League of Advocates for the Developmentally Disabled, et al. v. Illinois Dept. of Human Services*, 803 F.3d 972, 875 (7th Cir. 2015). That decision prompted a lawsuit brought on behalf of Murray residents (Case No. 13-1300). Judge Aspen initially entered a temporary restraining order that effectively prevented the State from closing Murray. After more than a year of extensive discovery and motion practice (evidenced by more than 400 docket entries in just 18 months), Judge Aspen conducted a preliminary injunction hearing, after which he denied the request for a preliminary injunction. An appeal followed, the Seventh Circuit affirmed the denial of the preliminary injunction, 803 F.3d at 878, and the case finally was dismissed more than three years after it was filed, by which time a new Governor decided to not close Murray.

consent decree does not contemplate any class member, not one, to go into a state-operated developmental center. So we think as a fundamental requirement the state should agree that no class member going forward will go into an SODC…." Transcript of March 21, 2023 hearing, Dkt. No. 793 at 20. What Plaintiffs are demanding is a compliance standard of 100 percent – that 100 percent of individuals in crisis be provided immediately with placement in CBS or an ICF-DD.  That degree of achievement is not required under the Decree, and is certainly not required under a substantial compliance standard. *See, e.g., Salazar*, 896 F.3d at 500; *R.C. v. Walley*, 270 F. App'x at 992; *R.C. v. Walley*, 475 F. Supp. 2d at 1144 (finding substantial compliance even though three out of ten counties were not in compliance).

Second, to the extent the Court determines that some consideration of the SODCs is appropriate as part of its substantial compliance assessment, the Defendants urge the Court to limit its consideration to (1) the few Class Members who have been placed in SODCs as interim crisis placements and (2) whether the Defendants' limited use of SODCs for interim crisis placements requires a finding of non-compliance. The Defendants have previously addressed the second point (Dkt. No. 828 at 17-22 of 24) and will address it again below after addressing the first point.

First, as has also been previously reported to the Court, of the total number of Class Members who request crisis services, only a small percentage are admitted to SODCs as an interim placement, and an even smaller percentage request CBS after SODC placement. As of October 31, 2023, 569 individuals have been admitted to SODCs since January 1, 2017,[26] but

---

[26] Notably, despite Plaintiffs' contention that it is very difficult for an SODC resident to move out (Dkt. No. 829 at 18 of 24), 372 SODC residents have moved out since July 1, 2017, and the total SODC population is the lowest ever. The Defendants provide monthly updates to the Monitor and the Plaintiffs with detailed SODC resident information.

only 45 of those are Class Members who were admitted as an interim placement in response to a request for crisis services, with nine having been discharged through October 31, 2023. Of the 197 Class Members in SODCs as of October 31, 2023, only 48 have requested CBS, which represents one percent of the 4,014 individuals who have received crisis services since 2011.[27] Although there certainly are a number of Class Members in SODCs who would prefer CILA placements but are unable to move due to the unavailability of appropriate and preferred CILA placements,[28] the State's track record of appropriately serving more than 98% of Class Members in crisis since 2011 demonstrates the Defendants' substantial compliance.

Second, the small number of Class Members in crisis who have not received CBS in a timely fashion does not require a finding of non-compliance. Class Members in SODCs (both those who wish to remain in an SODC and those who have requested CBS) (a total of 197) represent less than 5% of Class Members who have received crisis services (a total of 4014 as of October 31, 2023).[29] Further, Class Members in SODCs are less than 2% of the 11,233 Class Members who have received waiver services since the Decree was entered. Finally, these Class Members in SODCs are a minute fraction (less than 1%) of the 23,483 adults (both Class Members and non-Class Members) who receive services under the DD waiver. Even if the Court accepted the Plaintiffs' claim that all of the 197 SODC residents who are Class Members, not just 48, want CBS, that amounts to just 5% of the Class Members who have received crisis

---

[27] 4,014 includes individuals in crisis who received either waiver-based CBS or SODC services, in contrast to the 3,966 referenced for waiver-based CDS only. *See supra* at 25.

[28] Depending on the location of an available CILA, and its proximity to a Class Member's family, some families choose an SODC for geographic location, amongst other reasons. *See, e.g.*, Dkt. No. 828-1.

[29] This information is produced to the Monitor and the Plaintiffs on a monthly basis. Because these charts and spreadsheets include significant personal identifying information, the Defendants will confer with Plaintiffs' counsel regarding redaction that still provides meaningful information or defer to the Court's preference regarding filing under seal.

services since the Decree was entered, which is not a sufficient basis for a finding of non-compliance.

### 5. Class Members with higher needs

Plaintiffs have contended that the Defendants are not in compliance as to a "class within a class" – that "the State has not met its obligations" to provide sufficient resources for "many Class Members who have higher needs." Dkt. No. 829 at 8-13 of 24. A finding of non-compliance cannot be based on an alleged failure as to only one part of a defendant's obligations as a whole or failure to fully serve a small percentage of one subgroup within the class. *See, e.g., Salazar*, 896 F.3d at 500; *R.C. v. Walley*, 270 F. App'x at 992; *R.C. v. Walley*, 475 F. Supp. 2d at 1144. If the Court determines that some degree of scrutiny is required regarding Class Members with higher needs, however, the Court still can and should find the Defendants in substantial compliance.

The Defendants have in place policies and systems to serve Class Members with higher needs in the community, and in fact serve a significant number of individuals with higher needs, as the following demonstrates. First, eight percent of CILA residents – about 980 out of 12,187 – have the highest "Q score" of 4, which reflects higher medical needs such as the need for a tracheotomy, ventilator, nebulizer, or insulin injections, or reflects an individual in acute and/or end stages of cardiac, liver, lung, or kidney disease or end-stage terminal illness.[30]

Second, 55% of CILA residents, or about 5,471, have ICAP scores that indicate the need for a range of total personal care and intense supervision up to extensive personal care and/or constant supervision. Third, 47% of CILA residents (4,705) have a HRST score of 3-6 (out of 6), reflecting increased, moderate-high, high, and highest medical needs. Fourth, the Defendants'

---

[30] IDHS: Guidance on the Health Risk Screening Tool, https://www.dhs.state.il.us/page.aspx?item=135740

policies and procedures allow for enhanced payment rates for individuals with higher needs. The Defendants are currently serving about 57 individuals in CILAs with annual costs between $173,934 to $422,167 per person. The higher end of that range is well above the $350,000 per SODC resident that the Plaintiffs claim is an inappropriate amount to spend for one individual in an SODC. Dkt. No. 829 at 21 of 24.

Fifth, the Defendants are continuing to add to and enhance services specifically to better serve individuals with higher needs. DDD recently advised stakeholders of several service enhancements, including: updating nursing services calculations, which will increase payments for nurses providing services to individuals with complex medical needs; increasing payments to providers who open three-bed CILAs; and increasing payments to providers to allow them to hold CILA beds for up to 30 days to accommodate transitions from SODCs to CILAs.[31]

There are of course some Class Members with higher needs who are not receiving, at least promptly, all of the services they request and need in community-based settings, and, some of those Class Members are placed in SODCs on an interim basis while the identification of an appropriate community-based placement continues. But it is not accurate, as Plaintiffs contend (Dkt. No. 829 at 10-12, 17-18), that the Defendants deliberately force Class Members with higher needs into SODCs instead of trying to serve them in the community. Overall, especially through a systemic level lens, this Court has an ample basis on which to find that the Defendants are in substantial compliance regarding the provision of sufficient resources for that subgroup of the class.

---

[31] DDD Communication, Community Capacity Investments, October 27, 2023, https://www.dhs.state.il.us/page.aspx?item=155774

**C. The Defendants have implemented a durable remedy.**

As noted earlier, the Defendants' implementation of a durable remedy further demonstrates their substantial compliance because they have committed going forward to systems, policies, and procedures that will minimize the risk of future systemic violations of federal law of the kind that prompted this case and Decree. The Defendants have a comprehensive, effectively working system that: (1) informs individuals (and their guardians) of the full range of available community-based services and settings; (2) assesses individuals to determine their clinical eligibility and appropriateness for such services and settings; (3) offers individuals the choice between community-based and institutional (*i.e.*, ICF-DD) services; (4) approves community-based services without requiring the existence of an "emergency" situation (and not imposing monthly caps on crisis services); (5) for those individuals who are not served quickly, places those individuals on a waiting list; and (6) moves individuals off the waiting list and into services with reasonable promptness – *i.e.*, at a reasonable pace.

These are not temporary actions but are policies, processes, and procedures that have been fully integrated in the State's DD service delivery system for many years at a cost of more than $1.7 billion each year. Although no system can ensure that every individual eligible for services will always receive all required services or receive them as promptly as would be ideal, the Defendants have demonstrated their "commitment to maintaining existing remedies" that are more than "adequate" "to avoid systemic future [federal law] violations." *Shakman*, 43 F.3d at 730-31.

**D. Equitable considerations support vacating the Decree.**

Finally, although the Defendants have demonstrated their substantial compliance, the equitable considerations further support vacating the Decree. As the *Shakman* court explained:

> While extended federal judicial oversight might serve as an occasional backstop, absent extraordinary circumstances, it should not serve as a primary means of ensuring state officials comply with duties imposed by federal law. Doing so, the Supreme Court has cautioned, risks courts "in the name of the Constitution, becoming enmeshed in the minutiae of [state] operations" and depriving local officials of their own legislative and executive responsibilities.
>
> These principles are far from theoretical or aspirational. To the contrary, they supply a concrete guidepost for resolving this case: a federal court must "ensure that when the objects of the decree have been attained, responsibility for discharging the state's obligations is returned promptly to the state and its officials when the circumstances warrant."
>
> We have reached that point: leaving the Governor subject to the 1972 decree is no longer warranted or tolerable. Governor Pritzker has demonstrated substantial compliance with the decree and identified and instituted durable remedies to help ensure that compliance sticks. He has earned the right to make employment decisions for the state on his own and not under the terms and conditions of the 1972 decree or the watchful eyes of a special master and federal court. We cannot let perfect be the enemy of the constitutionally adequate.

*Shakman*, 43 F.3d at 731 (brackets in original; internal citations omitted).

The same is true here. The Defendants have demonstrated substantial compliance with the terms of the Decree and have implemented durable remedies to (more than) help ensure that compliance sticks. They have earned the right to operate the State's DD service delivery system and to make policy and programmatic decisions on their own. The State's system is not and never will be perfect, but it is much more than legally adequate to minimize the risk of future systemic violations of federal law.

## CONCLUSION

For all of the foregoing reasons, the Defendants respectfully request that this Court vacate the Decree.

Dated: December 1, 2023

Respectfully submitted,

**For Defendants:**

By: /s/ Brent D. Stratton
Brent D. Stratton
Karyn L. Bass Ehler
Office of the Illinois Attorney General
100 W. Randolph St., 12th Floor
Chicago, IL 60601
312-814-3000

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney of record, hereby certifies that, on December 1, 2023, he caused to be filed through the Court's CM/ECF system a copy of **DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO VACATE THE CONSENT DECREE**.  Parties of record may obtain a copy of this filing through the Court's CM/ECF system.

<u>/s/ Brent D. Stratton</u>
Brent D. Stratton